# EXHIBIT 22

LORI AAGARD - 01-29-2024

## Page 1

```
          UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

DEREK TUCSON, ROBIN SNYDER,    )
MONSIEREE DE CASTRO, and       )
ERIK MOYA-DELGADO,             )
                               )
              Plaintiff,       )
                               ) No. 2:23-cv-00017-MJP
       v.                      )
                               )
CITY OF SEATTLE, ALEXANDER     )
PATTON, TRAVIS JORDAN, DYLAN   )
NELSON, RYAN KENNARD, MIA      )
NGUYEN, JAMISON MAEHLER,       )
NICHOLAS GREGORY, RYAN         )
BARRETT, and MICHELE           )
LETIZIA,                       )
                               )
              Defendants.      )
_____

           VIDEOTAPED 30(b)(6) DEPOSITION OF
                CITY OF SEATTLE DESIGNEE
                      LORI AAGARD
_____

                  Monday, January 29, 2024

                   Via Zoom, Washington




          STENOGRAPHICALLY REPORTED BY:
          KIM SCHEUERMAN, WA CCR NO. 2517
              Kim@lakesidereporting.com
```

## Page 2

```
                  A P P E A R A N C E S
FOR THE PLAINTIFFS:
          BRADEN PENCE
          MacDONALD HOAGUE & BAYLESS
          705 Second Avenue, Suite 1500
          Seattle, Washington 98104
          bradenp@mhb.com
ALSO PRESENT:   NATHANIEL FLACK


FOR THE DEFENDANTS:
          KERALA COWART
          JESSICA LEISER
          ASSISTANT CITY ATTORNEYS
          SEATTLE CITY ATTORNEY'S OFFICE
          701 5th Avenue, Suite 2050
          Seattle, Washington 98104
          kerala.cowart@seattle.gov
          jessica.leiser@seattle.gov

ALSO PRESENT:   VLADIMIR KORNEYCHUK
                VIDEOGRAPHER
```

## Page 3

```
                      I N D E X
EXAMINATIONS                                  PAGE NO.
BY MR. PENCE                                     5


                     E X H I B I T S
EXHIBIT NO.  DESCRIPTION                      PAGE NO.
EXHIBIT 52   Plaintiffs' Amended Notice of 30    13
             (b)(6) Video Deposition

EXHIBIT 53   E-mail dated January 23, 2024       17

EXHIBIT 54   Supplemental Disclosures by the City 34
             of Seattle
EXHIBIT 55   Video - Bates PL000581              115
EXHIBIT 56   Video - Bates PL000165              116



               REQUEST FOR INFORMATION
                       80, 17
```

## Page 4

MONDAY, JANUARY 29, 2024; VIA ZOOM, WASHINGTON
                12:40 p.m.
                   ***
        THE VIDEOGRAPHER:  Good afternoon.  We are on the record.  Today is January 29th, 2024.  The time is approximately 12:40 p.m.  This is the Zoom remote video deposition of 30(b)(6) City of Seattle represented by Captain Aagard in the matter of Tucson, et al, versus City of Seattle, et al.
        Would counsel please give their appearances for the record, after which the reporter will swear in the witness.
        MR. PENCE:  Braden Pence here on behalf of plaintiff -- all plaintiffs, and then Mr. Nathaniel Flack and/or Mr. Neil Fox may be appearing but will not be conducting the deposition today.
        MS. COWART:  Kerala Cowart on behalf of all the defendants, and Jessica Leiser is here as well, my co-counsel.

                LORI AAGARD,
  having been sworn/affirmed on oath to tell the truth, the whole truth, and nothing but the truth, testified
                as follows:

### Page 45

1  warrants, is there any other factors that you can think
2  of that might justify arrests under SPD's decision
3  making at the time?
4          MS. COWART: Objection. Beyond the scope.
5  Calls for speculation. You can answer.
6  A. We don't arrest people that are just casually standing
7     on the street unless there's extenuating circumstances
8     or we have warned them to -- to disperse.
9  Q. How does SPD ensure that?
10 A. Ensure what?
11 Q. Ensure that what you just said, that officers don't
12    make inappropriate arrests at protests, how do you
13    track and monitor and follow-up on arrests?
14 A. That's the sergeant's responsibility. He's -- he or
15    she is responsible for their squad and they screen all
16    of those arrests prior to booking.
17 Q. So if someone was arrested and booked into the King
18    County Jail, that would have been a decision that was
19    approved by the sergeant; is that right?
20 A. Correct. Correct.
21 Q. Is there any -- any additional layer of supervision or
22    tracking that SPD does beyond the sergeant to ensure
23    that protests during [sic] arrests are appropriate?
24 A. On a daily -- on a daily during 911 like on patrol or
25    demos or what are you specifying?

### Page 46

1  Q. Anything beyond the level of a sergeant's review that
2     would allow SPD to review arrests and make sure that
3     the arrests at protests are lawful and appropriate?
4  A. We have several layers of accountability. We have our
5     OPA. If anyone has an issue, they can file a
6     complaint. We have three layers of oversight with the
7     first one being OPA. And if there's a complaint made,
8     OPA investigates.
9  Q. And what we have been talking about with respect to the
10    decision -- SPD's decision making for arrests and
11    booking decisions, was that all accurate as of January
12    1st, 2021?
13 A. Yes, it's the same, same today.
14 Q. Moving on to the decision to who to transport to King
15    County Jail for booking, who -- was there any limit on
16    who could be booked into the King County Jail during
17    large crowd events?
18 A. Some nights there was more limits depending on
19    different factors, but overall, no, there was no
20    specified limits or written protocols as far as
21    limiting.
22 Q. What were the factors?
23 A. The factors were on a case-by-case basis, totality of
24    circumstances, if it was a felony or a violent
25    misdemeanor. And if it didn't meet those, then it

### Page 47

1  would be screened with the jail.
2          MS. COWART: Braden, we have been going a
3  little over an hour.
4          THE WITNESS: I was going to ask to go to the
5  restroom.
6          MR. PENCE: We can do five minutes. How about
7  1:55?
8          MS. COWART: Okay. It might be like
9  seven-and-a-half minutes, but we'll take a break and
10 come back as quickly as we can.
11         MR. PENCE: My hope is that we get through
12 this today. So that will help if we do more today
13 rather than having to come back.
14         MS. COWART: That would be good.
15         MR. PENCE: See you soon.
16         THE VIDEOGRAPHER: Going off the record at
17 1:49 p.m.
18         (Recess taken.)
19         THE VIDEOGRAPHER: Back on the record at 1:58
20 p.m.
21 Q. (By Mr. Pence) So, Captain Aagard, what is -- if I
22    understand you correctly, your definition of large
23    crowd event is that there are a large number of people
24    and some sort of event that you have pre notice for so
25    that you can issue an IAP and initiate SPOC; is that

### Page 48

1     right?
2  A. That's best case scenario. Sometimes we get large
3     crowd events that we haven't planned for as well as.
4  Q. Okay. And your testimony is that the plaintiffs'
5     arrests was not a large crowd event?
6  A. Correct.
7  Q. So what is it you're able to testify to regarding the
8     plaintiffs' arrests?
9  A. You would have to ask me a question and I can give
10    protocols, policies that we use for arresting people in
11    the field.
12 Q. So you are prepared to answer questions regarding
13    plaintiffs' arrests; is that correct?
14         MS. COWART: Objection. Beyond the scope.
15 Mischaracterizes testimony.
16 A. I can -- yes.
17 Q. (By Mr. Pence) What -- what is it that makes
18    plaintiffs' arrests not a large crowd event?
19 A. There was not very many of them; the shear size of the
20    individuals that were there.
21 Q. What would be the cutoff generally speaking for that
22    criteria to be met?
23 A. You know, there's no hard and fast rule, but 20 to 50,
24    right in there, would be what I would consider a large
25    crowd event.

81

1  Were officers given a copy of the Diaz memo, the
2  booking restrictions memo, Exhibit 2?
3         MS. COWART: Objection. Scope. You can
4  answer.
5  A. I'm unsure if they were given a copy of that particular
6  memo.
7  Q. (By Mr. Pence) Were officers and sergeants given any
8  sort of instruction regarding the purpose of the
9  restrictions?
10        MS. COWART: Objection. Scope. You can
11 answer.
12 A. The booking restrictions were communicated and I was
13 aware of it. I'm assuming other people knew why as
14 well.
15 Q. (By Mr. Pence) So but specifically the purpose being a
16 health measure to prevent the spread of Covid-19, was
17 that communicated to officers and sergeants to your
18 knowledge?
19 A. Yes.
20 Q. And were officers given any instruction regarding how
21 to make booking referral decisions given the
22 restrictions?
23        MS. COWART: Objection. Scope. You can
24 answer.
25 A. They were given the list that non -- that still

82

1  qualified for booking that were non-violent
2  misdemeanors and told that outside of those, it would
3  be a case-by-case basis, which you would have to screen
4  with the jail.
5  Q. (By Mr. Pence) And what were they told about the
6  case-by-case basis criteria that they would need to --
7  what were they told they needed to tell the jail in
8  order to get a booking that didn't qualify under the
9  restrictions?
10 A. It would have been a case-by-case basis and there would
11 have to be extenuating circumstances, an ongoing threat
12 to the public, the community, repeat offenders,
13 totality of the circumstances surrounding the arrest.
14 Q. Were officers instructed to change their practices with
15 respect to arrests or booking in any way in response to
16 the restrictions?
17        MS. COWART: Objection. Scope. You can
18 answer.
19 A. If they screened an arrest with the jail and the jail
20 declined to take them, then they would investigate and
21 release the subject, if the jail would refuse to take
22 them.
23 Q. (By Mr. Pence) Okay. I guess I'm saying before the
24 decision was made to present them to the jail for
25 booking before the refusal would happen, if any, were

83

1  officers under instructions from SPD to make -- to
2  change their decision making at all about arrests or
3  bookings given the restrictions?
4         MS. COWART: Objection. Confusing. Compound.
5  So you can answer.
6  A. I can give you an example. If an officer had an arrest
7  for a shoplifter, misdemeanor shoplifter, during this
8  time with the restrictions and there was no extenuating
9  circumstances with that shoplifter, no warrants, no
10 ongoing threat to the community, then they would
11 investigate and release that subject. They wouldn't
12 screen those with the jail.
13 Q. (By Mr. Pence) Was there an instruction to SPD
14 officers to simply do less policing during 2020 leading
15 up to January 1st, 2021?
16        MS. COWART: Objection. Scope. Vague. You
17 can answer.
18 A. No.
19 Q. (By Mr. Pence) So were officers arresting people at
20 the same rate during that period of time than they were
21 prior like in the year before, for example?
22        MS. COWART: Objection. Scope. You can
23 answer.
24 A. I would have to look at data to know that for sure.
25 Q. (By Mr. Pence) I'm trying to understand how it is that

84

1  the jail population dropped substantially during this
2  period of time and how SPD participated in that drop.
3  So I guess my question is: To your knowledge with
4  respect to SPD decision making for booking and arrests,
5  how did SPD accomplish the reduction in the number of
6  people it's referring to the jail, or did it? Was SPD
7  referring the exact same number of people approximately
8  as it was in years before?
9         MS. COWART: Objection. Scope. Compound.
10 Confusing. You can answer.
11 A. I think one of the factors that reduced the King County
12 Jail population was the DOC warrants. They were
13 deferred to SCORE jail. We could no longer book DOC
14 warrants into the King County Jail. We had to take
15 them to the SCORE jail. That would have been a
16 substantial amount of arrestees.
17 Q. (By Mr. Pence) Anything else like that that would
18 structurally change the number of people SPD was
19 bringing into the jail?
20        MS. COWART: Objection. Scope. You can
21 answer.
22 A. Like the example I used before, a shoplift, they were
23 I&R'd, if there was no other extenuating circumstances
24 or ongoing threat to the community.
25 Q. (By Mr. Pence) So if I were to present to you the

89

1       MR. PENCE:  I'm going to be done by 4:00
2   today.
3       MS. COWART:  Okay.  Can we take a five-minute
4   break just so I can plug in my laptop?  But if you want
5   to ask a few more questions, that's totally fine.  But
6   if my laptop dies, then I'll be gone.  Then we'll have
7   to break.
8       MR. PENCE:  Definitely we can take a break in
9   a couple minutes.
10      MS. COWART:  Okay.
11  Q.  (By Mr. Pence)  So if I understood your testimony
12      regarding Exhibit 2 about the avenue, the way that
13      would work would be the booking sergeant would call
14      somebody over -- the sergeant -- the officer would
15      refer the matter to the sergeant and the sergeant would
16      call over to the jail or the person in your capacity
17      would call over to the jail and make representations
18      regarding public safety to the jail, who would then
19      either accept those or not and allow for an exception
20      to the booking restrictions; is that right?
21  A.  If there was an immediate risk to public safety, yes.
22  Q.  If SPD represented that to the jail?
23  A.  If we articulated the facts of the case.
24  Q.  Are there any magic words SPD would have to say to
25      articulate a public safety concern?

90

1   A.  No.
2   Q.  Are you aware of any times in which Seattle Police
3       Department said, This person represents a public safety
4       concern, we need them booked, and the jail said no?
5   A.  We would always articulate the facts in the case
6       surrounding the arrest.  We wouldn't just say "public
7       safety concern."  We would have to articulate the facts
8       in each case.
9   Q.  Right.  Are you aware of any times in which SPD made
10      those claims and the King County Jail said no, that's
11      not sufficient to constitute a public safety exception
12      to the restrictions?
13  A.  There were some times when they articulated they were
14      so short with staffing, it wasn't that -- it wasn't
15      just the facts.  They were taking into account also
16      their staffing.
17  Q.  So when did that occur?
18  A.  I don't -- I can't -- I do not know the exact moment I
19      had that conversation.
20  Q.  Approximately when did that occur?
21  A.  Somewhere of 2020.
22  Q.  Okay.  Approximately how many occasions did that occur?
23  A.  And you're asking just for the large crowd events,
24      correct?
25  Q.  Let's start with that, yes.

91

1   A.  I -- I wouldn't be able to give you a number on the
2       exact amount.  It was three years ago.
3   Q.  Okay.  So how about an approximate number?
4   A.  I really don't know.
5   Q.  So anywhere between -- so can you couch it for me,
6       somewhere between 100 times and zero times?  Is there
7       any range you can give that you would be comfortable
8       with?
9   A.  It would -- it would have been around 5-ish.  It's a
10      very broad number.  I just know it -- sometimes their
11      staffing was so low that it did affect the bookings.
12  Q.  All right.
13      MR. PENCE:  Let's -- Kerala, did you get the
14  plug in?  Is that what you were doing there for a
15  second?
16      MS. COWART:  I got the plug in. I still would
17  like a restroom break, but it's not as urgent as having
18  to plug in, so --
19      MR. PENCE:  Let's go ahead and take a break.
20  Five minutes.  3:17, please.  Thank you.
21      THE VIDEOGRAPHER:  Okay.  Off the record at
22  3:12 p.m.
23      (Recess taken.)
24      THE VIDEOGRAPHER:  Back on the record at 3:20
25  p.m.

92

1       MR. PENCE:  A little longer than five minutes.
2   Hopefully we'll get through with this before 4:00.
3   Q.  (By Mr. Pence)  So the term "protestor exception" has
4       been kicking around this case.  Sometimes it's referred
5       to in deposition testimony.  It's been referred to in
6       the pleadings.  What does that term mean to the City
7       with respect to the Topic 1?
8   A.  There's no protestor exception for bookings into the
9       King County jail.
10  Q.  We have discovery responses and deposition testimony
11      indicating that on occasion during 2020 Seattle Police
12      Department would reach out to the jail in advance of
13      large protest events to accommodate booking protestors
14      for offenses that did not qualify under the
15      restrictions.  Is that a protester exception?
16  A.  No.
17  Q.  What is that?
18      MS. COWART:  Objection.  Vague.  Vague.
19  Scope.  You can answer.
20  A.  So when we make arrests at large crowd demonstrations,
21      we are -- our objective is to facilitate people's right
22      to express their First Amendment right, freedom of
23      speech.  We don't -- we try to deter from making any
24      arrests.  The only arrests we make are targeted
25      arrests.

93

```
 1       So when we make a targeted arrest, it's for
 2   something that is either significant property damage or
 3   is endangering the public or the people -- the
 4   protesters themselves or bystanders.  So when we make
 5   an arrest, it's targeted.  So almost all of those fit
 6   the booking protocols.
 7  Q. My question was about the practice of SPD reaching out
 8     to the jail in advance of large protest events.  Is
 9     that true that that occurred?
10  A. Is that what?
11  Q. Did that occur?
12  A. Yes.
13  Q. So you're not doing that in response to any specific
14     event or specific property damage or endangering the
15     public or anyone because you're doing it before it's
16     happened.  So my question is whether or not -- what do
17     you call the practice of reaching out to the jail in
18     advance of a protest in order to get authority to book?
19  A. I did -- I was the one that reached out to the jail a
20     lot of the time.  And the reason I did that was more of
21     a courtesy to the jail to let them know we have this
22     big event and we're letting you know that we may have
23     several people that we're going to bring in to book.
24     So it was more of a courtesy to let them know and to be
25     prepared.
```

94

```
 1  Q. And what did the King County Jail say to you in
 2     response when you reached out in advance of these
 3     protests?
 4  A. When I was talking to them it was mainly letting them
 5     know, so they would say thank you for letting us know.
 6     And I have had conversations when I've called over
 7     there to the King County Jail.  And one night I was
 8     talking to one of the booking commanders there and he
 9     told me specifically that if any of the arrests do not
10     fit the non-violent or the violent misdemeanor, so it's
11     a non-violent misdemeanor, if you have any of those and
12     they're an ongoing threat to the community, we will
13     still take those.  So he told me that that would fit
14     the case-by-case screening basis.
15  Q. So prior to any particular arrest or any factors
16     arising, you would get preauthorization from the King
17     County Jail about -- for booking of protesters who met
18     that exception?
19  A. Preauthorization to know that they had staffing and
20     letting them know that there's going to be bookings and
21     that we may be screening on a case-by-case basis for
22     potential non-violent misdemeanors that were an ongoing
23     threat to the community.
24  Q. Where would officers have gotten the impression that
25     there was a protester exception to the booking
```

95

```
 1     restrictions?
 2          MS. COWART:  Objection.  Scope.  You can
 3     answer.
 4  A. I think those in patrol that weren't working a lot of
 5     the large crowd demonstrations that were not hearing
 6     the roll call and reading the IAPs may have in their
 7     world and their daily workup, like at each precinct
 8     when they're working second or third watch, they may
 9     casually think that.  But it was never what -- that was
10     never discussed or determined by anyone outside that
11     there was a protester exception.
12  Q. How would SPD have intervened in order to correct that
13     misunderstanding that officers and patrol may have
14     developed, like --
15  A. We didn't --
16  Q. -- was there a training or instruction or oversight
17     that would have corrected officers misunderstanding
18     about the existence of a protest or booking exception?
19          MS. COWART:  Objection.  Scope.  You can
20     answer.
21  A. There was the memo that was given out that said it was
22     a case-by-case basis.  So maybe they would have gotten
23     it confused by that, but there was not -- the thought
24     wasn't there that people were confused or that people
25     on patrol were -- thought that there was a protestor
```

96

```
 1     exception.  I had never heard that until I read
 2     Sergeant Kennard's testimony.
 3  Q. (By Mr. Pence)  I'm going to share with you previously
 4     marked Exhibit 21.  This is an October 8th e-mail
 5     string between Caedmon Cahill and public defenders and
 6     some folks from the King County -- yeah, I guess these
 7     are King County public defenders and other folks in the
 8     Seattle city government.
 9         This includes a response from Mr. David Montes to
10     Ms. Cahill responding in line to some questions that
11     Ms. Cahill posed, including a concern I guess by Ms.
12     Cahill, who you had previously identified as an Office
13     of Civil Rights employee, that SPD filings/practices
14     that appear to try and evade the booking restrictions.
15         Mr. Montes responds with information -- his
16     perspective on it, including the sentence "In protest
17     cases especially, they have gotten the jail to book
18     people on misdemeanors."
19         And this goes on.  So this is October 8th, 2020.
20     To your knowledge, as the City's 30 (b)(6) witness
21     regarding SPD decision making, did this ever come to
22     your attention?  Did you ever become aware of a concern
23     by the public defenders and other folks who actually
24     within the City -- the City's Office of Civil Rights
25     were concerned that SPD was circumventing the booking
```

97

1  restrictions in order to book people?
2         MS. COWART: Objection. Confusing as to you.
3  A. No, I wasn't aware of that.
4  Q. (By Mr. Pence) And you specifically as the City's 30
5     (b)(6) witness, are you aware of -- the City -- the
6     Seattle Police Department ever becoming aware of that
7     concern?
8  A. Only recently when I was reading over the material that
9     I received from my attorney.
10 Q. So the material you've reviewed in preparing for this
11    has let you know that SPD did have reason to know that
12    there was a concern about this prior to January 1st,
13    2021?
14        MS. COWART: Objection. Assumes facts not in
15    evidence.
16        MR. PENCE: It's a question.
17 A. The memo I read was from the jail, not from SPD.
18 Q. (By Mr. Pence) The memo you read about concerns that
19    SPD was circumventing the booking restrictions was from
20    the county jail?
21 A. The one that I just read, it appeared it was from the
22    -- someone from the county jail, not SPD.
23 Q. The one I just showed you?
24 A. Yeah.
25 Q. No, it's not from the county jail. Okay. I'm not

98

1  referring to Exhibit 21. Are you -- this -- as the
2  City's 30 (b)(6) designee, are you aware of any basis
3  that the City -- that SPD was aware of about a concern
4  that officers were circumventing the booking
5  restrictions to book protesters prior to January 1st,
6  2021?
7  A. Not specifically within SPD. I read some news articles
8     that stated that, yes.
9  Q. When were the news articles published?
10 A. I would have to refer to it.
11 Q. What did SPD do, if anything, to change or investigate
12    this concern?
13 A. We didn't change anything because we were already
14    screening them on a case-by-case basis and we did not
15    have a protester exception.
16 Q. Okay. When did SPD first become aware that the King
17    County Jail had took the position that SPD was
18    circumventing the booking restrictions?
19        MS. COWART: Objection. Mischaracterizes
20    testimony. Assumes facts not in evidence. Scope. You
21    can answer.
22 A. ==That doesn't make sense to me because we can't==
23    ==circumvent it. We screened it and it was up to the==
24    ==jail to accept it or not accept it.==
25 Q. (By Mr. Pence) Did SPD ever become aware of John Diaz,

99

1  the director of DAJD, having a complaint regarding the
2  people who SPD was bringing to the jail to book?
3  A. I wasn't aware of that.
4  Q. And you -- that's your testimony as a 30 (b)(6)
5     designee, correct?
6  A. Yes.
7  Q. Is SPD aware of anything that DAJD Director John Diaz
8     did to alert, advise, or influence SPD's decision
9     making regarding booking during 2020?
10        MS. COWART: Objection. Scope and confusing
11    with respect to timing.
12 Q. (By Mr. Pence) You can answer.
13 A. Can you repeat that one more time, please?
14 Q. Yeah. What, if anything, is SPD aware of John Diaz
15    doing to complain about alert, advise, or influence
16    SPD's decision making about booking protesters during
17    large crowd events in 2020?
18 A. I wasn't aware of any complaints from John Diaz about
19    the bookings that they accepted.
20 Q. And that's your testimony as the CR 30 (b)(6) witness,
21    correct?
22 A. Correct.
23 Q. What is SPD's understanding about the Office of Civil
24    Rights concern about protester booking in 2020?
25        MS. COWART: Objection. Confusing with

100

1  respect to time and outside scope. You can answer.
2  A. I wasn't aware of any at the time until I read the --
3     the articles.
4  Q. (By Mr. Pence) How would SPD make itself aware of a
5     concern about this particular topic, the decision
6     making regarding booking folks in 2020?
7         MS. COWART: Objection. Confusing. You can
8     answer.
9  A. Yeah, that's confusing.
10 Q. (By Mr. Pence) You're acknowledging that there was a
11    concern, but you weren't aware of it. You're
12    testifying about decision making, and I'm wondering
13    what is the way that SPD should have become aware of
14    that concern with respect to that topic?
15        MS. COWART: Objection. Confusing. Scope.
16    You can answer.
17 A. From the public or from the news media or from the
18    jail?
19 Q. (By Mr. Pence) Any or all. If someone has a concern
20    that SPD is circumventing the restrictions in order to
21    book protesters, how would SPD become aware of that?
22    If that's being discussed among Office of Civil Rights,
23    there's complaints from the director of the jail,
24    there's newspaper articles coming out about it.
25        How should you as the City have become aware of

```
                                                            121
 1                    C E R T I F I C A T E
 2   STATE OF WASHINGTON )
                         )
 3   COUNTY OF SNOHOMISH )
 4
 5        I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to administer
 6   oaths and affirmations in and for the State of Washington
     do hereby certify:
 7
          That the foregoing 30 (b)(6) DEPOSITION OF CITY OF
 8   SEATTLE DESIGNEE LORI AAGARD was taken before me and
     completed on January 29, 2024, and thereafter was
 9   transcribed under my direction; that the deposition is a
     full, true and complete transcript of the testimony of said
10   witness, including all questions, answers, objections,
     motions and exceptions;
11
          That the witness, before examination, was by me
12   duly sworn to testify the truth, the whole truth, and
     nothing but the truth, and that the witness reserved the
13   right of signature;
14        That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
15   of any such attorney or counsel and that I am not
     financially interested in the said action or the outcome
16   thereof;
17        That I am herewith securely sealing the said
     deposition and promptly delivering the same to Attorney
18   BRADEN PENCE.
19        IN WITNESS WHEREOF, I have hereunto set my hand
     this 5th day of February 2024.
20
21                    [signature]
22
23              Kim Scheuerman, CCR
                WA CCR. No. 2517
24              Washington State Certified Court Reporter
                Residing at Edmonds, Washington.
25
```

```
                                                            122
 1                  E R R A T A   S H E E T
 2   CASE: TUCSON vs CITY OF SEATTLE
     CASE NO.: 2:23-cv-00017-MJP
 3   NAME OF WITNESS: LORI AAGARD
     DATE TAKEN: 01/29/2024
 4
 5   Please make all changes or corrections on this sheet.
     If there are none, please write "NONE" across this sheet.
 6   Please sign and date this sheet and the declaration.
     Please do not mark the transcript. Thank you.
 7
 8   PAGE #    LINE #   CHANGE/CORRECTION & REASON
 9   _____    _____    _____
10   _____    _____    _____
11   _____    _____    _____
12   _____    _____    _____
13   _____    _____    _____
14   _____    _____    _____
15   _____    _____    _____
16   _____    _____    _____
17   _____    _____    _____
18   _____    _____    _____
19   _____    _____    _____
20   _____    _____    _____
21   _____    _____    _____
22        EXECUTED this _____ day of _____,
23   20____, at _____ (City), _____ (State).
24              _____
25                       LORI AAGARD
```

```
                                                            123
 1   CASE: TUCSON vs CITY OF SEATTLE
     CASE NO.: 2:23-cv-00017-MJP
 2   NAME OF WITNESS: LORI AAGARD
     DATE TAKEN: 01/29/2024
 3
 4        I, LORI AAGARD, do hereby declare under
 5   penalty of perjury that I have read the foregoing
 6   transcript of my deposition; that I have made such
 7   changes/corrections as noted herein, in ink, initialled
 8   by me or attached hereto; that my testimony contained
 9   herein, as corrected, is true and correct.
10        EXECUTED this _____ day of _____,
11   20____, at _____ (City), _____ (State).
12              _____
13                       LORI AAGARD
```