1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEREK TUCSON, ROBIN SNYDER,
MONSIEREE DE CASTRO, and ERIK
MOYA-DELGADO,

                    Plaintiffs,

        v.

CITY OF SEATTLE, ALEXANDER
PATTON, TRAVIS JORDAN, DYLAN
NELSON, RYAN KENNARD, MIA
NGUYEN, JAMISON MAEHLER,
NICHOLAS GREGORY, RYAN
BARRETT, and MICHELE LETIZIA,

                    Defendants.

CASE NO. C23-17 MJP

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment
(Dkt. No. 78), and Defendants' Motion for Summary Judgment (Dkt. No. 85). Having reviewed
the Motions, the Oppositions (Dkt. Nos. 95, 102), the Replies (Dkt. Nos. 106, 110), and all
supporting materials, the Court DENIES Plaintiffs' Motion and GRANTS in part and DENIES in
part Defendants' Motion.

**INTRODUCTION**

The First Amendment reflects a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," and our courts "have consistently commented on the central importance of protecting speech on public issues." <u>Boos v. Barry</u>, 485 U.S. 312, 318 (1988) (internal quotations and citations omitted). "It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." <u>Bridges v. California</u>, 314 U.S. 252, 270 (1941).

Plaintiffs here claim that they were wrongly arrested and booked in jail for exercising their right to speak their mind critically of the police through messages written in charcoal and chalk on a temporary concrete barrier erected on the sidewalk outside of the Seattle Police Department's East Precinct. Defendants maintain that they merely enforced Seattle's property destruction ordinance in a reasonable and content-neutral manner, and that they in no way retaliated against Plaintiffs on account of their political views. But Plaintiffs point out that the City rarely, if ever, enforces the property destruction ordinance against chalking or charcoaling in public spaces. Given the Parties' disputed views of the evidence, it is beyond this Court's role to determine just who is correct. As explained in detail below, a jury must resolve the hotly-contested factual questions of whether Plaintiffs were arrested and booked in jail for expressing their views and whether Defendants' actions violated their First Amendment rights. While this case does not implicate the City's ability enforce its property destruction ordinance more generally, it touches on questions impacting the public civil discourse and free speech in Seattle.

**BACKGROUND**

Plaintiffs allege that they were arrested and booked in violation of their First Amendment rights and as retaliation for expressing their political views. To unpack the claims and the Cross-

1   Motions for Summary Judgment, the Court reviews in detail the arrests, the nature of the wall on

2   which Plaintiffs wrote, and the booking decision.

3   **A.      Writing and Arrests**

4           On the evening of January 1, 2021, Plaintiffs Derek Tucson, Monsieree De Castro, Robin

5   Snyder, and Erik Moya-Delgado gathered at an apartment on Capitol Hill. (Deposition of

6   Monsieree De Castro at 87; Deposition of Robin Snyder at 72-73.) Tucson and Snyder decided to

7   go for a walk and happened to pass by the East Precinct. (Snyder Dep. at 72-74.) Outside the

8   Precinct Tucson found a charcoal briquette along the sidewalk, and in what he calls a "very

9   spontaneous" act, he wrote the words "PEACEFUL PROTEST" in charcoal on a temporary

10  chain-link-topped concrete "eco-block" wall that had been erected on portions of the outer

11  perimeter of the sidewalk running on Pine Street and 12th Avenue outside the East Precinct. (See

12  Sec. Am. Compl. (SAC) ¶ 4.2 (Dkt. No. 64) (Deposition of Derek Tucson at 95-96; Snyder Dep.

13  at 81-82).) To write this message, Tucson stood on the sidewalk area on Pine Street that contains

14  a driveway to a car entry called a "sally port" into the Precinct. (Tucson Dep. at 94-95.)

15          Officer Michele Letizia was in the control room at the Precinct and observed Tucson

16  write on the eco-block wall through security cameras. (Deposition of Michele Letizia at 14-15,

17  30, 46.) Letizia zoomed in on what Tucson was writing, and then broadcast to officers at the

18  Precinct to arrest Tucson for engaging in property destruction in violation of Seattle's property

19  destruction ordinance, SMC 12A.08.020 (the "Ordinance"). (Letizia Dep. at 30-1, 46; Police

20  Report by Letizia (Dkt. No. 86-16 at 43); Deposition of Alexander Patton at 69; Deposition of

21  Ryan Barrett at 30.) At the time of the arrest, the Ordinance stated:

22

23          A.      A person is guilty of property destruction if he or she:

24                  1. Intentionally damages the property of another; or

2. Writes, paints, or draws any inscription, figure, or mark of any type on any public or private building or other structure or any real or personal property owned by any other person.

B.  1. It is an affirmative defense to property destruction under subsection 12A.08.020.A.1 that the actor reasonably believed that he had a lawful right to damage such property.

2. It is an affirmative defense to property destruction under subsection 12A.08.020.A.2 that the actor had obtained express permission of the owner or operator of the building, structure, or property.

C.  Property destruction is a gross misdemeanor.

SMC 12A.08.020 (2021). "Property destruction" under SMC 12A.08.020 is punishable by imprisonment of up to 364 days and a fine of up to five thousand dollars. SMC 12A.08.020(C); 12A.02.070(A).

In response to Letizia's broadcast, Officers Alexander Patton, Ryan Barrett, Nicholas Gregory, and Travis Jordon exited the Precinct to investigate. (Ex. 4 to the Declaration of Kerala Cowart (Dkt. Nos. 86 & 94).) Patton arrested Tucson with the assistance of Barrett, Gregory, and Jordon. (Declaration of Alexander Patton ¶¶ 3-4 (Dkt. No. 92); Deposition of Travis Jordon 68.) At his deposition, Patton claimed he did not recall whether he read the specific message Tucson wrote, but he did consider the writing to be property damage because it would take labor to remove it. (Patton Dep. at 55-57.) When arrested, Tucson offered to clean off the charcoal, but the Officers did not permit him to do so. (Patton Dep. at 59.) Several Officers then escorted Tucson into the Precinct. (Cowart Decl. Ex. 4.)

After observing Tucson's arrest, which she believed was retaliatory, Snyder took up the charcoal briquette and finished Tucson's message before writing "BLM" for Black Lives Matter and "FTP" for Fuck The Police. (Snyder Dep. at 84-5.) There were about eight other people present on the sidewalk at the time. (Cowart Decl. Ex. 11 (Dkt. Nos. 86 & 94).) Officer Dylan

1    Nelson, who was using his personal phone to watch a livestream of the events on Instagram from

2    an account called Future Crystals, saw Snyder writing on the eco-block wall. (Deposition of

3    Dylan Nelson Dep. at 74.) Letizia also broadcast to officers that Snyder was chalking. Nelson

4    then arrested Snyder and escorted her into the building. (Cowart Decl. Ex. 4.)

5           Plaintiff Monsieree De Castro received a phone call about Tucson's arrest and, finding it

6    "absurd," headed to the Precinct where she then wrote messages in chalk on the eco-block wall

7    critical of the police and the killings of several individuals at the hands of SPD officers. (De

8    Castro Dep. at 88-91.) Through the Instagram feed, Nelson saw De Castro writing on the eco-

9    block wall. (Nelson Dep. at 80-82.) Letizia also saw De Castro and called it out to the other

10   officers. (Letizia Dep. at 30-31.) Nelson, Barrett, and Gregory responded, and Nelson made the

11   arrest. (Deposition of Mia Nguyen Dep. at 35; Nelson Dep. 80-82.) Lieutenant Jamison Maehler

12   was also present and assisted in her handcuffing. (Deposition of Jamison Maehler at 58.)

13   Maehler is part of the "Community Response Group" that responds to protests, and he was

14   known to at least Snyder and Tucson. (Maehler Dep. at 16, 46; Tucson Dep. at 116; Snyder Dep.

15   at 68.)

16          Plaintiff Erik Moya-Delgado also wrote on the eco-block wall and the Precinct itself.

17   Letizia called out the writing, and Officers Gregory, Mia Nguyen, and Barrett arrested Moya-

18   Delgado. (Letizia Dep. at 30-31; Cowart Decl. Ex. 10.) Moya-Delgado testified that he was

19   familiar with Gregory and Patton from prior interactions. (Deposition of Erik Moya-Delgado at

20   70.) The Court notes that although Moya-Delgado wrote on the Precinct in addition to the eco-

21   block wall, Plaintiffs "do not contend for the purpose of this motion that the Ordinance would be

22   unconstitutional as applied to writing on the building." (Pls. MPSJ at 4 n.1.)

23

24

1

**B.      Nature of the Forum**

2          The eco-block on which Plaintiffs wrote was erected "to protect the precinct and the

3   officers after a series of attacks on the building," which included an arson attempt and a mortar

4   shell that blew a hole in the Precinct's wall. (Declaration of Jung Trinh ¶ 4 (Dkt. No. 93).) The

5   eco-block wall blocked access to portions of the sidewalk that border the East Precinct, but it still

6   allowed access to the sidewalk in front of portions of the Precinct. (See Cowart Decl. Ex. 10

7   (Dkt. Nos. 86 & 94).) One such sidewalk access point was on Pine Street, where the sally port

8   was located. This is the sidewalk area where Tucson and the others stood to write nearly all of

9   their messages. (See Ex. 4 Cowart Decl. (Dkt. No. 86) as presented at Def. MSJ at 2 (Dkt. No. 85

10  at 7).) The sally port is not the only entry into the building. (See Patton Dep. at 12-13.)

11         Once the eco-block wall was erected, it was almost immediately subject to daily writing

12  and posting. (Letizia Dep. at 49; Deposition of Richard Matthews at 28.) The erection of the wall

13  coincided with a time of significant protest in the City after the murder of George Floyd. (See

14  Jordon Dep. at 17-18; Nguyen Dep. at 12, 35, 46, 55.) The writing on the eco-block wall

15  frequently included anti-police messages. (See Matthews Dep. at 29; Jordon Dep. at 17-18;

16  Nguyen Dep. at 12, 35.) The Precinct's station master, Richard Matthews, spent considerable

17  time most days washing and repainting the eco-block wall. (Matthews Dep. at 33.) Although

18  Matthews asked for assistance from the Seattle Public Utilities' anti-graffiti team, they refused

19  assistance because they viewed the wall as separate from the Precinct and outside its jurisdiction.

20  (Matthews Dep. at 33, 36.) And no one from SPD or the City placed signs informing the public

21  that writing was permitted or forbidden on the eco-block wall. (Letizia Dep. at 51; Matthews

22  Dep. at 27.)

23

24

**C.     Booking**

After they arrested and placed Plaintiffs in holding cells at the Precinct, the Officers determined to transport all four Plaintiffs to the King County Jail for booking. This was a discretionary call because the Officers had two alternatives: (1) they could have obtained contact information from Plaintiffs, released them, and then referred the case to the prosecutor; or (2) they could have written a citation and filed a case in Seattle Municipal Court, either booking Plaintiffs in jail or releasing them under certain criteria. (See Deposition of Nicholas Gregory at 31, 10; Deposition of Ryan Kennard at 13-16; Patton Dep. at 61.) Defendants instead opted to book Plaintiffs in jail, which required them to be strip-searched, placed in jail garb, and detained in jail cells for hours. (De Castro Dep. at 104-05; Moya-Delgado Dep. at 72, 135-36; Snyder Dep. at 92.)

The decision to book Plaintiffs also required the Officers to invoke an exception to King County Jail's then-existing policy to refuse most misdemeanants for booking. During the COVID-19 pandemic, King County issued rules restricting booking for most misdemeanants, except for those arrested for misdemeanor assaults, violations of no-contact and protection orders, DUIs, sex crimes or other charges that present serious public safety concerns. (Booking Policy Memorandum (Dkt. No. 96-7).) The policy did not allow for the admission of those who violated of the Ordinance, though the King County Jail "Shift Captains" had the authority to accept individuals on a case-by-case basis. (Id.; Answer to SAC ¶ 4.20.) Notwithstanding these King County restrictions, Plaintiffs have adduced evidence that SPD was allowed to send "protest-related arrestees" to King County Jail. (See Kennard Dep. at 33; Patton Dep. at 85; Jordon Dep. at 75.) The exception for protest-related arrestees allowed SPD to send low-level misdemeanants involved in "protests" to King County Jail even though they would not otherwise

meet King County's restrictive booking criteria. Consistent with this practice or policy, Officers Barrett, Jordon, Nelson, Patton, and Sergeant Kennard testified that they knew they were allowed to send misdemeanants arrested during a protest to King County Jail on the theory that it would prevent escalation. (Barrett Dep. at 55-56; Jordon Dep. at 75; Nelson Dep. at 85-86; Kennard Dep. at 35-37; Patton Dep. at 85-86.)

Precisely who decided to book Plaintiffs remains unclear on the record presented. No single officer has admitted to being the individual who made the decision. But Jordon testified that there were "multiple discussions of, you know, the choices to make" around booking the Plaintiffs, and the conversation included Jordon, Kennard, Nelson, Gregory, and Barrett. (Jordon Dep. at 73-74.) While the Court has not been presented with testimony as to what specifically was discussed, Patton and Jordon testified that they believed booking was appropriate to ensure Plaintiffs would not return to chalk/charcoal more in the sally-port area, which could interfere with "operations," or allow the situation to escalate. (Patton Dep. at 80-83; Jordon Dep. at 70.) It is worth noting that there were approximately eight to nine individuals outside the Precinct at the time of the arrests. (See Cowart Decl. Ex. 5.)

The on-duty sergeant, Sergeant Ryan Kennard, testified that he did not make the booking decision. (Kennard Dep. at 29, 52-53.) But Kennard had the authority and discretion to book Plaintiffs at King County Jail and he at least reviewed and approved the arrests and booking decisions. (Kennard Dep. at 29.) As part of the booking decision, Kennard was to consider the totality of the circumstances, the severity of the crimes "or just kind of the general status of the arrestee or what's happening in the city that day." (Kennard Dep. at 31.) He testified that booking for misdemeanors is not unusual. (Kennard Dep. at 32.) Kennard also testified that Plaintiffs were arrested as "some sort of protest at the precinct that night." (Kennard Dep. at 53.)

1    Additionally, the City's 30(b)(6) witness stated that booking a person for a misdemeanor can be

2    appropriate if they pose an "immediate risk to the public safety." (Deposition of Lisa Aagard at

3    118-19.).

4        After being booked, Plaintiffs were released and never charged. (SAC ¶ 4.34.)

5                                     **ANALYSIS**

6    **A.    Legal Standard**

7        Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

8    file, and any affidavits show that there is no genuine issue as to any material fact and that the

9    movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

10   an issue of fact exists, the Court must view all evidence in the light most favorable to the

11   nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty

12   Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is

13   sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The

14   moving party bears the initial burden of showing that there is no evidence which supports an

15   element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

16   Once the movant has met this burden, the nonmoving party then must show that there is a

17   genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

18   existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

19   matter of law." Celotex, 477 U.S. at 323-24.

20   **B.    Plaintiffs' Motion for Summary Judgment on their First Amendment Claim**

21       Plaintiffs seek summary judgment on their as-applied First Amendment claim. The Court

22   finds disputes of fact prevent any relief on the claim because a jury needs to determine whether

23   the enforcement of the Ordinance constituted viewpoint discrimination.

24

1         **1.    Legal Standard**

2         Plaintiffs must show that "the law is unconstitutional as applied to the litigant's particular

3    speech activity, even though the law may be capable of valid application to others." <u>Foti v. City</u>

4    <u>of Menlo Park</u>, 146 F.3d 629, 635 (9th Cir. 1998), <u>as amended on denial of reh'g</u> (July 29, 1998).

5    "An as-applied challenge does not implicate the enforcement of the law against third parties,"

6    and "[a] successful as-applied challenge does not render the law itself invalid but only the

7    particular application of the law." <u>Id.</u> But "[t]he underlying constitutional standard, however, is

8    no different than in a facial challenge." <u>Legal Aid Servs. of Oregon v. Legal Servs. Corp.</u>, 608

9    F.3d 1084, 1096 (9th Cir. 2010).

10        The Court's constitutional analysis begins with an assessment of whether Plaintiffs

11   engaged in protected speech. Here it is undisputed that Plaintiffs engaged in political speech,

12   which is subject to heightened First Amendment protection. <u>Arizona Students' Ass'n v. Arizona</u>

13   <u>Bd. of Regents</u>, 824 F.3d 858, 867 (9th Cir. 2016) (quoting <u>McIntyre v. Ohio Elections Comm'n</u>,

14   514 U.S. 334, 347, 351 (1995) ("A person's First Amendment free speech right is at its highest

15   when that person engages in 'core political speech,' which includes issue-based advocacy related

16   to ballot initiatives.")); <u>Connick v. Myers</u>, 461 U.S. 138, 145 (1983) ("[S]peech on public issues

17   occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special

18   protection."). Given that Plaintiffs have demonstrate they engaged in political speech, "the

19   Government bears the burden of proving the constitutionality of its actions." <u>United States v.</u>

20   <u>Playboy Entm't Grp. Inc.</u>, 529 U.S. 803, 816 (2000).

21        To determine the constitutionality of the government's action, the Court must assess the

22   nature of the forum and the nature of the restriction on Plaintiffs' political speech to determine

23   what level of scrutiny to apply. Plaintiffs claim they exercised their First Amendment rights in a

24

1    traditional public forum, and that the Ordinance was enforced against them because of the

2    content of their political speech. "The First Amendment generally prevents government from

3    proscribing speech" and "[c]ontent-based regulations are presumptively invalid." R.A.V. v. City

4    of St. Paul, 505 U.S. 377, 382 (1992). In a traditional public forum, "content-based restrictions

5    on speech are prohibited, unless they satisfy strict scrutiny." Seattle Mideast Awareness

6    Campaign v. King Cnty., 781 F.3d 489, 496 (9th Cir. 2015) (citing Pleasant Grove City, Utah v.

7    Summum, 555 U.S. 460, 469–70 (2009)). Content-based regulations of speech are generally

8    subject to strict scrutiny "and may be justified only if the government proves that they are

9    narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, 576 U.S. 155,

10   163–64 (2015). But the government's "content-neutral" time, place, and manner limitation in a

11   traditional public forum will survive constitutional scrutiny provided that the restrictions "are

12   narrowly tailored to serve a significant government interest, and leave open ample alternative

13   channels of communication." Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45

14   (1983). Under this intermediate scrutiny, "the requirement of narrow tailoring is satisfied 'so

15   long as the . . . regulation promotes a substantial government interest that would be achieved less

16   effectively absent the regulation.'" Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)

17   (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)). Narrow tailoring in this context

18   means that the law does not "burden substantially more speech than is necessary to further the

19   government's legitimate interests." Id.; see Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505

20   U.S. 672, 678 (1992).

21        Below, the Court assesses: (1) whether Plaintiffs engaged in political speech; (2) whether

22   Plaintiffs exercised their rights in a traditional public forum; (3) whether Defendants'

23

24

1   enforcement of the Ordinance was constitutional. Lastly, the Court reviews Defendants' theory

2   that Plaintiffs did not adequate plead an as-applied claim.

3         **2.     Plaintiffs Engaged in Protected Speech**

4         Though undisputed, the Court finds that Plaintiffs' charcoal and chalk constitute political

5   speech. (See Pls. MPSJ at 14-16; Defs. Opp. at 3 (stating that "[m]ost of [Plaintiffs' graffiti] was

6   negative messages about the police).) The messages here are generally political, in that they

7   embody anti-police slogans and protest the treatment of people of color by police. (See Snyder

8   Dep. at 84; Moya-Delgado Dep. at 67; De Castro Dep. at 88-91.) Plaintiffs' political speech "is

9   entitled to special protection." Connick, 461 U.S. at 145.

10         **3.     The Eco-Block Wall Was Part of a Traditional Public Forum**

11         The Court finds that the portion of the eco-block wall on which Plaintiffs wrote was part

12   of a traditional public forum, which is subject to heightened First Amendment protections.

13         "The Supreme Court has constructed an analytical framework known as 'forum analysis'

14   for evaluating First Amendment claims relating to speech on government property." Am. C.L.

15   Union of Nevada v. City of Las Vegas, 333 F.3d 1092, 1097 (9th Cir. 2003) ("ACLU") (quoting

16   Perry, 460 U.S. at 45-46). Under this analysis, the Court considers the nature of the forum in

17   which the speech occurred to determine the level of judicial scrutiny we apply. See Minnesota

18   Voters All. v. Mansky, 585 U.S. 1, 11, (2018). Here, the primary question is whether the eco-

19   blocks are part of a traditional public forum.

20         As the Ninth Circuit has recognized, "[n]o clear-cut test has emerged for determining

21   when a traditional public forum exists." ACLU, 333 F.3d at 1099. "In the absence of any

22   widespread agreement upon how to determine the nature of a forum, courts consider a jumble of

23   overlapping factors, frequently deeming a factor dispositive or ignoring it without reasoned

24

1    explanation." <u>Id.</u> at 1099-100. From this "jumble," the Ninth Circuit has identified "three factors

2    [a Court must review] in considering whether an area constitutes a traditional public forum: 1)

3    the actual use and purposes of the property, particularly status as a public thoroughfare and

4    availability of free public access to the area; 2) the area's physical characteristics, including its

5    location and the existence of clear boundaries delimiting the area; and 3) traditional or historic

6    use of both the property in question and other similar properties." <u>Id.</u> at 1100-01 (citation

7    omitted). The Ninth Circuit has also emphasized two "underlying considerations": (1) "the

8    compatibility of the uses of the forum with expressive activity"; and (2) "a commitment by the

9    courts to guarding speakers' reasonable expectations that their speech will be protected." <u>Id.</u> at

10   1110. As to the first factor, "'[t]he crucial question is whether the manner of expression is

11   basically incompatible with the normal activity of a particular place at a particular time.'" <u>Id.</u>

12   (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 116 (1972)).

13           All three factors and the two underlying principles strongly suggest the eco-block wall

14   was a traditional public forum.

15           First, the actual use and purpose of eco-block supports a finding that it formed part of a

16   traditional public forum for expressive activity. The eco-block wall was placed in a public right

17   of way, on top of and abutting a sidewalk, which prevented access to the remaining portions of

18   the sidewalk surrounding the Precinct. Public streets and sidewalks "'occup[y] a special position

19   in terms of First Amendment protection.'" <u>Comite de Jornaleros de Redondo Beach v. City of</u>

20   <u>Redondo Beach</u>, 657 F.3d 936, 945 (9th Cir. 2011) (quoting <u>Snyder v. Phelps</u>, 562 U.S. 443, 456

21   (2011) (quotation omitted)). Here, the wall created a form of vertical extension of the sidewalk

22   that was freely open to public access in this sidewalk area that is otherwise a traditional public

23   forum. And the eco-block wall was easily accessible to Plaintiffs by standing on the sidewalk

24

1    itself, which speaks to the "free public access to the area" and its status as a public space. See

2    ACLU, 333 F.3d at 1100. As the Ninth Circuit has noted, "[e]xpressive activities have

3    historically been compatible with, if not virtually inherent in, spaces dedicated to general

4    pedestrian passage." Id. at 1101 (citation and quotation omitted). Against these considerations,

5    the Court notes that the wall was erected to prevent access to the sidewalks around the Precinct

6    to protect the building and officers from harm. But that fact alone is not dispositive. "[T]he

7    primary use of the property" for non-expressive purposes "is irrelevant as long as there is no

8    concrete evidence that use for expressive activity would significantly disrupt the principal uses."

9    Id. at 1101–02. Here, the wall itself was used continuously for expressive purposes, and doing so

10   did not impair the wall's protective function. (See Letizia Dep. at 51 (testifying that daily wall

11   writing occurred "[f]or a long time"); Matthews Dep. at 28 (same).) These facts support this first

12   factor.

13        Second, the physical characteristics, location, and clear boundaries delimiting the area

14   around the eco-block wall also support finding it a traditional public forum. "Similarity to other

15   traditional public forums not only indicates suitability for the conduct of expressive activity, but

16   additionally, areas that are centrally located and integrated into the surrounding locale provide no

17   alteration of expectations that would justify nonpublic forum status." ACLU, 333 F.3d at 1102.

18   Here, other than being vertical, the eco-block wall possesses characteristics similar to the public

19   sidewalk it abutted and on which it was placed. Visually, the eco-block wall was painted grey

20   and, like a sidewalk, lacked any signage stating that writing was not permitted. Defendants

21   contend that the wall "was an extension of the precinct." (Defs. Reply at 1 (citing Trinh Decl. ¶

22   7; Maehler Dep. at 51; Patton Dep. at 64).) The claim is unconvincing. Trinh's declaration

23   identifies no such contention, while Patton and Maehler merely testified that they believed the

24

1    eco-blocks extended the Precinct itself because they were bolted onto the building. (See Trinh

2    Decl. ¶ 7; Patton Dep at 63-65; Maehler Dep. at 50-51.) Visually, the chain-link topped, concrete

3    eco-block wall was indisputably distinct from the Precinct building. The physical characteristics

4    and the placement of the eco-block wall on and abutting a public sidewalk suggest it was a

5    traditional public forum.

6           Third, the eco-block wall was erected over an area that was historically a public forum,

7    which supports Plaintiffs' position. As the Ninth Circuit has explained, "[t]he final factor that we

8    consider in determining whether an area is a traditional public forum is its historic use as a public

9    forum and whether it is part of the class of property which, by history and tradition, has been

10   treated as a public forum." ACLU, 333 F.3d at 1103. The prior use of the area as a traditional

11   public forum is highly relevant. See Venetian Casino Resort, L.L.C. v. Loc. Joint Exec. Bd. of

12   Las Vegas, 257 F.3d 937, 943 (9th Cir. 2001) (considering as relevant that a private sidewalk's

13   replaced a public sidewalk that was a public forum). Though the eco-blocks were not usually

14   there, they sat atop a public sidewalk, which is a traditional public forum. And the portions of the

15   wall on which Plaintiffs wrote were accessed from the sidewalk abutting the wall. This strongly

16   supports finding the wall a traditional public forum.

17          The two "underlying considerations" also support finding the eco-block wall a traditional

18   public forum. See ACLU, 333 F.3d at 1110. First, the wall was compatible with the expression

19   and exchange of written words. While the wall itself was erected to protect the Precinct, it served

20   to preserve the expressive forum that the sidewalk in front of the Precinct would have otherwise

21   allowed had access not been curtailed. And there is nothing in the record suggesting that the

22   frequent messages on the eco-block wall impeded its function as a boundary to protect the

23   Precinct. Second, the eco-block provided a citizen with a reasonable expectation that their speech

24

1   would be protected. The wall itself was daily covered in writing and other expressive work, and

2   there were no signs erected stating that writing was banned. It is true that someone routinely

3   placing messages on the wall might have noticed the wall was frequently cleaned and concluded

4   that it was not open to free expression. But the lack of signage dulls the potency of that fact. The

5   wall was a public space that was used daily for expressive purposes. This indicates the public

6   had a reasonable expectation that the eco-block wall was an expressive forum.

7       Having considered the three factors and two underlying considerations, the Court finds

8   that the eco-block wall was a traditional public forum.

9       **4.      Content-Based Enforcement**

10      Although Plaintiffs exercised their First Amendment rights in a traditional public forum,

11  they have failed to present sufficient undisputed evidence the Ordinance was enforced against

12  them because of the views they expressed. A jury must decide this issue.

13      "The First Amendment generally prevents government from proscribing speech" and

14  "[c]ontent-based regulations are presumptively invalid." R.A.V., 505 U.S. at 382. In traditional

15  public forum, content-based restrictions on speech are prohibited, unless they satisfy strict

16  scrutiny. See Pleasant Grove, 555 U.S. at 469-70. Content-based regulations will survive strict

17  scrutiny "only if the government proves that they are narrowly tailored to serve compelling state

18  interests." Reed, 576 U.S. at 163–64. And in an as-applied challenge, "discriminatory

19  enforcement of a speech restriction amounts to viewpoint discrimination in violation of the First

20  Amendment." Foti, 146 F.3d at 635. Though the Ordinance is facially content-neutral, the Court

21  must examine whether it was applied to Plaintiffs because of the political messages they wrote.

22      There remain disputes of fact concerning the Officers' enforcement decision that

23  preclude summary judgment. On the one hand, Plaintiffs point to the fact that Letizia zoomed in

1    on and was aware of the content of Plaintiffs' messages before calling in the arrests. They also

2    point to evidence that they were known to some of the officers, and that at least Patton and

3    Nelson would have seen their messages before arresting them. Plaintiffs also identify testimony

4    from some of the Officers suggesting they did not appreciate the anti-police protests and

5    attendant messages. On the other hand, Defendants point to testimony suggesting that most of the

6    officers involved in the arrest decision had no prior knowledge of the Plaintiffs and were

7    unaware of the content of the messages. Although the Court has reviewed the deposition

8    excerpts, declarations, and exhibits, it cannot clearly divine the officers' motives in enforcing the

9    Ordinance against Plaintiffs, particularly when it construes the facts here in Defendants' favor. A

10   jury must make this determination based on all of the evidence presented. Without resolution of

11   this factual issue, the Court cannot make any determination as to what level of scrutiny to apply

12   and whether the government's justification passes scrutiny (a question that also involves disputed

13   facts).

14        Plaintiffs also argue that the enforcement of the Ordinance against them must have been

15   discriminatory because the City and SPD acknowledge that it does not enforce the Ordinance

16   against sidewalk chalking. This is a persuasive argument that may convince a jury that the

17   Officers enforced the Ordinance in a discriminatory fashion. But the Court cannot rely on this

18   argument to grant summary judgment because the Officers maintain that they enforced the

19   Ordinance in a content-neutral fashion because they viewed the wall as distinct from the

20   sidewalk and subject to enforcement. As the Supreme Court has explained, "[g]overnment

21   regulation of expressive activity is content neutral so long as it is justified without reference to

22   the content of the regulated speech." Ward, 491 U.S. at 791 (citation and quotation omitted).

23   Here, a jury must determine whether there was such a justification.

24

1           **5.      Defendants' Waiver Argument**

2           Defendants' primary defense to Plaintiffs' Motion is that Plaintiffs failed to plead an as-

3    applied First Amendment claim, noting that Plaintiffs "did not take issue in any way with

4    Defendants' description of their as-applied claims" in opposing Defendants' Motion to Dismiss.

5    (Defs. Opp. at 24.) The Court agrees with Plaintiffs that this argument "border[s] on frivolous."

6    (Pls. Reply at 2.)

7           Plaintiffs' Second Amendment Complaint clearly lays out the as-applied challenge on

8    which Plaintiffs now seek summary judgment. Plaintiffs' first cause of action alleges a violation

9    of the First Amendment, which identifies the as-applied challenge. In relevant part, the

10   Complaint alleges that the Ordinance "violates U.S. Const., amend. I as applied to Plaintiffs, in

11   that Defendants' selective enforcement of the provision discriminated against Plaintiffs'

12   viewpoint and was applied to punish and prohibit protected speech without a legitimate or

13   compelling state interest." (SAC ¶ 5.4.) Plaintiffs also alleged that "Defendants subjected to

14   Plaintiffs to booking and prolonged detention based on the content or viewpoint of their speech

15   in violation of the First Amendment." (SAC ¶ 5.6.) This adequately pleads a First Amendment

16   as-applied challenge. Indeed, the Ninth Circuit specifically stated that "Plaintiffs may continue to

17   litigate their challenge to the Local Ordinance as it applies to them." Tucson v. City of Seattle,

18   91 F.4th 1318, 1330 (9th Cir. 2024). And while Plaintiffs may not have contested Defendants'

19   description of the claim in opposing the Motion to Dismiss, Defendants identify no rule

20   suggesting that a brief alters the pleadings.

21          The Court also rejects Defendants' fanciful argument that the Complaint fails to

22   "challenge the Ordinance as applied to chalk or charcoal" or as to "sidewalks and the eco-block

23   wall." (Defs. Opp. at 24.) The Complaint describes in great detail Plaintiffs' charcoal and

24

1   chalking activities on the eco-blocks erected outside of the Precinct, which forms the basis of the

2   claim. The Complaint more than adequately put Defendants on notice of the as-applied claim,

3   which is all that is required under Rule 8. The Court rejects these arguments.

4          **6.      Injunction Not Presently Appropriate**

5          Plaintiffs have requested the Court enter an injunction based on their First Amendment

6   claim. Given that summary judgment cannot be granted on the claim, the Court similarly may

7   not grant the injunction at this time. The Court will revisit this issue after the jury does its fact

8   finding.

9   **C.     Defendants' Motion for Summary Judgment on the False Arrest Claim**

10         Defendants seek summary judgment on Plaintiffs' false arrest claim on the theory that the

11  Officers had probable cause to arrest them for violating the Ordinance and, alternatively, they are

12  entitled qualified immunity. The Court finds that because the Officers had probable cause to

13  arrest Plaintiffs, the false arrest claim must be dismissed.

14         As the cases Plaintiffs cite make clear, there need only be a "fair probability or

15  substantial chance of criminal activity" for probable cause to exist. Lacey v. Maricopa County,

16  693 F.3d 896, 918 (9th Cir. 2012) (en banc). Here, the Ordinance criminalized writing or

17  drawing "on any public or private building or other structure or any real or personal property

18  owned by any other person," which is precisely what Plaintiffs did. There was therefore a fair

19  probability Plaintiffs were violating the Ordinance. Plaintiffs argue that the Officers lacked

20  probable cause to enforce the Ordinance because a "jury could find that there was no evidence at

21  the time of the arrests that the Plaintiffs lacked permission to write on the wall." (Pls. Opp. at

22  26.) Plaintiffs suggest that a jury could find they had permission because the wall was frequently

23  used for messages, there were no signs against writing, and the Precinct did not own the wall.

24

1    But even if the wall was covered with other messages and the officers did not know who owned

2    the wall, the evidence here still shows a fair probability the Plaintiffs were chalking without

3    permission. Given the broad language of the Ordinance, there was probable cause to arrest. The

4    Court therefore GRANTS summary judgment in Defendants' favor on this claim. And because

5    the claim does not survive summary judgment, the Court does not examine the issues of qualified

6    immunity or the adequacy of the claims against the City and individual defendants.

7    **D.      Cross-Motions on Retaliatory Arrest Claim**

8           Both Parties move for summary judgment on Plaintiffs' retaliatory arrest claim. The

9    Court DENIES both Motions because material facts remain disputed as to whether Defendants

10   arrested Plaintiffs because of their protected speech. But the Court GRANTS Defendants'

11   Motion in part as to claims against certain defendants.

12          **1.      Legal Standard**

13          "[A]s a general matter the First Amendment prohibits government officials from

14   subjecting an individual to retaliatory actions" for engaging in protected speech. Hartman v.

15   Moore, 547 U.S. 250, 256 (2006). "If an official takes adverse action against someone based on

16   that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse

17   consequences,' the injured person may generally seek relief by bringing a First Amendment

18   claim." Nieves v. Bartlett, 587 U.S. __, 139 S. Ct. 1715, 1722 (2019) (quoting Hartman, at 256).

19   To prove a claim of retaliatory arrest, the plaintiff must show that the government defendant's

20   retaliatory animus was a but-for cause of the arrest. Id.

21          Probable cause "will generally defeat a retaliatory arrest claim[.]" Nieves, 139 S. Ct. at

22   1727. But "a narrow qualification is warranted for circumstances where officers have probable

23   cause to make arrests, but typically exercise their discretion not to do so." Id. To show that

24

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 20

1    officers do not typically exercise their discretion to arrest, the plaintiff must "present[] objective

2    evidence that he was arrested when otherwise similarly situated individuals not engaged in the

3    same sort of protected speech had not been." Id. For example, "[i]f an individual who has been

4    vocally complaining about police conduct is arrested for jaywalking"—an offense that "rarely

5    results in arrest"—"it would seem insufficiently protective of First Amendment rights to dismiss

6    the individual's retaliatory arrest claim on the ground that there was undoubted probable cause

7    for the arrest." Id.

8         First, the Court reviews and concludes that Plaintiffs have adduced evidence sufficient to

9    satisfy the Nieves exception to probable cause. Second, the Court reviews the evidence of

10   retaliatory animus and causation, and finds that disputes of fact preclude summary judgment,

11   except in favor of a subset of the individual officers and the City.

12        **2.       Evidence Suffices to Satisfy the Probable Cause Exception**

13        To satisfy the Nieves exception, Plaintiffs must show that an officer would not typically

14   have arrested anyone for the same conduct despite the existence of probable cause. On an

15   evidentiary basis, this requires Plaintiffs to show that similarly-situated individuals "not engaged

16   in the same sort of protected speech" were not arrested when chalking. Nieves, 139 S. Ct. at

17   1727. In a case involving sidewalk chalking, the Ninth Circuit found similarly-situated

18   individuals where the plaintiff showed: (1) "they [the Plaintiffs] were arrested while others who

19   chalked and did not engage in anti-police speech were not arrested"; (2) there were only two

20   other "instances in which chalkers were suspected of or charged with violating" the law at issue,

21   and "only one individual was cited—not arrested—for chalking on public property"; and (3)

22   there was "no evidence that anyone besides the Plaintiffs has been arrested for chalking on the

23   sidewalk." Ballentine v. Tucker, 28 F.4th 54, 62 (9th Cir. 2022). "Additionally, the Plaintiffs

24

1    presented evidence that other individuals chalking at the courthouse at the same time as Plaintiffs

2    were not arrested." Id.

3              Plaintiffs have provided sufficient grounds to conclude that they were treated differently

4    from similar-situated people engaged in chalking and charcoaling in traditional public fora such

5    that an officer would typically have exercise their discretion not to arrest them. First, the City

6    admits it does not criminalize chalking in the sidewalk—which, from a constitutional

7    perspective, is indistinguishable from the eco-block walls as far as being a traditional public

8    forum. Defendants admit that "[i]n 2015 the City publicly announced, 'the use of sidewalk chalk

9    doesn't constitute graffiti'" and that "Captain Trinh, a supervising lieutenant in the East Precinct

10   at the time, instructed the officers not to make arrests for people chalking on sidewalks." (Defs.

11   Opp. at 7 (quoting SAC ¶ 4.40).) The City admits it "has an established, informal policy of

12   treating sidewalk chalk on sidewalks as non-criminal." (Answer to SAC ¶ 4.39 (emphasis

13   omitted). Indeed, Plaintiffs have provided evidence of officers themselves used chalk to mark the

14   sidewalk in front of the West Precinct. (See Ex. 1 to the Declaration of Monsieree De Castro

15   (Dkt. No. 108).) Officers Barrett and Patton also testified that they did not consider it reasonable

16   to arrest someone for chalking on the sidewalk. (Patton Dep. 78; Barrett Dep. 49-50.) Second,

17   the City's 30(b)(6) designee testified that the City has not expended any resources combatting

18   chalk writing except in this case and that he was personally unaware of anyone other than

19   Plaintiffs being arrested for doing so. (Jackson Dep at 17, 19, 44.) There is also no evidence that

20   the City or SPD typically—or ever—enforce the Ordinance against chalking or charcoaling in

21   public areas. This is evidence that the Ordinance is not typically enforced against individuals

22   similarly-situated to the Plaintiffs.

23

24

1    The Court acknowledges that Plaintiffs have not produced evidence, as there was in

2    Ballentine, of someone else chalking non-political messages on the eco-block wall at the same

3    time and not being arrested. But this is not fatal to the claim. In Ballentine, the plaintiffs were

4    able to point to the unique fact that there were others engaged in sidewalk chalking at the very

5    same time they were arrested for writing their anti-police messages and that those individuals

6    were not arrested. Id., 28 F.4th at 62. While this was clear evidence, the Ninth Circuit did not

7    suggest such evidence was necessary. Instead, the Court highlighted broader statistics showing

8    that the law was not typically enforced for similar conduct. See id. The Ninth Circuit did not

9    suggest that there must be perfect symmetry between the Plaintiff and the similarly-situated

10   individuals. Here, Plaintiffs have provided similarly sufficient and compelling evidence that the

11   City does not typically—or ever—enforce the Ordinance against those who chalk or charcoal in

12   public areas.

13   Defendants' efforts to point to enforcement of the Ordinance against similarly-situated

14   individuals falls short. Defendants argue that officers had a practice at the Precinct, "subject to

15   officer availability and 911 call volume—to go out immediately to address it if anyone was

16   marking the wall." (Defs. MSJ at 18 (citing Jordon Dep. 52, 70; Nguyen Decl. ¶ 2; Patton Dep.

17   39; Trinh Decl. ¶¶ 7-9.) But the four pieces of evidence cited do not come close to supporting

18   this statement. First, Jordon only testified about responding to individuals outside of the Precinct

19   who interfered with their duties and whose behavior escalated into destruction and damage to the

20   building. (Jordon Dep. at 52, 70.) He said nothing about individuals chalking or writing on the

21   walls similar to the conduct here. Second, Patton only testified in a vague and seemingly

22   hypothetical manner about what might have been done to people writing on the eco-block wall:

23       Q. What enforcement action was taken to stop people from writing on the wall during
         that period of time?

24

A. I mean, if we saw them doing it, we would stop them, detain them, identify them and/or arrest them.

(Patton Dep. at 39.) Patton did not state that he or any fellow officer ever arrested anyone for writing or chalking on the wall. Third, Nguyen's declaration says only that "[d]uring this period, we addressed unlawful activity outside of the East Precinct promptly." (Nguyen Decl. ¶ 2.) She does not identify any enforcement for chalking or charcoaling anywhere. This does not support the City's position. Lastly, Trinh's declaration says nothing about arresting other individuals for writing on the eco-block wall or even the Precinct itself. As such, the City has failed to show that they ever arrested anyone else for chalking or charcoaling the Precinct or anywhere in the City.

### 3. Disputed Facts as to Retaliatory Animus and Causation

There remain disputes of material fact as to whether certain Defendants acted with the requisite retaliatory animus against Plaintiffs in arresting them. The Court first considers the evidence concerning an anti-protest "culture" at SPD generally before reviewing the evidence as to each individual officer defendant, and finds that only some of the officers are entitled to summary judgment.

SPD Culture

Plaintiffs cite to three sources of anti-protest animus concerning the SPD, generally. First, Plaintiffs point out that the City has a longstanding policy not to enforce the Ordinance against those chalking on sidewalks and the fact that no one other than Plaintiffs have been arrested for chalking on eco-blocks. Second, Plaintiffs argue there was a "politicized context of the law enforcement," as evidenced by a Trump flag and mock tombstone of a person shot and killed by SPD in the breakroom at the East Precinct. (See Pls. MSJ at 25.) Third, Plaintiffs point to the City's 30(b)(6) witness, who spoke of the City encouraging "positive speech" rather than embracing contrarian speech.

1    While some of this evidence may be probative of a general anti-protest animus, the Court

2    does not find it sufficient to sustain the claim without additional evidence concerning the specific

3    officers involved in this action. As such, the Court places little to no weight on this evidence in

4    assessing the validity of the claim.

5        Officer Letizia

6        Plaintiffs point out that Officer Letizia was the officer who saw the messages each

7    Plaintiff wrote and broadcast to the other officers to effectuate the arrests. (Letizia Dep. 30;

8    Police Report by Letizia (Dkt. No. 86-16 at 43); Patton Dep. 69; Barrett Dep. at 30. Although

9    Letizia did not perform any arrests, his knowledge of the content of Plaintiffs' writings appears

10   to have served as at least one reason why he told other officers to arrest Plaintiffs. As the Ninth

11   Circuit has explained, "[a]n officer's liability under section 1983 is predicated on his 'integral

12   participation' in the alleged violation." Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12

13   (9th Cir. 2007) (quoting Chuman v. Wright, 76 F.3d 292, 294–95 (9th Cir. 1996)). This means

14   that the officer's act does not have to "rise to the level of a constitutional violation . . . [b]ut it

15   does require some fundamental involvement in the conduct that allegedly caused the violation."

16   Id. (citation and quotation omitted). Moreover, Letizia testified that he was familiar with

17   Plaintiffs and had a particular animus against them:

18       I know they were part of the group that reoffended on a daily basis. There was at least
         one person in that group I recognized as far as having vandalized the precinct or protested
19       or harassed the officers trying to come in to work on an almost daily basis. So they were -
         - they were part of that group. That is a consideration. This isn't someone with their
20       daughter playing hopscotch on the sidewalk.

21   (Letizia Dep. at 83.) This is sufficient evidence that Letizia was acquainted with Plaintiffs and

22   possessed some bias against them and their viewpoint. A jury must determine whether this bias

23   was a but-for cause of his decision to call in the arrests—a determination the Court cannot make

24

1    at summary judgment. All four Plaintiffs' claims shall proceed against Letizia and the Court

2    DENIES both Motions on this claim.

3        Sergeant Kennard

4        Plaintiffs have produced inadequate evidence that Sergeant Kennard's involvement in the

5    arrests was impacted by any bias. Plaintiffs have shown Kennard was involved in the arrests by

6    approving the arrests of all four Plaintiffs and possessing the ability to reject any arrest. (Kennard

7    Dep. at 12, 52-52; Arrest Report at 2 (Dkt. No. 17-1 at 2).) Indeed, Kennard's role requires him

8    to review arrests for "any sort of claim of differential treatment due to a protected class," and to

9    ensure the officers used their discretion appropriately. (Kennard Dep. at 14-17.) But Plaintiffs

10   fail to show any specific evidence of Kennard's bias. Plaintiffs point to Kennard's testimony

11   about a Trump flag in the Precinct break room: "people get upset about everything these days . . .

12   [s]o I'm sure there's someone in the public that is upset about this." (Kennard Dep. at 115-16.)

13   The Court does not find this statement sufficient to show a bias or animus against these specific

14   Plaintiffs and their political messages. The lack of evidence of any bias and how it impacted his

15   decision to approve the arrests causes the claims to fail. The Court therefore GRANTS summary

16   judgment in Kennard's favor on each Plaintiff's retaliatory arrest claim.

17       Officer Patton

18       Officer Patton arrested Tucson and there is sufficient circumstantial evidence to suggest

19   he may have acted out of a bias against what Tucson wrote. First, Tucson testified he had prior

20   interactions with Patton during protests, though his testimony was somewhat equivocal. (Tucson

21   Dep. at 116.) Second, Patton testified that he saw the frequent messages written on the eco-

22   blocks, and did not think they were fair to the police. (Patton Dep. at 38.) Third, Patton testified

23   that he did not think it reasonable to arrest someone for chalking on the sidewalk. This calls into

24

1    question whether Patton found it reasonable to arrest Tucson. Fourth, although Patton noted there

2    was typically lots of writing on the eco-block wall, he could not identify any specific

3    enforcement of the Ordinance against any pro-police messages or anyone else, for that matter.

4    (Patton Dep. at 42.) Construing the evidence in favor of the non-moving party, the Court finds

5    that this circumstantial evidence is sufficient to allow the claim to proceed. A jury should weigh

6    the testimony and evidence to determine whether Patton's dislike of Tucson's anti-police

7    messaging was a but-for cause in the arrests. The Court DENIES both Motions as to Tucson's

8    claim against Patton.

9        <u>Officer Nelson</u>

10       The Court finds sufficient information to allow De Castro's and Snyder's claims against

11   Nelson to proceed. Nelson was the arresting officer of both individuals. Before arresting both De

12   Castro and Snyder, Nelson watched a livestream of their writing through the Instagram account

13   of someone he labelled a "known protestor" who used the handle "Future Crystals" on

14   Instagram. (Dkt. No. 17-1; Nelson Dep. at 28-29.) Although the individual who maintained the

15   Future Crystals Instagram is not a Plaintiff, Nelson nevertheless knew the individual and

16   followed his broadcasts. (Nelson Dep. at 28-32.) Nelson did not recognize any of the Plaintiffs

17   but he "guessed, given that Future Crystals was there and streaming," that Plaintiffs were

18   protesting because he had "never seen him stream when they aren't protesting something."

19   (Nelson Dep. at 40.) He further stated that this was a "recurring event" that people would be

20   outside the Precinct protesting "police things," "abortion things," and things he "didn't

21   understand." (Dep. at 41.) There is therefore evidence here that Nelson not only saw the

22   messages De Castro and Snyder wrote, but that he also believed they were protesting against the

23   police. While the evidence of Nelson's bias against Snyder and De Castro's anti-police

24

1    messaging is circumstantial, there is sufficient evidence to allow the jury to decide whether it this

2    animus was a but-for cause in the arrests. The Court therefore DENIES both Motions as to these

3    claims against Nelson.

4        Officer Maehler

5        The Court briefly examines the Parties' dispute as to whether Maehler participated in the

6    arrest of Moya-Delgado. Defendants argue the Maehler was not involved in Moya-Delgado's

7    arrest. (Defs Reply at 7.) But Defendants admitted in their Answer to the Complaint that

8    Maehler and Gregory assisted in Moya-Delgado's arrest. (Answer ¶ 4.15 (Dkt. No. 71).) And the

9    evidence Defendants cite in their Reply to support their argument does not actually contradict

10   this admission. (See Def. Reply at 4 (citing Maehler Dep. at 45 (stating that Maehler assisted in

11   the arrest of De Castro, but not that this was his only role).) The Court finds sufficient evidence

12   that Maehler participated in both arrests.

13       Even though Maehler participated in both arrests, there is insufficient evidence of

14   causation to allow De Castro's or Moya-Delgado's claims to proceed. First, although Maehler

15   was acquainted with Tucson and Snyder, there is no evidence he was acquainted with either

16   Moya-Delgado or De Castro. (Tucson Dep. at 116; Snyder Dep. at 68.) Second, although

17   Maehler states that "generally speaking," the four Plaintiffs were "anti-police people," he was

18   not aware of the content of the messages. (Maehler Dep. at 61-63.) Third, perhaps most

19   importantly, Maehler was "working off another officer's probable cause" and his role was "more

20   the muscle than anything." (Kennard Dep at 117-118.) As such, he was not involved in the

21   decision to arrest, which undermines the evidence of causation, even if he had a bias against

22   Plaintiffs. Fourth, while there is evidence that Maehler made a sarcastic remark to Tucson that

23   showed their pre-existing and antagonistic relationship, the interaction occurred after Tucson was

24

1    arrested, and Maehler was not involved in Tucson's arrest. Plaintiffs have failed to show

2    sufficient information linking Maehler's alleged bias to the arrests of De Castro and Moya-

3    Delgado. The Court therefore GRANTS summary judgment in his favor on these claims against

4    him.

5        Officer Nguyen

6        Plaintiffs have failed to identify any evidence of Nguyen's animus against Plaintiffs. (See

7    Pls. Opp. at 23.) Nguyen herself explained that she was horrified by the murder of George Floyd

8    and "totally agreed with peaceful protests." (Nguyen Dep. at 48.) She even testified that "I think

9    a couple of us wanted to go and protest for like ourselves about the whole entire thing"—the

10   "George Floyd situation." (Nguyen Dep. at 55.) She only expressed a general disagreement with

11   "the property destruction that was occurring during the protests and assaulting other people,

12   assaulting officers." (Id. at 48.) Given the absence of evidence of bias, the Court GRANTS

13   summary judgment in Nguyen's favor on the claim against her.

14       Officer Gregory

15       Plaintiffs have failed to provide evidence of Officer Gregory's animus or causation him.

16   Gregory heeded Letizia's call to perform an arrest of Snyder. (Gregory Dep at 36, 59-61.) And

17   Gregory testified that he would not arrest a child for chalking on the sidewalk. (Gregory Dep. at

18   28.) While that shows perhaps a bias in favor of children, the Court finds a lack of evidence of a

19   specific animus against Plaintiffs. Gregory was also unaware of any prior interactions with

20   Plaintiffs. (Gregory Dep. at 33.) On the record presented, the Court finds inadequate evidence of

21   bias or causation. The Court GRANTS summary judgment in favor of Gregory on this claim.

22       Officer Barrett

23

24

1    Plaintiffs fail to identify adequate evidence of Barrett's animus in relation to his

2  participation in the arrest of Moya Delgado. Barrett testified in his deposition that he disagreed

3  with the anti-police messages that Plaintiffs wrote, but that Plaintiffs were entitled to have and

4  express their views. (Barrett Dep. at 40-43.) He testified that although Plaintiffs were free to

5  express their opinions, they could not do so on the eco-block wall because doing so violated the

6  Ordinance. (Id. at 42-3.) Even if this reflects Barrett's bias against Plaintiffs' messaging,

7  Plaintiffs fail to show that Barrett was aware of what Plaintiffs had written before arresting them

8  or that the bias caused the arrests. Plaintiffs' brief suggests he saw the chalking through Letizia's

9  camera, but Plaintiffs cite to a portion of Barrett's testimony that has not been provided. (Pls.

10  Opp. at 244 (citing Barrett Dep. at 31 (Dkt. No. 96-24).) There is therefore a gap in causative

11  evidence. The Court GRANTS summary judgment in favor of Barrett on this claim.

12    Officer Jordon

13    Plaintiffs have failed to show evidence of Jordon's animus or causation. At most,

14  Plaintiffs point out that Officer Jordon testified he knew Plaintiffs before the incident—"I am

15  sure I have seen them" prior to the incident (Jordon Dep. 50.) But as Plaintiffs' own briefing

16  concedes, Jordon only "assisted" with Tucson's arrest and provided security to the other officers.

17  (Pls. Opp. at 24.) There are no facts showing Jordon had a particular bias against Tucson or that

18  he acted on that bias in assisting in the arrests. The Court GRANTS summary judgment in favor

19  of Jordon on this claim.

20                                    *      *      *

21    In summary, the following retaliatory arrest claims may proceed: (1) all Plaintiffs' claims

22  against Letizia; (2) Tucson's claims against Patton; and (3) Snyder and De Castro's claims

23  against Nelson. All other retaliatory arrest claims are dismissed.

24

### 4. Qualified Immunity Improper on the Record Presented

On the record before the Court, qualified immunity cannot be granted in favor of Letizia, Patton, or Nelson.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It protects government officials "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 583 U.S. 48, 62–63 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). The Court may address either prong first, see Pearson v. Callahan, 555 U.S. 223, 236– 42 (2009), and "may exercise [its] discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional," O'Doan v. Sanford, 991 F.3d 1027, 1036 (9th Cir. 2021).

A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle, 566 U.S. at 664 (internal quotation marks and alterations omitted). There need not be "a case directly on point, so long as the "existing precedent" "place[d] the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

First, the law was clearly established that an officer may not arrest someone for a minor infraction such as chalking on a public wall that is generally unenforced even if there was probable cause. Nieves clearly established that retaliatory arrests on account of the political message of the person engaged in a minor crime that is traditionally unenforced is improper even if there is probable cause for arrest. Nieves, 139 S. Ct. at 1727. A reasonable officer in

1   Defendants' position would have known they could not use the Ordinance to criminalize

2   chalking in a public space and as a pretext to retaliate against Plaintiffs for exercising their right

3   to speak their political messages publicly.

4          Second, although the law was clearly established, disputed facts remain as to whether

5   Defendants are entitled to qualified immunity. A jury must first answer the question of whether

6   Letizia, Nelson, and Patton acted with a retaliatory animus and whether their animus was a but-

7   for cause of the injury. If the jury so finds, then these officers are not entitled to qualified

8   immunity. If they jury disagrees, then qualified immunity will apply. On the disputed record

9   before the Court, it cannot grant summary judgment and DENIES without prejudice the request

10  for qualified immunity. See Foster v. City of Indio, 908 F.3d 1204, 1212-13 (9th Cir. 2018)

11  (noting that denial of summary judgment on a qualified immunity claim is proper where material

12  facts necessary to make that determination remain disputed).

13       **5.    Monell Claims Against the City**

14         Plaintiffs have failed to provide sufficient evidence to sustain their retaliatory arrest claim

15  against the City pursuant to Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658

16  (1978). Plaintiffs argue that the anti-protest culture at SPD was a cause of their retaliatory

17  arrests. To sustain this claim, Plaintiffs must show that the individual officers "act[ed] pursuant

18  to an expressly adopted official policy, longstanding practice or custom, or as a final

19  policymaker." Thomas v. Cnty. of Riverside, 763 F.3d 1167, 1170 (9th Cir. 2014). This requires

20  proof the policy, custom, or practice was the "moving force" of the constitutional violation. See

21  Lockett v. County of Los Angeles, 977 F.3d 737, 741 (9th Cir. 2020). Here, Plaintiffs have failed

22  to identify any policy, custom or practice that was the moving force behind the arrests at issue.

23

24

1   The lack of evidence of causation undermines the claim against the City. As such, the Court

2   GRANTS summary judgment on the <u>Monell</u> claim due to a lack of causation.

3   **E.      Defendants' Motion on Plaintiffs' Retaliatory Booking Claim**

4           Plaintiffs pursue a claim that they were booked into King County Jail in retaliation for

5   exercising their First Amendment rights. The claim elements of this claim are identical to those

6   in the retaliatory arrest claim. The Court finds that there remain disputes of fact as to whether

7   Plaintiffs were booked in King County Jail because of their exercise of First Amendment right.

8           **1.      Disputed Facts as to Animus and Causation**

9           There are disputes of fact concerning whether the City, Kennard, Nelson, and Patton

10  acted with a retaliatory animus in deciding to book Plaintiffs in jail. The Court reviews the claim

11  as to the City of Seattle, then as to each individual defendant.

12          <u>City of Seattle</u>

13          Plaintiffs point to sufficient evidence to survive summary judgment showing that

14  Plaintiffs were booked in King County Jail on account of a City policy or practice to discriminate

15  against anti-police protestors.

16          First, at the time of the arrests, King County had imposed a restriction against admitting

17  most misdemeanants. (Booking Policy Memorandum (Dkt. No. 96-7).) The policy did not allow

18  for the admission of those who violated of the Ordinance, though the King County Jail "Shift

19  Captains" had the authority to potentially accept individuals on a case-by-case basis. (<u>Id.</u>;

20  Answer to SAC ¶ 4.20.) Notwithstanding these King County restrictions, Plaintiffs have adduced

21  evidence that SPD was allowed to send "protest-related arrestees" to King County Jail. (Kennard

22  Dep. at 33; Patton Dep. at 85; Jordon Dep. at 75.) This created a loophole to allow SPD to send

23

24

1    those involved in "protests" to King County Jail even though they might not otherwise meet the

2    criteria.

3           Second, there is evidence that Kennard exercised his discretion to book Plaintiffs in jail

4    simply because they were involved in protesting, consistent with the City's protest-booking

5    policy and custom at the time. Kennard had the authority and discretion to book Plaintiffs at

6    King County Jail. (Kennard Dep. at 29.) As part of the booking decision, Kennard was to

7    consider the totality of the circumstances, the severity of the crimes "or just kind of the general

8    status of the arrestee or what's happening in the city that day." (Kennard Dep. at 31.) Kennard

9    testified that Plaintiffs were arrested as "some sort of protest at the precinct that night." (Kennard

10   Dep. at 53.) Based on these facts, a jury might conclude that Kennard used his discretion to book

11   Plaintiffs merely because they were "protestors" exercising their First Amendment rights and

12   that the City's policy encouraging the booking of protestors was the moving force behind the

13   decision. And even though Kennard testified he did not make the booking decision; he was

14   nonetheless responsible for it.

15          These facts, taken together and construed in Plaintiffs' favor suggest that a jury could

16   find that Plaintiffs were booked in King County Jail pursuant to the City's protest-specific

17   booking policy and that this was on account of their exercise of First Amendment rights.

18   Defendants' Motion as to the Monell claim against City is DENIED.

19          Defendants also argue that the totality of the circumstances justified the booking because

20   the officers thought the Plaintiffs might have just gone back to chalking and blocking the sally

21   port and that, based on prior incidents, the "protest" could have escalated. These are all plausible

22   reasons why Defendants may have booked Plaintiffs. But they do not support summary judgment

23

24

1   given the contrary information Plaintiffs have provided. A jury must weigh these competing

2   reasons.

3        Sgt. Kennard

4        Plaintiffs have identified sufficient evidence of Kennard's involvement in the retaliatory

5   booking of Plaintiffs because of their exercise of free speech. Kennard believed he was

6   approving the booking of "protestors" and he knew Plaintiffs had been arrested for writing in

7   charcoal and chalk on a public wall. Jordon also testified that Kennard was part of discussions

8   among the officers as to whether to book Plaintiffs. (Jordon Dep. at 73-74.) Unlike the arrest

9   claims, Kennard here had more involvement in the booking decision and a jury should sort out

10  what exactly was discussed insofar as the booking decision, including what the other officers

11  reported to him as to Plaintiffs messages and the reasons for the arrests. And, as a supervisor,

12  Kennard "'can be held liable for: 1) their own culpable action or inaction in the training,

13  supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of

14  which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the

15  rights of others.'" Hyde v. City of Willcox, 23 F.4th 863, 874 (9th Cir. 2022) (quoting

16  Cunningham v. Gates, 229 F.3d 1271, 1292 (9th Cir. 2000). So while the evidence of Kennard's

17  particular dislike of the Plaintiffs' messages is somewhat thin, a jury might conclude that

18  Kennard nonetheless acquiesced to the booking as retaliation for Plaintiffs' anti-police messages.

19  This is sufficient to allow the claim to proceed against Kennard and the Court DENIES the

20  Motion as to him.

21        Nelson

22        Plaintiffs suggest that Nelson should be held liable because he transported Tucson and

23  Moya-Delgado to jail and that he was aware they were being booked as protestors. This

24

1   evidence, combined with the other evidence of Nelson's dislike for Plaintiffs' messages,

2   discussed above, suggests that a jury could find his animus was causally linked to the booking

3   decision itself. And because Kennard disclaims any active role in making the booking decision, a

4   jury could well determine Nelson made the decision given that he was the arresting officer. The

5   Court DENIES the Motion as to Nelson.

6        Patton

7        Plaintiffs have adduced evidence that Patton may have been the officer who made the

8   decision to book Plaintiffs. He was also considered by other officers to be the primary arresting

9   officer given that he wrote up the arrest reports. (Barret Dep. at 51; Jordon Dep. at 76.) And he

10   would have had discretion to make the booking decision. Given his role and the information

11   identified above concerning his animus against Plaintiffs, the Court finds the claims against

12   Patton survive summary judgment. The Court DENIES the Motion as to Patton.

13        Nguyen

14        Plaintiffs suggest that Nguyen should be held liable because she transported Tucson and

15   Moya-Delgado to jail and she may have made the booking decision. Plaintiffs also point out that

16   Nguyen testified you "could technically book anybody for any misdemeanor." (Nguyen Dep. at

17   11.) But Plaintiffs have failed to show sufficient evidence of Nguyen's retaliatory animus, and

18   there is no clear evidence she believed Plaintiffs were "protestors" who should be booked. The

19   Court GRANTS the Motion as to Nguyen for lack of evidence of bias and causation.

20        Jordon

21        Plaintiffs argue that Jordon should be held liable because he was responsible for the

22   "processing of the suspects," though he was unsure who was ultimately responsible. (Jordon

23   Dep. at 68.) Jordon also testified that there "multiple discussions of, you know, the choices to

24

1  make" around booking the Plaintiffs. (Jordon Dep. at 73-74.) But missing is evidence of Jordon's

2  animus against Plaintiffs and how that served as a but-for cause of the booking. The Court

3  therefore GRANTS the Motion as to Jordon.

4      Gregory

5      Plaintiffs argue that Gregory should be held liable because he transported Snyder and De

6  Castro to jail even after they told him that they should not be booked. (Pls. Opp. at 13.) But the

7  Court does not find this to be evidence of a retaliatory animus. Although Jordon identified

8  Gregory as one of the individuals involved in discussing whether to book Plaintiffs, (Jordon Dep.

9  at 73-74), Plaintiffs have not identified any evidence of Gregory's retaliatory animus or

10 causation. The Court GRANTS the Motion as to Gregory.

11     Letizia & Maehler

12     Plaintiffs do not argue that either Letizia or Maehler should be liable for this claim. The

13 Court therefore GRANTS summary judgment on this claim against them.

14                              *        *        *

15     To summarize, the Court DENIES summary judgment on the retaliatory booking claim as

16 to: (1) all Plaintiffs' claims against the City; (2) all Plaintiffs' claims against Kennard; (3)

17 Tucson's and Delgado-Moya's claims against Nelson; and (4) all Plaintiffs' claims against

18 Patton. All other retaliatory booking claims are dismissed.

19     **2.     No Qualified Immunity**

20     The Court DENIES Defendants' request for qualified immunity on the retaliatory

21 booking claim.

22     First, the law was clearly established at the time of these events that officers could not

23 book a misdemeanant in retaliation for exercising their First Amendment right to criticize the

24

1    police. "[T]he First Amendment protects a significant amount of verbal criticism and challenge

2    directed at police officers." <u>City of Houston v. Hill</u>, 482 U.S. 451, 461 (1987). As of at least

3    2007, "the law in this Circuit gave fair notice that it would be unlawful to jail [an individual] in

4    retaliation for his First Amendment activity" and "[p]olice officers have been on notice at least

5    since 1990 that it is unlawful to use their authority to retaliate against individuals for their

6    protected speech." <u>Ford v. City of Yakima</u>, 706 F.3d 1188, 1195 (9th Cir. 2013), <u>abrogated on</u>

7    <u>other grounds by</u> <u>Nieves</u>, 139 S. Ct. 1715. And as the Supreme Court highlighted in <u>Nieves</u>,

8    retaliating against an individual on the basis of their speech by punishing them a low level

9    offense, such as jaywalking, that is usually not enforced, is unconstitutional. <u>Id.</u>, 139 S. Ct. at

10   1727. The law was thus clearly established on January 1, 2021, that an officer could not book

11   someone in jail as retaliation for exercising their First Amendment rights.

12          Second, as with the retaliatory arrest claims, disputes of fact as both retaliatory animus

13   and causation prevent resolution of the claim of qualified immunity. Plaintiffs have identified a

14   dispute of fact as to whether Kennard, Patton, and Nelson retaliated against Plaintiffs through the

15   booking process on account of their anti-police views. Until a jury resolves those questions, the

16   Court cannot resolve qualified immunity. The Court therefore DENIES qualified immunity

17   without prejudice.

18   **F.      Fourteenth Amendment Claim**

19          Defendants seek summary judgment on Plaintiffs' Fourteenth Amendment selective

20   enforcement claim. Plaintiffs do not to oppose summary judgment on this claim and Defendants

21   have presented sufficient grounds for summary judgment on the claim. As such, the Court

22   GRANTS summary judgment in Defendants' favor.

23

24

1 | **G.   Facial Challenges**

2      Defendants seek summary judgment on Plaintiffs' facial challenges to the Ordinance. The

3  Ninth Circuit already provided a strong indication that Plaintiffs' facial challenge to the

4  Ordinance cannot proceed. <u>Tucson</u>, 91 F.4th at 1329-30. Not surprisingly, Plaintiffs do not

5  challenge summary judgment on the claim. The Court therefore GRANTS summary judgment on

6  the facial challenges to the Ordinance.

7                                   **CONCLUSION**

8      Given the disputes of fact on the record presented to the Court, this case must proceed to

9  trial for resolution of Plaintiffs' as-applied First Amendment challenge to the Ordinance,

10  including the request for injunctive relief. Plaintiffs' retaliatory arrest claims must also proceed

11  to trial to resolve: (1) all Plaintiffs' claims against Letizia; (2) Tucson's claims against Patton;

12  and (3) Snyder's and De Castro's claims against Nelson. And Plaintiffs' retaliatory booking

13  claims must proceed to trial to resolve: (1) all Plaintiffs' claims against the City; (2) all

14  Plaintiffs' claims against Kennard; (3) Tucson's and Delgado-Moya's claims against Nelson; and

15  (4) all Plaintiffs' claims against Patton. All other retaliatory arrest and retaliatory booking claims

16  are dismissed. Similarly, Defendants are entitled to summary judgment on Plaintiffs' Fourth

17  Amendment, Fourteenth Amendment, and First Amendment facial challenge claims. On these

18  grounds the Court DENIES Plaintiffs' Motion, and GRANTS in part and DENIES in part

19  Defendants' Motion. And because material facts remain in dispute that impact the Court's

20  qualified immunity analysis, the Court DENIES the request for qualified immunity without

21  prejudice.

22      \\\

23      \\\

24

The clerk is ordered to provide copies of this order to all counsel.

Dated May 10, 2024.

Marsha J. Pechman
United States Senior District Judge