# Aagard, Lori 30(b)(6)

Volume 1 - 01/29/2024

## Full Proceeding with Highlighted Clips
Printed 05/22/2024 12:21PM PDT

## CONFIDENTIAL

| Def Counter Designations | Pls' Dep Designations |

```
       0001
01:                      UNITED STATES DISTRICT COURT
02:                 WESTERN DISTRICT OF WASHINGTON AT SEATTLE
        _____
03:
04:        DEREK TUCSON, ROBIN SNYDER,    )
           MONSIEREE DE CASTRO, and       )
05:        ERIK MOYA-DELGADO,             )
                                          )
06:                     Plaintiff,        )
                                          ) No. 2:23-cv-00017-MJP
07:            v.                         )
                                          )
08:        CITY OF SEATTLE, ALEXANDER     )
           PATTON, TRAVIS JORDAN, DYLAN   )
09:        NELSON, RYAN KENNARD, MIA      )
           NGUYEN, JAMISON MAEHLER,       )
10:        NICHOLAS GREGORY, RYAN         )
           BARRETT, and MICHELE           )
11:        LETIZIA,                       )
                                          )
12:                     Defendants.       )
        _____
13:
14:                  VIDEOTAPED 30 (b)(6) DEPOSITION OF
15:                      CITY OF SEATTLE DESIGNEE
16:                           LORI AAGARD
        _____
17:
                          Monday, January 29, 2024
18:
                           Via Zoom, Washington
19:
20:
21:
22:
23:
24:                    STENOGRAPHICALLY REPORTED BY:
                    KIM SCHEUERMAN, WA CCR NO. 2517
25:                     Kim@lakesidereporting.com
```

```
     0002
01:                       A P P E A R A N C E S
02:      FOR THE PLAINTIFFS:
03:                       BRADEN PENCE
                          MacDONALD HOAGUE & BAYLESS
04:                       705 Second Avenue, Suite 1500
                          Seattle, Washington 98104
05:                       bradenp@mhb.com
06:      ALSO PRESENT:    NATHANIEL FLACK
07:
08:
09:      FOR THE DEFENDANTS:
10:                       KERALA COWART
                          JESSICA LEISER
11:                       ASSISTANT CITY ATTORNEYS
                          SEATTLE CITY ATTORNEY'S OFFICE
12:                       701 5th Avenue, Suite 2050
                          Seattle, Washington 98104
13:                       kerala.cowart@seattle.gov
                          jessica.leiser@seattle.gov
14:
15:      ALSO PRESENT:   VLADIMIR KORNEYCHUK
                          VIDEOGRAPHER
16:
17:
18:
19:
20:
21:
22:
23:
24:
25:
```

0003

01:                        I N D E X

02:    EXAMINATIONS                              PAGE NO.

03:    BY MR. PENCE                                 5

04:

05:                      E X H I B I T S

06:    EXHIBIT NO.  DESCRIPTION                   PAGE NO.

07:    EXHIBIT 52   Plaintiffs' Amended Notice of 30      13

                    (b)(6) Video Deposition

08:

       EXHIBIT 53   E-mail dated January 23, 2024         17

09:

       EXHIBIT 54   Supplemental Disclosures by the City  34

10:                 of Seattle

11:    EXHIBIT 55   Video - Bates PL000581               115

12:    EXHIBIT 56   Video - Bates PL000165               116

13:

14:

15:                    REQUEST FOR INFORMATION

16:                          80, 17

17:

18:

19:

20:

21:

22:

23:

24:

25:

0004

01:            MONDAY, JANUARY 29, 2024; VIA ZOOM, WASHINGTON

02:                      12:40 p.m.

03:                         ***

04:            THE VIDEOGRAPHER:  Good afternoon.  We are on

05:    the record.  Today is January 29th, 2024.  The time is

06:    approximately 12:40 p.m.  This is the Zoom remote video

07:    deposition of 30 (b)(6) City of Seattle represented by

08:    Captain Aagard in the matter of Tucson, et al, versus

09:    City of Seattle, et al.

10:        Would counsel please give their appearances for the

11:    record, after which the reporter will swear in the

12:    witness.

13:            MR. PENCE:  Braden Pence here on behalf of

14:    plaintiff -- all plaintiffs, and then Mr. Nathaniel

15:    Flack and/or Mr. Neil Fox may be appearing but will not

16:    be conducting the deposition today.

17:            MS. COWART:  Kerala Cowart on behalf of all

18:    the defendants, and Jessica Leiser is here as well, my

19:    co-counsel.

20:

21:                      LORI AAGARD,

22:     having been sworn/affirmed on oath to tell the truth,

23:     the whole truth, and nothing but the truth, testified

24:                    as follows:

25:

```
       0005
01:                    E X A M I N A T I O N
02:        BY MR. PENCE:
03:        Q. All right.  Good afternoon, Captain.  Would you please
04:           let me know how to pronounce your name and then also
05:           state and spell it for the record?
06:        A. It's Aagard.  A-a-g-a-r-d.
07:        Q. And then what's an appropriate way to address you -- or
08:           respectfully address you today?  Captain, Ms., or do
09:           you have a preference?
10:        A. Captain is fine.
11:        Q. So Captain Aagard, you understand you're under oath,
12:           correct?
13:        A. Correct.
14:        Q. And as a result, you understand that you must tell the
15:           truth, correct?
16:        A. Correct.
17:        Q. And you understand you must tell the whole truth,
18:           correct?
19:        A. Correct.
20:        Q. And nothing but the truth, correct?
21:        A. Correct.
22:        Q. And you are going to do that today; is that right?
23:        A. That is correct.
24:        Q. You understand that today's testimony here is
25:           essentially testimony in front of a jury, that the
```

0006

01:        judge and/or jury may see or hear this testimony?

02:    A. Yes.  Correct.

03:    Q. Do you understand that the judge and jury may -- that

04:        this testimony is, therefore, just as important as

05:        though we're testifying in trial?

06:    A. Yes.

07:    Q. And as a result, it's very important that you give

08:        truthful, complete, and accurate testimony today.  Do

09:        you understand that?

10:    A. Yes.

11:    Q. And you intend to do that; is that right?

12:    A. That's right.

13:    Q. If I ever ask you a question that you don't understand,

14:        you need to let me know.  Because if you answer a

15:        question without letting me know that you don't

16:        understand it, I'm going to assume that you understand

17:        it.  Does that make sense?

18:    A. Yes.

19:    Q. That way, if you let me know that there's a need for

20:        clarification, we can ensure that your testimony is

21:        accurate and complete; is that right?

22:    A. Yes.

23:    Q. If you ever want to take back an answer or add to an

24:        answer or change an answer in any way, you need to let

25:        me know that.  Okay?

0007

01:     A. Okay.

02:     Q. It's important that you do that as soon as possible.  I

03:        will allow you to make a change to your testimony if

04:        you need to, okay?

05:     A. Okay.

06:     Q. Of course the intention of that is so that we get

07:        truthful, accurate, and complete testimony today.  Do

08:        you understand that?

09:     A. Yes.

10:     Q. If you do make changes to your testimony, however, I

11:        will be allowed to make arguments regarding the reason

12:        why you changed testimony.  Do you understand that?

13:     A. Yes.

14:     Q. All right.  And you understand there's a court reporter

15:        writing down everything that you're saying and a

16:        videographer recording everything that we're all

17:        saying.  Do you understand that?

18:     A. Yes, I do.

19:     Q. Therefore, we need to have verbal answers because

20:        uh-huh or huh-uh isn't clear in terms of what the court

21:        reporter is writing down.  Does that make sense?

22:     A. Yes.

23:     Q. And the same goes for shaking your head or nodding your

24:        head; we'll need verbal answers.  Okay?

25:     A. Okay.

0008

01:     Q. So the court reporter is going to make a transcript of

02:        your testimony today; you will have the opportunity to

03:        review that transcript and make any changes that are

04:        necessary.  Do you understand that?

05:     A. Yes.

06:     Q. If you do make those changes, however, I will be

07:        allowed to argue that -- about the reasons why you

08:        changed the testimony.  Do you understand that?

09:     A. Yes.

10:              MS. COWART:  Braden, this is getting a little

11:        repetitive and bordering on argumentative.

12:              MR. PENCE:  Ms. Cowart, you can make form

13:        objections if you wish.  I can use my time how I wish.

14:        I would prefer for us all to use our time efficiently,

15:        which would include avoiding unnecessary speaking

16:        objections.

17:     Q. (By Mr. Pence)  So Ms. Aagard, regarding breaks, we're

18:        going to be taking breaks during today's testimony.

19:        But I only have a certain number of hours today, so if

20:        you need a break, will you please let me know?

21:     A. Yes.

22:     Q. All right.  And I will allow you to take that break if

23:        you need one.  Okay?

24:     A. Okay.

25:     Q. Is there any reason, medical or otherwise, why you will

```
0009
01:          not be able to give truthful, accurate, and complete
02:          testimony today?
03:     A. No.
04:     Q. If that ever changes during the course of the
05:          deposition, you need to let me know immediately.  Is
06:          that fair?
07:     A. Yes.
08:     Q. Do you understand that the City has designated you as a
09:          CR 30 (b)(6) witness?
10:     A. Yes.
11:     Q. Do you understand what that means?
12:     A. Yes.
13:     Q. Do you understand that as a 30 (b)(6) witness, you are
14:          responsible for testifying for the City itself?
15:     A. Yes.
16:     Q. Do you understand that you are charged with having
17:          knowledge -- all knowledge available to the City on the
18:          designated topics?
19:     A. Yes.
20:     Q. Do you understand that you are charged with testifying
21:          about the City's subjective beliefs and opinions on the
22:          designated topic?
23:     A. Yes.
24:     Q. And do you agree to testify for the City in that
25:          capacity?
```

D's Obj: 401, 402 (court can instruct on what this means)

Pl's resp.: relevant to establish foundation and binding nature of later testimony.

```
        0010
01:        A. Yes.
02:        Q. Do you agree that your testimony will bind the City at
03:           trial?
04:        A. Yes.
05:        Q. You may also be asked for your personal knowledge or
06:           information or opinions.  Unless I specifically ask for
07:           your personal opinion or knowledge, understand that I
08:           am asking for the City's information, knowledge, or
09:           opinion.  Do you understand that?
10:        A. Yes.
11:        Q. And so unless I specify otherwise, you are testifying
12:           as a City's designee and not in your personal capacity.
13:           Do you understand that?
14:        A. Yes.
15:                   MR. PENCE:  Okay.  Regarding objections as to
16:           the scope of the topic, I think it's a poor use of our
17:           time for counsel and I to quibble back and forth about
18:           the scope of the topic.  You can make an objection
19:           regarding scope; we can address that with the Court
20:           regarding whether or not it's admissible down the road.
21:           But so I'm going to ask that the objections be limited
22:           to scope of the topic of objection.
23:                   MS. COWART:  I mean, I'll also object to
24:           things like vague, compound, but yes, I will make
25:           objections if it's beyond the scope.
```

0011

01:                    MR. PENCE:  All right.  I'm not asking you to

02:        limit other objections.  I'm just simply saying

03:        regarding the scope that we not get into protracted

04:        discussions about that.

05:                    MS. COWART:  Agree.

06:    Q. (By Mr. Pence)  So Captain Aagard, what is your

07:        educational background?

08:    A. I have a BA from the UW.

09:    Q. What year did you get that BA?

10:    A. 1986.

11:    Q. Any other formal education past high school?

12:    A. No.

13:    Q. Work history prior to coming to work for the City of

14:        Seattle Police Department, could you please give me a

15:        brief summary of the jobs you held prior to SPD?

16:    A. SPD was the first job I had out of college, so it was

17:        during high school I worked at Taco Time and a cannery.

18:    Q. When were you hired by Seattle Police Department?

19:    A. 1986.

20:    Q. And you've been with SPD since then?

21:    A. No.

22:    Q. Where -- what other places did you work during that

23:        period of time?

24:    A. In 1991, I resigned to stay home with children for 13

25:        years and I came back in 2004.

0012

01:  Q. Other than that period of time when you were not with

02:     SPD or any other employers since 1986?

03:  A. I coached at high schools and -- high schools as a

04:     tennis coach and a basketball coach.

05:  Q. Anything besides that?

06:  A. No.

07:  Q. What is your rank as of January 1st, 2020, through

08:     present?

09:  A. Can you repeat that?

10:  Q. Yeah.  As of 2020, January 1st, 2020, what was your

11:     rank?

12:  A. 2020, I was a lieutenant.

13:  Q. And when did you get promoted to captain?

14:  A. It was October of 2021.

15:  Q. And what were your duties as a lieutenant between the

16:     end of May 2020 and January of 2021?

17:  A. I was -- let's see, 2020, I had two -- I was operations

18:     lieutenant at the south precinct, and then I was also

19:     the training lieutenant for our field training

20:     operations.

21:  Q. You've been designated to testify regarding Topic 1,

22:     which we'll talk about in just a second.  I'm wondering

23:     if you can give me a brief summary of why in your

24:     personal capacity as an officer what sort of

25:     experiences or training you would have that would give

0013

01:        you exposure to Topic 1?

02:    A. I don't have Topic 1 in front of me.

03:    Q. All right.  Well, let me bring that up for you.  And

04:        before we move on, where are you currently located?

05:    A. Columbia Center downtown.

06:    Q. All right.  Who else is in the room with you besides

07:        Ms. Cowart?

08:    A. Nobody.

09:    Q. Do you have any documents in front of you?

10:    A. No.

11:                MR. PENCE:  I'm going to share my screen and

12:        show you.  Ma'am court reporter, will you let me know,

13:        are we on 52?  Don't know.  I'm going to say 52, it's

14:        my understanding.

15:                (Exhibit 52 marked for identification.)

16:    Q. (By Mr. Pence)  What do you see on the screen?  Do you

17:        see a document entitled Plaintiffs' Amended Notice of

18:        30 (B)(6) Deposition?

19:    A. Yes.

20:    Q. Have you seen this document before?

21:    A. Yes.

22:    Q. All right.  It's dated January 25th, 2024, signed by

23:        myself and my co-counsel.  This is the notice that

24:        prompted today's deposition.  In fact, we have given

25:        this language to the City's counsel in December.  There

0014

01:       was an earlier notice, but this is the most recent

02:       iteration of it testifying via video-recorded

03:       deposition.

04:          So Topic 1, my understanding is you're here to

05:       testify regarding Topic 1.  So when I say Topic 1, I'm

06:       referring to -- there's two topics, one here and one

07:       below.

08:          You're here for this one that says "SPD's decision

09:       making with respect to which individuals were arrested

10:       and transported to King County Jail for booking during

11:       large crowd events in 2020 and how King County Jail's

12:       booking restrictions affected SPD's decision making."

13:          Do you see that language?

14:   A. I do.

15:   Q. Have you seen that language before just now?

16:   A. Yes.

17:   Q. Do you understand that's the topic you're here to

18:       testify about?

19:   A. Yes.

20:   Q. Okay.  So what -- stopping the share there -- what --

21:       what -- what experience or training do you have in your

22:       job as a lieutenant and now captain would give you

23:       information about Topic 1?

24:   A. Years of patrol experience on the street, dealing with

25:       arrests, and then many -- working many of the

0015

01:　　　　　demonstrations as the prisoner processing lieutenant.

02:　　Q. What -- tell me about the prisoner processing

03:　　　　　lieutenant.  What does that person do?

04:　　A. That person is in charge of the prisoner processing

05:　　　　　team and the vans that go out and pick up and do the

06:　　　　　arrest screenings of the people that we arrest.

07:　　Q. Does the prisoner processing lieutenant have

08:　　　　　information regarding what the rules of engagement are

09:　　　　　for any given protest; for example, if there are

10:　　　　　certain crimes that SPD will be focusing on or

11:　　　　　disregarding, would that sort of information be

12:　　　　　available to the prisoner processing lieutenant?

13:　　A. Yes, there's a -- prior to deploying, we have a -- a

14:　　　　　debrief with everyone involved, including the incident

15:　　　　　commander, and we go over intent and what we want to

16:　　　　　accomplish.

17:　　Q. And you served in that capacity as a prisoner

18:　　　　　processing lieutenant between May 20 -- end of May 2020

19:　　　　　and January 2021; is that correct?

20:　　A. Yes.  Not every one, but several.

21:　　Q. On approximately how many occasions did you serve in

22:　　　　　that capacity?

23:　　A. I would -- I do not remember.  At least 15.

24:　　Q. Were you the prisoner processing lieutenant on January

25:　　　　　1st, 2021?

0016

01:     A. No.

02:     Q. Do you know who was?

03:     A. I do not have that information, but I believe there was

04:        not prisoner processing set up on January -- on that

05:        date.

06:     Q. So going -- well, we received an e-mail from Ms. Cowart

07:        indicating that the City has no written policies or

08:        procedures on this topic.  Let me flip back to Exhibit

09:        52.  Do you see that back on your screen again?

10:     A. Yes.

11:     Q. There are two sub parts:  1 (a) and 1 (b).  Do you see

12:        both of those?

13:     A. I do.

14:     Q. Regarding 1 (a), it states:  Relevant City policies,

15:        procedures, protocols, or practices.  Do you see that?

16:     A. I do.

17:     Q. We received an e-mail from Ms. Cowart indicating that

18:        the City does not have policies or protocols.  Is that

19:        what it was, policies or protocols?

20:            MS. COWART:  Do you want me to --

21:            MR. PENCE:  Procedures.  Someone just spoke.

22:        I didn't hear who that was.

23:            MS. COWART:  Braden, do you want me to pull up

24:        the e-mail or no?

25:            MR. PENCE:  No, I can pull it up.  So we'll

0017

01:     mark this 53.

02:                 (Exhibit 53 marked for identification.)

03:     Q. (By Mr. Pence)  An e-mail from Ms. Cowart.  Down here

04:     it states:  For the 30 (b)(6) deposition, I wanted to

05:     provide a quick update regarding 1 (a).  There are no

06:     written policies or procedures as to this topic.

07:     Captain Aagard will be prepared to testify about the

08:     City's protocols and practices.  Is that your

09:     understanding, Captain Aagard?

10:     A. Yes.

11:     Q. All right.  So what did you do to confirm that there

12:     are no policies or procedures?

13:     A. I had taken -- I have taken many promotional tests and

14:     I've studied everything that's involved with our

15:     policies and procedures on the Seattle Police

16:     Department, and there are no written policies or

17:     procedures for that topic.

18:     Q. Okay.  Should there be written policies or procedures

19:     regarding this topic?  Specifically, what individuals

20:     should be arrested or transported to the jail during

21:     large crowd events?

22:     A. That is up to the chief.

23:     Q. Okay.  Well, you're testifying as the City.  So is it

24:     your testimony then as the City that this is a matter

25:     of discretion for the chief, and this is not something

0018

01:         that the City would have any sort of position regarding

02:         or whether there should be a written policy on this

03:         topic?

04:                 MS. COWART:  Objection.  Mischaracterizes

05:         testimony.  Beyond the scope.

06:     Q. You can answer the question.

07:     A. As law enforcement officers, we always look at the

08:         totality of the circumstances no matter what an

09:         individual is under arrest for.  We have to have

10:         probable cause and -- and whether or not we book, it's

11:         always totality of circumstances.  So that wouldn't

12:         change for prisoner processing for a demonstration or a

13:         large crowd event.

14:     Q. So object as to nonresponsive.

15:                 My question is whether the City has a position

16:         regarding whether or not there should be a written

17:         policy about SPD decision making for individuals

18:         arrested and transported to the jail during protest

19:         events?

20:                 MS. COWART:  Objection.  Scope.  You can

21:         answer.

22:     A. What was the question?

23:     Q. (By Mr. Pence)  That -- well, okay.  The question is to

24:         Topic 1, it says SPD's decision making with respect

25:         to -- to which individuals are arrested and transported

0019

01:          to the jail, right?

02:     A. We always --

03:     Q. So --

04:     A. We -- we have written policies on arrest procedures,

05:          but they're not specific to large crowd events because

06:          the process is the same.  So we don't have subtitles

07:          for every situation in written policy because our --

08:          our broad policy covers -- would cover any demo or

09:          protest.

10:     Q. Captain Aagard, my question was, that the topic says

11:          SPD's decision making with respect to this topic,

12:          right?

13:     A. Okay.  Yes.

14:     Q. Okay.  And then I've been told that you do not have a

15:          written policy or procedure as to SPD's decision making

16:          with respect to that topic, okay?

17:     A. Correct.

18:     Q. So my question is:  What is your position as the City's          **Pl's Obj.: 401-403.**

19:          designated witness regarding whether or not there

20:          should be a written policy or procedure as to that

21:          topic?

22:               MS. COWART:  Objection.  Scope.  You can

23:          answer.

24:     A. I don't believe that one is needed.

25:     Q. (By Mr. Pence)  Why not?

0020

01:     A. Because we have -- we already have a written policy

02:        about when we can and can't arrest subjects or

03:        arrestees.  We have to have probable cause, and the

04:        procedures are the same whether it's a demonstration, a

05:        911 call, a Seahawks event.  It covers all of those

06:        subtitles.  We don't have specific ones for each

07:        condition.

08:     Q. Are there any written protocols or practices as opposed

09:        to policies or procedures?

10:     A. Written protocols?

11:     Q. Correct.  Written protocols or practices?

12:     A. Yes.

13:     Q. Okay.  What are those?

14:     A. For specifically what?

15:     Q. Showing you again 52, I'm -- I've been told that

16:        there's no policies or procedures that are written.

17:        Now I'm asking about protocols and practices.  What

18:        protocols or practices are written with respect to

19:        this?

20:     A. They're not written.  We have protocols that we do and

21:        that we go over at the start of each formal prisoner

22:        processing setup.

23:     Q. Okay.  And just verbally; is that right?

24:     A. Yes.  The written ones are just the protocols of we

25:        pick them up, we screen the arrests, we bring them to

0021

01:        the precinct; we talk to them, we photograph them, we

02:        do a report.  So they're very -- they're very general

03:        for any other arrest as well.

04:    Q. All right.  So in addition to 1 (a), there's also 1

05:        (b), which deals with the connection, if any, between

06:        this topic and the arrest and booking of plaintiffs at

07:        issue in this case.  Do you understand that?

08:    A. Yes.

09:    Q. Okay.  So we haven't had any objection or concerns

10:        raised by your attorney prior to the deposition

11:        regarding Topic 1 (a) and 1 (b), other than the issue

12:        about no written policies or procedures.

13:            So my question for you is:  Is there any confusion

14:        you have regarding this topic?

15:    A. No.

16:    Q. In the City's opinion, is this topic relevant to the

17:        disputes in this case?

18:    A. Relevant to the what?

19:    Q. To the disputes in this case?

20:                MS. COWART:  Objection.  Scope.  You can

21:        answer.

22:    A. Yes.

23:    Q. (By Mr. Pence)  Are there any objections that you have

24:        to this -- or concerns that you have with respect to

25:        this topic?

0022

01:                    MS. COWART:  Are you asking the witness if she

02:          has objections or me?

03:    Q. (By Mr. Pence)  Does the City have any concerns or

04:          complaints or criticisms about this topic?

05:                    MS. COWART:  So we -- I -- I object that

06:          you're calling for a legal conclusion from the witness.

07:          You can answer.

08:    A. Not that I can think of right now.

09:    Q. (By Mr. Pence)  Are there any limits on your testimony

10:          about this topic today?

11:                    MS. COWART:  Objection.  Confusing.  Vague.

12:    A. Limits would be I can only testify to what I know and

13:          what I have heard.

14:    Q. (By Mr. Pence)  Well, then we have a problem then

15:          because you're here testifying as the City, not just as

16:          your own personal knowledge and your own personal

17:          opinion.  So you're -- you're charged with having

18:          the -- yeah, you're charged with having the knowledge

19:          of the entire City.

20:              You're at a duty to educate yourself regarding

21:          topics.  So we're going to go into some specifics about

22:          that.  But if you're saying that you're not willing to

23:          testify with respect to the City's knowledge about this

24:          topic, then we have a problem, so --

25:                    MS. COWART:  Braden, objection.

0023

01:         Mischaracterizes testimony.  Harassing.  Let us -- just

02:         why don't you just answer [sic] your questions.  I'm

03:         getting a little angry.  If we need to get chambers on

04:         the phone, I'll do it, but let's just not go down this

05:         route.  Ask your questions and see how it goes.

06:    Q. (By Mr. Pence)  My question is:  Are there any limits

07:         on your testimony today?

08:               MS. COWART:  And that's -- objection.  Asked

09:         and answered.  And objection, vague.

10:    Q. (By Mr. Pence)  So I want to understand your answer,

11:         Captain Aagard.  You said that you were only going to

12:         testify regarding your personal knowledge as to Topic

13:         1, so is that correct?

14:    A. Personal knowledge, I can't testify to what other

15:         people may have said that I wasn't aware of.  I can

16:         only testify to the procedures and protocols that I was

17:         involved in.

18:    Q. Okay.  Well, we'll go a little further here regarding

19:         the knowledge that you have for Topic 1, but I think we

20:         have an issue that we're going to need to address.  And

21:         whether we can proceed today or not with a witness who

22:         is not prepared to testify on behalf of the City is

23:         potentially an issue.

24:               MS. COWART:  Braden, she has already said that

25:         she understands she is speaking on the behalf of the

0024

01:       City.  This is just a -- this is a waste of time.  It's

02:       a frolic and detour.  You're being harassing.  Ask the

03:       question and see how it goes.

04:              MR. PENCE:  Kerala, you are interrupting and

05:       making this slower than it needs to be, so please allow

06:       me ask my questions.

07:   Q. (By Mr. Pence)  All right.  So Captain Aagard, what is

08:       the universe of information that is available to the

09:       City regarding Topic 1?

10:              MS. COWART:  Objection.  Vague.  Confusing.

11:   A. Information is the practices that we use in my

12:       experience when I was involved with the prisoner

13:       processing.

14:   Q. (By Mr. Pence)  Is there anyone besides you who is

15:       involved with prisoner processing?

16:   A. Yes.

17:   Q. Who are those individuals?

18:   A. I don't -- you mean specific names?

19:   Q. Yes.

20:   A. Lieutenants or sergeants?  There's different ranks of

21:       people that did the prisoner processing.  There's

22:       several lieutenants -- there were several lieutenants

23:       that acted as prisoner processing lieutenants.

24:   Q. So the ranks of individuals who would occupy that job

25:       as far as you know are lieutenants and sergeants?

0025

01:    A. Yes.

02:    Q. All right.  So you said there's several lieutenants.

03:       Can you please list who those folks are for me?

04:    A. I don't -- I would have to go back through the

05:       paperwork to see exactly who was a prisoner processing

06:       lieutenant at that time.  There were several.

07:    Q. All right.  Do you know who the sergeants were who were

08:       doing that job?

09:    A. There were even more of those.

10:    Q. Can you list any of them?

11:    A. I cannot.

12:              MS. COWART:  Objection.  Scope.

13:    Q. (By Mr. Pence)  All right.  Did you speak to any of

14:       those individuals, lieutenants or sergeants, who would

15:       have done that job in preparation for this deposition?

16:    A. No, no lieutenants or sergeants.

17:    Q. Okay.  Anyone besides lieutenants or sergeants, and not

18:       including your attorney, who did you speak with to

19:       prepare for this deposition?

20:    A. I spoke with Chief Mahaffey, I spoke with Officer

21:       Monique Avery, and Sergeant Kennard.

22:    Q. So addressing Mahaffey first, what did you discuss with

23:       Mahaffey?

24:    A. We discussed the general practices of arrests of

25:       individuals, to be specific, the one failure to

0026

01:         disperse arrest and also a media -- or not a media, but

02:         a meeting he had with a particular individual whose

03:         name I cannot think of right now.

04:    Q. So you discussed a meeting with an individual, but you

05:         don't know who that individual was?

06:    A. I can't remember her name.

07:    Q. What was the meeting about?

08:    A. We didn't really get that far because Chief Mahaffey

09:         could not remember the meeting.

10:    Q. What else did you discuss with Mr. Mahaffey?

11:    A. That was -- it was a short discussion.  That was pretty

12:         much it.

13:    Q. How long was the discussion approximately?

14:    A. 15 minutes at the most.

15:    Q. Did you discuss the arrests of the plaintiffs?

16:              MS. COWART:  And just to jump in, so it's

17:         absolutely fine to talk about your conversations with

18:         Chief Mahaffey.  I was there for the meeting, so just

19:         don't repeat anything I said, but you probably don't

20:         remember that anyway.  But yeah, totally fine to answer

21:         and talk about what you and Mahaffey talked about.

22:    A. Right.  We talked about his -- we talked about his

23:         conversation that he could not remember with this

24:         particular individual that I cannot remember right now.

25:         We talked about subjects that were arrested for failure

0027

01:        to disperse and the reasons they were arrested.

02:        Q. (By Mr. Pence)  Okay.  Well, what about the plaintiffs'

03:        arrests, did you discuss that with Chief Mahaffey?

04:        A. I don't remember -- we did not talk about that

05:        specifically.

06:        Q. Did you discuss with Chief Mahaffey the SPD's decision

07:        making with respect to which individuals to arrest and

08:        transport to the jail during 2020?

**D's Obj: 401, 402, 403 (confusion/waste of time)**

09:        A. Yes, in regards to non-violent misdemeanors.

10:        Q. And were you able to get all of the information you

11:        wanted to get from Chief Mahaffey regarding your

12:        preparation for this deposition?

**D's Obj: 401, 402, 403, 801, 802 (Mahaffey statements)**

13:        A. Yes.

14:        Q. What was the meeting about that he can't remember who

15:        he met with?

16:        A. I believe it was the protocols for jail bookings.

17:        Q. Was this person an SPD employee or a King County Jail

18:        employee or a member of the public; do you remember

19:        anything about who it was that he -- does he remember

20:        anything about who it was he met with?

21:        A. The name is Cahill is coming to mind.  C-a-h-i-l [sic].

22:        Q. Okay.  And who does that individual work for?

23:        A. I believe she used to work for the Office of the Civil

24:        Rights but is in a different capacity now.  So I'm not

25:        sure who she works with now.

0028

01:     Q. And approximately when did the meeting occur?

02:     A. Last week.

03:     Q. He met with Cahill last week?

04:     A. No, I met with Chief Mahaffey to discuss the meeting

05:        that he had with her, but he did not recall it.

06:     Q. I'm asking about approximately when the meeting with

07:        Cahill occurred?

08:             MS. COWART:  We're starting to border on

09:        questions that I posed rather than information

10:        provided.  Can you just focus on information provided

11:        by Chief Mahaffey to our witness, because there were

12:        topics that I brought up to try to prepare.

13:     Q. (By Mr. Pence)  So, Captain Aagard, what is your

14:        understanding given the preparation you did for this

15:        deposition about when the meeting occurred between

16:        Cahill and Mahaffey?

17:     A. It was at least a year ago.  It wasn't anything recent.

18:     Q. Was it -- did it occur prior to plaintiffs' arrests?

19:     A. I don't know for sure, but if I remember correctly, I

20:        believe it was after.

21:     Q. Okay.  What is that based on?

22:             MS. COWART:  So this is based on information

23:        that I provided, not information Mahaffey provided.  So

24:        can we just try to have the questions in a way that

25:        we're not -- that -- if you're asking about her meeting

0029

01:        with Chief Mahaffey, can you just try to focus on

02:        information that he provided to her, factual

03:        information that he provided to her?  Does that make

04:        sense, Braden?

05:   Q. (By Mr. Pence)  Captain Aagard, did you do anything

06:        other than speak with Chief Mahaffey to follow-up on

07:        the Cahill meeting?

08:   A. No.

09:   Q. Other than speak with your attorney?

10:   A. There was an article or something in writing that I was

11:        provided to read.

12:   Q. Was that regarding the Cahill meeting with Mahaffey?

13:   A. I would have to refer to it and I don't have it with

14:        me.

15:   Q. Okay.  How long did you speak with Officer Monique

16:        Avery?

17:   A. About an hour.

18:   Q. What did you discuss with Officer Monique Avery?

19:   A. I discussed her role as one of the officers in the

20:        prisoner processing.

21:   Q. What was her role in prisoner processing?

22:   A. She did a lot of the write-ups for the booking sheets.

23:   Q. Are those like the sergeant booking -- like screening

24:        forms?

25:   A. The officer -- they're the booking sheet for the jail

0030

01:        which has the probable cause statement for booking.

02:     Q. Did you look at any of those forms in preparation for

03:        the hearing or in preparation for deposition today?

04:     A. I didn't -- I did not.

05:     Q. Are you familiar with those forms?

06:     A. I am.

07:             MS. COWART:  Braden, I think you're sharing

08:        your screen and you may not want to.

09:             MR. PENCE:  Fair enough.

10:     Q. (By Mr. Pence)  Exhibit 15 previously marked and

11:        admitted in this case is a screening form, Sergeant

12:        Arrest Screening Form.  Are you familiar with those?

13:     A. Yes.

14:     Q. Do you know what the difference is between the

15:        Sergeants Arrest Screening Form and the jail write-up

16:        that you're indicating Officer Monique Avery was

17:        involved with?

18:     A. Yes.

19:     Q. What is the difference?

20:     A. The sergeant arrest screening is when the sergeant

21:        talks to the arrestee and asks them questions about the

22:        arrest, medical issues, kind of an overall, Are you

23:        doing okay?  Is there anything you want to tell me?

24:        And the booking sheets are the place we put the

25:        probable cause statements for the arrests for the jail

0031

```
01:        to read.
02:    Q. So are there probable -- are there those jail screening
03:        forms for my clients?
04:    A. There would be, yes.
05:    Q. Have you reviewed those in preparation for today's
06:        deposition?
07:    A. No.
08:                MS. COWART:  Objection.  Scope.
09:    A. Sorry.  No.
10:    Q. (By Mr. Pence)  What other information goes on there
11:        besides probable cause?
12:    A. Personal information:  Their name, their date of birth,
13:        address; what crime that they're charged with, location
14:        of arrest, case number.
15:    Q. Thank you.
16:                MR. PENCE:  I'm asking -- I'm making a formal
17:        request right now, and we can follow-up in writing, but
18:        a formal request that the forms that Captain Aagard is
19:        referring to be provided for my clients.  My
20:        understanding is those have not been provided.
21:                MS. COWART:  Okay.  Talk to me later.  I'm not
22:        sure if I understand what you're asking for, but I'm
23:        happy to work with you on that later.
24:    Q. (By Mr. Pence)  Captain Aagard, do you understand what
25:        I'm asking for?
```

0032

01:     A. Yes.

02:     Q. Will you please assist your attorney in finding --

03:        locating those documents?  Because they have not been

04:        provided.

05:             All right.  So you -- and then Kennard, tell me

06:        about how much time you spent discussing and preparing

07:        for this deposition with Mr. Kennard?

08:     A. I talked to him for about 30 minutes.

09:     Q. What did you discuss?

10:     A. We discussed his deposition.

11:     Q. Did you discuss with him SPD's decision making with

12:        respect to individuals who were arrested and

13:        transported to King County Jail for booking for

14:        protests in 2020?

15:     A. Yes.

16:     Q. And what did you learn from him?

17:     A. I learned from him that it was my understanding after

18:        talking with him because I needed to clarify some

19:        things with him was that he believed that the booking

20:        procedures were on a case-by-case basis and it was up

21:        to the jail who they took and we screened it on a

22:        case-by-case basis for non-violent misdemeanors.

23:     Q. Anyone else did you speak to other than your attorney

24:        and other than Mahaffey, Avery, and Kennard; anybody

25:        else?

0033

01:     A. No.

02:     Q. Is there anybody else who would have knowledge

03:        regarding Topic 1 who you did not speak to?

04:     A. Anyone that was involved in any of the demonstrations

05:        in prisoner processing or as an IC would have

06:        information during that time.

07:     Q. Is there anyone else you wish you had an opportunity to

08:        speak with but did not in preparing for the deposition?

09:     A. No.

10:     Q. Were there -- what documents did you review in

11:        preparing for the deposition?

12:     A. I reviewed news articles, depositions, and memos and

13:        e-mails.

14:     Q. About how much time did you spend reviewing those

15:        documents?

16:     A. Three to four hours in addition to the time I met with

17:        my attorney.

18:     Q. Is there any other documents you wish you had an

19:        opportunity to review but didn't have access to?

20:     A. No.

21:     Q. After the time you spent speaking with these

22:        individuals and reviewing documents, to your knowledge,

23:        is there anybody who is more prepared than you to

24:        testify on behalf of the City regarding Topic 1?

25:     A. No.

0034

01:     Q. I'm going to share Exhibit 54.

02:              (Exhibit 54 marked for identification.)

03:     Q. (By Mr. Pence)  These are Supplemental Disclosures by

04:        the City of Seattle.  All right.  Do you see this

05:        document in front of you?

06:     A. Yes.

07:     Q. A three-page PDF dated by counsel on the 14th day of

08:        August 2023 disclosing two witnesses:  Captain Lori

09:        Aagard and Detective Monique Avery.

10:              This statement:  "Captain Aagard was assigned to

11:        prisoner processing on many occasions during large

12:        crowd events in 2020.  Captain Aagard has information

13:        about SPD's decision making with respect to which

14:        individuals were arrested and transported to King

15:        County Jail for booking during such events and how King

16:        County Jail's booking restrictions affected SPD's

17:        decision making?"

18:              Is that a correct statement, Captain Aagard?

19:     A. Yes.

20:     Q. And Detective Avery is also disclosed here.  You

21:        referred to her as officer.  Is this a detective as

22:        well or was at the time?

23:     A. She is a detective.

24:     Q. All right.  And it sounds like essentially the same

25:        statement regarding scope of knowledge here that

0035

01:        Detective Avery did about the same things you did; is

02:        that true to your information and belief?

03:    A. No, we had different -- we had different expectations

04:        for what we did.

05:    Q. Okay.  And what were those differences?

06:    A. I was in charge of the -- the entire prisoner

07:        processing and booking, and she was in charge of the

08:        writing the probable cause statement.  So she was more

09:        hands-on than I was as far as writing the -- up the

10:        booking sheets.  I had responsibility for the entire

11:        crew.

12:    Q. So you were Detective Avery's supervisor in that role?

13:    A. Yes.

14:    Q. All right.  Given your personal background, training,

15:        and experience and knowledge that we were told about in

16:        August of 2023, all of the work you've done to prepare

17:        for this deposition by talking to those individuals,

18:        reviewing documents, are you prepared to testify and

19:        bind the City with your answers regarding Topic 1

20:        today?

21:    A. Yes.

22:    Q. So I'm going to go into back to Exhibit 52, the notice.

23:        So there's a term here "large crowd event."  What does

24:        that term mean?

25:    A. Large crowd event to me means a substantial amount of

0036

01:          people that are planning an event.  It can be a

02:          Seahawks game, it can be a 4th of July -- any event

03:          there's several people -- lots of people.

04:     Q.  Do the arrests that occurred outside of the east

05:          precinct on January 1st, 2021, that are the subject

06:          matter of this suit constitute a large crowd event?

07:     A.  No.

08:     Q.  So how does the term "large crowd event" apply to the

09:          protest activity that occurred in 2020?  How did

10:          Seattle apply that?  I understand you're saying that

11:          there's Seahawks games and other stuff.  Focusing in on

12:          protests in 2020, how does large crowd event apply

13:          there?

14:     A.  So when there's a planned large crowd event during that

15:          time, we would activate our -- our SPOC, our special

16:          operations center, and we would have a formal IAP and

17:          people assigned to the event apart from the normal

18:          responsibilities.

19:     Q.  So I'm going to try and clarify right now that we're

20:          talking about large crowd events in the context of this

21:          deposition.  I'm referring to protests-related large

22:          crowd events.  I don't think we need to go into

23:          Seahawks games.  Does that sound fair to you?

24:     A.  Yes.

25:     Q.  So what is -- I understand there's no written policy or

```
0037
```

01:     procedure, but I guess my -- are there unwritten

02:     policies or procedures that would apply to this?

03:               MS. COWART:  Objection.  Vague.  You can

04:     answer.

05:  A. When we do a large crowd event and we activate SPOC, we

06:     do what's called an Incident Action Plan, which states

07:     our commander's intent, our objectives, and what we

08:     plan to accomplish and how we're going to accomplish

09:     them for that particular event.  So it's in our IAPs.

10:  Q. (By Mr. Pence)  I understand this may be confusing

11:     partly because there's a distinction that's been drawn

12:     between policy and procedure on the one hand that there

13:     aren't any written policies or procedures but there are

14:     protocols and practices.

15:          And so I guess rather than getting too wrapped up

16:     in the distinction there, I'm interested in your answer

17:     being with respect to anything like that, whether it's

18:     written or unwritten, what the City's policies or

19:     practices are with respect to that.

20:          So with respect to a large crowd event, how does

21:     the IAP or whatever sort of planning document that SPD

22:     produces in anticipation of a large crowd event, under

23:     that approach, who has discretion for making arrests,

24:     arrest decisions?

25:  A. Under the IAP anybody can make an arrest at a large

**Pl.'s Obj: 401-403 (relevance, confusion, waste of time). Subject to Pl's MIL re: other activity at the East Precinct.**

```
    0038
01:          crowd event.
02:     Q. Do IAPs ever identify certain thresholds of activity or
03:          public safety --
04:     A. No.
05:     Q. -- concerns in order to authorize arrests?
06:     A. The standard is significant property damage or anything
07:          that threatens the public safety is a threat to the
08:          community or the police or the people that are involved
09:          in the protest or bystanders.  So that is kind of --
10:          that is what we go -- and anyone can make that arrest
11:          depending on what is happening in front of them.
12:     Q. So those criteria, are those -- do those apply to all
13:          IAPs in response to a large crowd event or are those
14:          sort of the standing rules of engagement with respect
15:          to making arrests?
16:     A. It's stated on the IAPs in large crowd events, but if
17:          an officer is on patrol they have that discretion to
18:          make arrests to protect life and safety of the public.
19:     Q. That was the case in 2020 up through January 1st, 2021?
20:                    MS. COWART:  Objection.  Confusing.
21:     A. Yes, and it's -- we still operate with that, protecting
22:          life and significant property damage, protecting the
23:          public.
24:     Q. (By Mr. Pence)  Okay.  What does significant property
25:          damage mean?
```

D's Obj: 403 (confusion and mischaracterizes testimony)

PI's Resp.: relevant to City's interest in arrest. Testimony speaks for itself.

```
     0039
01:        A. Significant property damage means breaking out windows,
02:           denting cars.
03:        Q. Did you say denting cars?
04:        A. Yeah, if they were bashing cars.  You know, significant
05:           property damage, felony-level property damage.
06:        Q. So what about misdemeanor-level property damage, would
07:           that be -- meet the threshold for significant property
08:           damage?
09:        A. It would depend on the totality of the circumstances in
10:           a large crowd event.
11:        Q. Okay.  So if we're talking about a protest that does
12:           not constitute a large crowd event, do those limits
13:           still apply or is something other -- some other
14:           practice with respect to non large crowd events?
15:        A. If it's a non large crowd event and it's misdemeanor,
16:           non-violent, property damage, we're more likely -- or
17:           we will address it and it wouldn't be as targeted.  We
18:           would -- if we saw someone doing misdemeanor property
19:           damage, we would address it quicker.
20:        Q. What does that -- I'm sorry, I didn't hear the last
21:           word.
22:        A. Quicker than in a large crowd event.
23:        Q. And what does "address it" mean?
24:        A. Make an arrest.
25:        Q. So in a large crowd event, you're less likely to make
```

0040

01:       an arrest?

02:    A. Yes.

03:    Q. Other than the life safety issue and the significant

04:       property damage consideration that you have raised --

05:       and I want to be broad as to life safety.  You included

06:       threats to bystanders, threats to officers, all of that

07:       understood.

08:           So setting those two considerations aside, were

09:       there any other limits on SPD's discretion that it gave

10:       officers to make arrests during protests in 2020?

11:    A. No specific limits, but officers were directed not to

12:       go into the crowds for safety.  We were making targeted

13:       arrests on the whole unless something was going on

14:       right in front of that officer that he needed to stop

15:       at the moment.

16:    Q. Were there any limits based on the nature of the

17:       offense?

18:    A. Can you give me an example?

19:    Q. Well, misdemeanor as opposed to felony, for example?

20:    A. It would depend on the crowd, what was going on in the

21:       totality of the circumstances.

22:    Q. Was misdemeanor versus felony a factor that Seattle

23:       Police Department approved officers using when

24:       determining discretion to conduct an arrest in 2020?

25:    A. It wasn't broken down like that.  It was more life

0041

01:        safety, overall totality of circumstances.

02:    Q. So it was not a factor that SPD approved in terms of

03:        making decisions about arrests in 2020?

04:    A. It wasn't specified felony versus misdemeanor.  It was

05:        more broad.  It was more life safety depending on the

06:        crowd, the circumstances of the day.

07:    Q. Who had authority to make those decisions during large

08:        crowd events?

09:    A. For who was going to be arrested or?

10:    Q. Yes, who was going to be arrested?

11:    A. The commander's intent was given at roll call at the

12:        start of each event.  The IC would describe what he

13:        wanted to accomplish, but officers were always given

14:        the discretion based on the commander's intent to make

15:        arrests.

16:    Q. How did Seattle Police Department maintain control over

17:        officer discretion -- given what you're saying, I

18:        understand completely that in the moment the officer

19:        has been given some sort of direction regarding the

20:        commander's intent, but how does SPD maintain a

21:        continuity of command and control following the event?

22:            Is there a supervision, is there some tracking, how

23:        did SPD make sure that officers are exercising

24:        discretion appropriately?

25:                    MS. COWART:  Objection.  Compound.  You can

0042

01:     answer.

02:     A. Well, there's the chain of command out in the field.

03:         You have a captain, a lieutenant, and then you have

04:         sergeants that are in charge of their squads.  The

05:         lieutenant and the captain place these squads of

06:         officers in places with directions on what to do.

07:             They're not allowed to -- or I mean, they're

08:         discouraged from running into the crowd because it's

09:         not safe.  So when arrests were made, it was usually a

10:         targeted arrest where they were told, this person is

11:         going to be arrested, and they give a description, and

12:         then it's a targeted arrest.

13:     Q. (By Mr. Pence)  So who makes that decision in advance

14:         to make a targeted arrest?

15:     A. They're -- it wasn't made in advance.  It's made during

16:         the protest or the demonstration.  If someone is

17:         seen -- for an example, throwing a bottle at bystanders

18:         or the police, that description will go out and those

19:         officers are directed, whether it's a -- usually a bike

20:         squad will go in, surround that individual and arrest

21:         them, just that one.  It's a targeted arrest.

22:     Q. When I say advance, I don't mean in advance of the

23:         protest.  I mean in advance of -- it's not like an

24:         officer makes a decision and dives forward and grabs

25:         somebody.  If it's a targeted arrest, there's a

0043

01:          decision to target a person, and that --

02:     A. Right.

03:     Q. -- targeted decision is made by the officer, or is

04:          there supervision involved prior to the arrest itself?

05:     A. It's -- it's usually someone that's watching the crowd

06:          that sees this happening.  And then they will call out

07:          over the radio, This is what's going on, and they'll

08:          direct the officers in to arrest the individual.

09:     Q. So I have personal experience with an arrest occurring

10:          on the 4th of July on Pine Avenue right about a block

11:          away from the east precinct at around 12:30 or 1:00

12:          where an officer came in and arrested an individual who

13:          hadn't thrown anything or done anything to threaten

14:          anybody.  He was simply standing in the street.

15:          Would that circumstance be consistent with what

16:          SPD's practice and policy was with respect to who was

17:          to be arrested during protests during 2020?

18:               MS. COWART:  Objection.  Personal knowledge.

19:          Beyond the scope.  You can answer.

20:     A. I would need to know the details of that particular

21:          arrest to be able to answer that.

22:     Q. (By Mr. Pence)  Yeah.  I can ask you to -- based on a

23:          hypothetical that if you -- if the -- if an officer was

24:          confronted with an allegation of pedestrian

25:          interference, no allegation of assault, no allegation

0044

01:       of confronting people or being violent, would that

02:       criteria meet Seattle Police Department's policy with

03:       respect to decision making about arrests and booking?

04:  A. It would depend on where the pedestrian interference

05:       was.  If it was in the middle of a deserted street, no.

06:       If it was blocking an onramp to, say, Harborview where

07:       people needed to get medical attention, then yes.  So

08:       it's still the totality of the circumstances.

09:  Q. We can be more specific on that point as well.  This

10:       was on Pine Street just outside of the intersection

11:       with 11th in the middle of the afternoon on the 4th of

12:       July.  Dozens and dozens of other people in the street,

13:       protest activity going on, but nothing violent.

14:          Would that be a circumstance in which that would

15:       comply with SPD's decision making at the time regarding

16:       arrests and booking?

17:  A. Was this the only person that got arrested?

18:  Q. Yes.

19:  A. Not knowing why the officers arrested them, there was

20:       probably another reason.  Maybe he or she had already

21:       done something prior to coming there and they were

22:       tracking them or they had a warrant.

23:  Q. Okay.  If we were to be specific on those points, that

24:       there had been nothing that the person had done

25:       illegally up to that point and that there was no

0045

01:         warrants, is there any other factors that you can think

02:         of that might justify arrests under SPD's decision

03:         making at the time?

04:                 MS. COWART:  Objection.  Beyond the scope.

05:         Calls for speculation.  You can answer.

06:    A. We don't arrest people that are just casually standing

07:         on the street unless there's extenuating circumstances

08:         or we have warned them to -- to disperse.

09:    Q. How does SPD ensure that?

10:    A. Ensure what?

11:    Q. Ensure that what you just said, that officers don't

12:         make inappropriate arrests at protests, how do you

13:         track and monitor and follow-up on arrests?

14:    A. That's the sergeant's responsibility.  He's -- he or

15:         she is responsible for their squad and they screen all

16:         of those arrests prior to booking.

17:    Q. So if someone was arrested and booked into the King

18:         County Jail, that would have been a decision that was

19:         approved by the sergeant; is that right?

20:    A. Correct.  Correct.

21:    Q. Is there any -- any additional layer of supervision or

22:         tracking that SPD does beyond the sergeant to ensure

23:         that protests during [sic] arrests are appropriate?

24:    A. On a daily -- on a daily during 911 like on patrol or

25:         demos or what are you specifying?

0046

01:     Q. Anything beyond the level of a sergeant's review that

02:        would allow SPD to review arrests and make sure that

03:        the arrests at protests are lawful and appropriate?

04:     A. We have several layers of accountability.  We have our

05:        OPA.  If anyone has an issue, they can file a

06:        complaint.  We have three layers of oversight with the

07:        first one being OPA.  And if there's a complaint made,

08:        OPA investigates.

09:     Q. And what we have been talking about with respect to the

10:        decision -- SPD's decision making for arrests and

11:        booking decisions, was that all accurate as of January

12:        1st, 2021?

13:     A. Yes, it's the same, same today.

14:     Q. Moving on to the decision to who to transport to King

15:        County Jail for booking, who -- was there any limit on

16:        who could be booked into the King County Jail during

17:        large crowd events?

18:     A. Some nights there was more limits depending on

19:        different factors, but overall, no, there was no

20:        specified limits or written protocols as far as

21:        limiting.

22:     Q. What were the factors?

23:     A. The factors were on a case-by-case basis, totality of

24:        circumstances, if it was a felony or a violent

25:        misdemeanor.  And if it didn't meet those, then it

0047

01:          would be screened with the jail.

02:                    MS. COWART:  Braden, we have been going a

03:          little over an hour.

04:                    THE WITNESS:  I was going to ask to go to the

05:          restroom.

06:                    MR. PENCE:  We can do five minutes.  How about

07:          1:55?

08:                    MS. COWART:  Okay.  It might be like

09:          seven-and-a-half minutes, but we'll take a break and

10:          come back as quickly as we can.

11:                    MR. PENCE:  My hope is that we get through

12:          this today.  So that will help if we do more today

13:          rather than having to come back.

14:                    MS. COWART:  That would be good.

15:                    MR. PENCE:  See you soon.

16:                    THE VIDEOGRAPHER:  Going off the record at

17:          1:49 p.m.

18:                    (Recess taken.)

19:                    THE VIDEOGRAPHER:  Back on the record at 1:58

20:          p.m.

21:     Q.  (By Mr. Pence)  So, Captain Aagard, what is -- if I

22:          understand you correctly, your definition of large

23:          crowd event is that there are a large number of people

24:          and some sort of event that you have pre notice for so

25:          that you can issue an IAP and initiate SPOC; is that

0048

```
01:        right?

02:     A. That's best case scenario.  Sometimes we get large

03:        crowd events that we haven't planned for as well as.

04:     Q. Okay.  And your testimony is that the plaintiffs'

05:        arrests was not a large crowd event?

06:     A. Correct.

07:     Q. So what is it you're able to testify to regarding the

08:        plaintiffs' arrests?

09:     A. You would have to ask me a question and I can give

10:        protocols, policies that we use for arresting people in

11:        the field.

12:     Q. So you are prepared to answer questions regarding

13:        plaintiffs' arrests; is that correct?

14:                MS. COWART:  Objection.  Beyond the scope.

15:        Mischaracterizes testimony.

16:     A. I can -- yes.

17:     Q. (By Mr. Pence)  What -- what is it that makes

18:        plaintiffs' arrests not a large crowd event?

19:     A. There was not very many of them; the shear size of the

20:        individuals that were there.

21:     Q. What would be the cutoff generally speaking for that

22:        criteria to be met?

23:     A. You know, there's no hard and fast rule, but 20 to 50,

24:        right in there, would be what I would consider a large

25:        crowd event.
```

D's Obj: duplicative
of 36:04-36:07

0049

01:     Q. What would be the different policies or protocols that

02:        would apply to a large crowd event as opposed to

03:        plaintiffs' arrests?

04:     A. There wouldn't be a difference except for the fact that

05:        we would plan and ensure that we had proper -- the

06:        proper amount of personnel to ensure that the crowd was

07:        safe and the community was safe during it.

08:     Q. So authority for making these decisions and the factors

09:        that should apply to them and the fact that it's case

10:        by case and like the other factors you've talked about,

11:        those would apply to large crowd events as well as to

12:        an event like the one where my clients were arrested?

13:     A. The arrests that you're referring to with your clients

14:        was a 911 call.  I wouldn't call it an event.

15:     Q. Tell me what you mean by -- tell me what you understand

16:        about my clients' arrests.

17:     A. From what I --

18:            MS. COWART:  Objection.  Vague.  You can

19:        answer.

20:     A. What I know is that there was eight to -- around eight

21:        people that were outside the east precinct writing with

22:        chalk and standing around the precinct.

23:     Q. And your understanding was it was a 911 call?

24:            MS. COWART:  Objection as scope.  You can

25:        answer.

**Pl's Obj.:**
**Relevance**
**(401-403). Witness**
**testified**
**plaintiffs' arrest**
**was not large**
**crowd event.**

**Pl.'s Obj.: 403**
**(confusion, no 911**
**call).**

0050

01:     A. It was like a 911 call that would have come from the

02:        community.  I believe it was from the clerk to patrol,

03:        but the protocol was one like a 911 call coming in from

04:        a community member.

05:     Q. (By Mr. Pence)  The factors that apply to large crowd

06:        events, which I understand you to say are essentially

07:        the same as they would apply to my clients' arrests,

08:        those factors were it's a case-by-case basis dealing

09:        with whether it's a felony or misdemeanor, there's sort

10:        of officer discretion involved.  Are there any other

11:        major factors that we should know about with respect to

12:        SPD decision making for arrests and booking?

13:              MS. COWART:  Objection.  Vague.

14:        Mischaracterizes testimony.  Scope.  You can answer.

15:     A. Ongoing threat to the community, any danger to the

16:        community or police or bystanders.

17:     Q. That's the life safety factor, right?

18:     A. No, it's ongoing threat to the community depending on

19:        the totality of the circumstances and what they are

20:        doing.

21:     Q. All right.  Ongoing threat, life safety issues,

22:        substantial property destruction, what other factors

23:        might apply?

24:              MS. COWART:  Objection.  Vague.  Scope.

25:     A. Repeat offenders.

Aagard, Lori 30(b)(6) - Volume 1 - 01/29/2024

0051

01:     Q. (By Mr. Pence)  Anything else?

02:            MS. COWART:  Same objections.

03:     A. Not that I can think of right now.

04:     Q. (By Mr. Pence)  Are there any factors that are

05:        prohibited by the Seattle Police Department with

06:        respect to making the decision to arrest or book

07:        someone during a protest event?

08:     A. No.

**D's Obj: 403 (mischaracterizes intended testimony)**

**PI's Resp.: Testimony speaks for itself.**

09:     Q. Will you be testifying at trial about anything other

10:        than large crowd events?

11:            MS. COWART:  Objection on personal knowledge.

12:        Calls for speculation.  Beyond the scope.

13:     A. I would be testifying to whatever I'm testifying here

14:        today on.

15:     Q. (By Mr. Pence)  So I asked you a series of questions

16:        about how Seattle Police Department monitored,

17:        influenced, or controlled officer discretion with

18:        respect to arrests during 2020 protests.  Same question

19:        with respect to the decision to book.

20:            How did SPD influence, monitor, and control those

21:        decisions?

22:     A. It was on a case-by-case basis and we would screen it

23:        with the jail.  And if it met their criteria, we would

24:        transport and book them.

25:     Q. So if an officer was making a decision to book someone

```
     0052
```

01:         on the basis of their participation in non-violent

02:         protests or criticizing the police, how would the

03:         Seattle Police Department know that?  How would Seattle

04:         Police Department apprise itself of an improper basis

05:         for retaliating?

06:     A. Are you talking about a large crowd or a 911 call?

07:     Q. Well, let's first talk about a large crowd.

08:     A. For a large crowd, the prisoner processing team would

09:         decide whether or not to book after screening it with

10:         the jail.  The officers would make the arrest in the

11:         field, then it was screened by a sergeant, and then by

12:         the prisoner processing team.  So the officer was

13:         making the decision to arrest but not to book.

14:     Q. For large crowd events?

15:     A. Correct.

16:     Q. How does that differ from non large crowd events?

17:     A. The difference is there's not a prisoner processing

18:         team set up for 911 calls.  The officers make the

19:         arrest and they screen it with a patrol sergeant and

20:         the decision is made by the patrol sergeant whether or

21:         not to book, if or with the screening at the jail.

22:     Q. All right.  So I'm a little confused.  I'm going to go

23:         back to Exhibit 54 regarding what you're going to be

24:         testifying about.  All right.  Do you have Exhibit 54

25:         in front of you again?  This is the supplemental

0053

01:     disclosures.

02:          It states here for number one:  Captain Lori Aagard

03:     that you were assigned to prisoner processing during

04:     large crowd events.  You have information about SPD's

05:     decision making with respect to individuals that were

06:     arrested during such events.

07:          So what I fail to understand is what the scope of

08:     your testimony would be at trial.  And I'm -- you

09:     haven't been disclosed as a witness to testify about

10:     anything other than large crowd events?

11:               MS. COWART:  Objection.  This is beyond the

12:     scope.  It calls for speculation.  Calls for a legal

13:     conclusion.

14:     Q.  (By Mr. Pence)  Well, I'm asking the witness:  Do you

15:     as the City's 30 (b)(6) designee intend to testify on

16:     anything other than the topics about which you have

17:     been disclosed as testifying during the 30 (b)(6)

18:     deposition?

19:               MS. COWART:  Objection.  The -- anything about

20:     trial is outside the scope.

21:               MR. PENCE:  No, it's not.

22:               MS. COWART:  That this was noticed for.

23:               MR. PENCE:  No, it's not.  The 30 (b)(6)

24:     testimony is intended to define what the City's

25:     testimony will be at trial, not just at -- with respect

0054

01:          to what -- with respect to these -- this topic.  The

02:          City doesn't get to pick and choose what testimony it

03:          wants to present at trial.  This is the testimony at

04:          trial.

05:     Q. (By Mr. Pence)  So, Captain Aagard, is there anything

06:          beyond -- anything that you intend to testify to

07:          regarding Topic 1 that hasn't been disclosed

08:          previously?

09:               MS. COWART:  Same objections.

10:     A. I -- I'm a little confused.  I answered the questions

11:          that you asked me.  I didn't volunteer information

12:          about non large crowd events you specifically asked me,

13:          so I answered them.

14:     Q. (By Mr. Pence)  So other than submitting a complaint

15:          about a booking and other than the sergeant's review,        **Pl's Obj: Relevance 401-403.**

16:          is there anything the Seattle Police Department does to

17:          monitor, influence, or control officer decision making

18:          regarding booking in response to protests in 2020?

19:               MS. COWART:  Objection.  Scope.  You can

20:          answer.

21:     A. We have a full -- if there's any force used, we have a

22:          full -- it's called our Force Review Board, which I was

23:          the chair of for a year.  And it looks at the entire

24:          incident, the probable cause, the legal authority for

25:          that arrest, and deescalation tactics.  It looks deeply

```
      0055
01:          into any incidents where officers use force, so that is
02:          a very thorough layer of oversight that our department
03:          uses.
04:     Q. Okay.  So if an officer doesn't use force but is making
05:          an arrest and booking decision, is there any
06:          supervision that SPD has other than the sergeant's
07:          review and if someone submitted a complaint?
08:                 MS. COWART:  Objection.  Scope you can answer.
09:     A. We have body-worn video as well as ICB.  Everything
10:          those officers do is on multiple cameras.  So
11:          everything is recorded.  So any citizen could ask for a
12:          public disclosure and get all of the video from that
13:          incident as well as all of the reports if they wanted
14:          to.
15:     Q. (By Mr. Pence)  So in a non large crowd event, who is
16:          it that makes the decision to book?
17:                 MS. COWART:  Objection.  Scope.  You can
18:          answer.
19:     A. The officer screens it with the sergeant and the
20:          sergeant has the ultimate responsibility whether or not
21:          that person should be booked.  But they take into
22:          account officers -- what the officers say as well.  But
23:          the sergeant has the ultimate authority on whether or
24:          not they should be booked, but they still have to
25:          screen it with the jail if it's a non-violent
```

```
     0056
```

01:          misdemeanor.  So ultimately it would be up to the jail.

02:                    MR. PENCE:  Object as to the portion of that

03:          answer that as nonresponsive.

04:     Q. (By Mr. Pence)  How are officers and the sergeants

05:          advised about Seattle Police Department's policy

06:          regarding decisions to book?

07:                    MS. COWART:  Objection.  Scope.  You can

08:          answer.

09:     A. We are still operating under the Covid restrictions

10:          that were put in place in 2020, so we do have protocols

11:          where if it's a non-violent felony, we have to screen

12:          with the jail on a case-by-case basis.

13:     Q. My question is:  How are the officers and the sergeants

14:          advised about this policy?  Not anything about the

15:          Covid.  How -- you're -- the topic you're testifying is

16:          about SPD's decision making.  You just said that the

17:          decision is made by the officer and then reviewed by

18:          the sergeant.

19:              So my question is:  How does SPD's decision making

20:          communicate that policy or practice or procedure, how

21:          is that communicated to the officers and the sergeants

22:          who are actually doing it?

23:                    MS. COWART:  Objection.  Compound.  Confusing.

24:          Scope.  You can answer.

25:     A. Officers have discretion in the field to place people

0057

01:        under arrest, transport them to the precinct, and then

02:        screen it with the sergeant and to book them if

03:        appropriate.  The officers have that discretion in the

04:        field to make the arrest and bring them to the precinct

05:        where the arrest is then screened by the sergeant.

06:    Q. (By Mr. Pence)  How are officers and sergeants advised

07:        about the factors that they're -- they are to consider

08:        in making these decisions?

09:              MS. COWART:  Objection.  Vague.  Scope.  You

10:        can answer.

11:    A. They need to have legal authority, they need to have

12:        lawful purpose, they have to have probable cause.  And

13:        if they have those three things, then they are allowed

14:        to screen a booking to get them booked into the King

15:        County Jail if appropriate.

16:    Q. (By Mr. Pence)  Is there any training regarding --

17:              MS. COWART:  Objection.

18:    Q. -- how SPD's -- does SPD give its officers or sergeants

19:        any training regarding the factors that were to be

20:        considered in making determinations about whether to

21:        book an arrest in 2020?

22:              MS. COWART:  Objection.  Scope.  You can

23:        answer.

24:    A. If all of the factors are met with legal authority,

25:        lawful purpose, and probable cause, the training is

**Pl's Obj: Personal knowledge, relevance, legal conclusion. FRE 401-403, 602.**

0058

01:          it's a case-by-case basis.  And if they're an ongoing

02:          threat to the community, it would be better to book.

03:          Like a DV, we book them to unplug them from the scene

04:          because they're an ongoing threat to that DV victim.

05:              So we have conditions when we are mandated by state

06:          law to book.  So we give training on things like that,

07:          yes.

08:     Q. (By Mr. Pence)  Does SPD know how many people were

09:          arrested during protests for non-violent offenses that

10:          did not qualify for booking under the book restrictions

11:          during 2020?

12:              MS. COWART:  Objection.  Scope.  You can

13:          answer.

14:     A. We have numbers of the people that we arrested and that

15:          were booked, yes.

16:     Q. (By Mr. Pence)  Okay.  And how many people were

17:          arrested during 2020 for misdemeanors that did not

18:          qualify for booking under the booking restrictions?

19:              MS. COWART:  Objection.  Scope.

20:     A. I am not aware of any bookings that were booked that

21:          did not qualify for booking under the non-violent

22:          misdemeanor restriction.

23:     Q. (By Mr. Pence)  Did SPD track that?

24:              MS. COWART:  Objection.  Scope.  You can

25:          answer.

0059

01:     A. I'm not sure if they tracked that, what you're saying.

02:     Q. (By Mr. Pence)  What I'm specifically saying is protest

03:        arrests, was SPD tracking the number of arrests during

04:        the protests and then tracking what the offenses they

05:        were arrested for?

06:     A. Yes.

07:     Q. Okay.  How many people were arrested -- do you know how

08:        many people were arrested during 2020 protests?

09:                   MS. COWART:  Objection.  Scope.  You can

10:        answer.

11:     A. I don't know the total.

12:     Q. (By Mr. Pence)  What do you know about the number?

13:                   MS. COWART:  Objection.  Scope.  You can

14:        answer.

15:     A. I know about some of the numbers on the nights that I

16:        worked prisoner processing how many were arrested and

17:        booked.

18:     Q. (By Mr. Pence)  I'm going to show you what has been

19:        marked previously as Exhibit -- Plaintiffs' Exhibit 2.

20:        It's a two-page PDF.  Do you see that on your screen?

21:     A. Yes.

22:     Q. All right.  This is a March 24th, 2020 Memorandum from

23:        the King County Jail's Director John Diaz to King

24:        County Sheriff and Police Chiefs.

25:                Have you seen this document before?

0060

01:     A. Yes.

02:     Q. This was -- and obviously addressed to police chiefs

03:        would be including the Seattle Police Department chief.

04:        Do you know whether this was received by the Seattle

05:        Police Department chief?

06:     A. I don't know for sure if he read it.

07:     Q. When this was sent, to be clear, the chief would have

08:        been Chief Best, correct?

09:     A. Yes.

10:     Q. Do you know whether Chief Best or now Chief Diaz

11:        received this document?

12:     A. I'm assuming they read it, but I can't testify to the

13:        fact that they for sure did.

14:     Q. Was this document discussed internally by SPD command

15:        staff?

16:     A. I am not sure about that.  I wasn't on the command

17:        staff with SPD.

18:     Q. Given that you're testifying as a 30 (b)(6) witness for

19:        the City of Seattle, was this document considered at

20:        all with respect to the decision making Seattle Police

21:        Department was making with respect to protest arrests

22:        and bookings?

23:     A. Yes, that is why we had the restrictions on the

24:        non-violent misdemeanors and why we had to screen it

25:        with the jail on a case-by-case basis.

Aagard, Lori 30(b)(6) - Volume 1 - 01/29/2024

0061

01:      Q. And was that the policy as of the beginning of the 2020

02:         protests?  So this goes in place in March, protests

03:         really begin the end of May.  What was the SPD policy

04:         as of that period of time about the County's booking

05:         restrictions?

06:      A. This applied -- the first protest that I worked was the

07:         May 30th, and this was taken into account for that.

08:      Q. Okay.  So Captain Aagard, I'm asking you in your

09:         capacity as a 30 (b)(6) witness and not with your

10:         personal -- your personal testimony.  So for the City

11:         of Seattle, did this policy apply to bookings prior to

12:         the 2020 protests in May?

13:                    MS. COWART:  Objection.  Vague.  Confusing.

14:      A. We were aware of this and we did -- it was provided to

15:         patrol during that time March 24th, 2020.  People were

16:         aware of the restrictions because of Covid.

17:      Q. (By Mr. Pence)  And you as City of Seattle understood

18:         that this restriction was a health measure, correct?

19:                    MS. COWART:  Objection.  Scope.  You can

20:         answer.

21:      A. That's what the memo says, to cut down the amount of

22:         inmates in the jail so they could all have their own

23:         bunk.  And Seattle police also were being very careful

24:         with arrestees as well as because we didn't want to

25:         catch -- and catch Covid.  So we had protocols in place

**Pl's Obj: Personal knowledge, relevance, legal conclusion. FRE 401-403, 602.**

```
    0062
01:        as well.
02:    Q. (By Mr. Pence)  Right.  We're talking about SPD
03:        decision making, and so part of the decision is that
04:        we're dealing with a contagious virus that the City
05:        acknowledges is potentially fatal, right?
06:    A. Correct.
07:                MS. COWART:  Objection.  Scope.  You can
08:        answer.
09:    A. Correct.
10:    Q. (By Mr. Pence)  And the risk is to the public; it's to
11:        City employees, it's to detainees, it's to County
12:        employees, the jail, it's to the community at large,
13:        correct?
14:    A. Correct.
15:    Q. (By Mr. Pence)  And that risk, this health concern, is
16:        especially valid in congregate settings where you have
17:        lots of people milling around each other, right, like
18:        jail?
19:    A. Correct.
20:    Q. And those concerns all applied as of January 1st, 2021,
21:        did they not?
22:                MS. COWART:  Objection.  Scope.  You can
23:        answer.
24:    A. The protocols were still in place during that time.
25:    Q. (By Mr. Pence)  Right.  And the health concerns
```

D's Obj: Outside Scope of 30(b)(6)

0063

01:     underlying those protocols all applied as of January

02:     1st, 2021, as they pertained to Seattle Police

03:     Department decision making, correct?

04:             MS. COWART:  Objection.  Scope.  You can

05:     answer.

06:  A. Correct.

07:  Q. (By Mr. Pence)  And the strategy that this memo

08:     outlines as it pertains to Seattle Police Department

09:     decision making in Topic 1, the strategy was to reduce

10:     the jail population by restricting eligibility to book,

11:     literally booking restrictions, right?

12:             MS. COWART:  Objection.  Confusing.  You can

13:     answer.

14:  A. It was a guideline, but there was always -- there was

15:     always the direction that we could screen with the jail

16:     on a case-by-case basis with the underlying reasoning

17:     being if they were going to be an ongoing threat to the

18:     community or factors that would endanger anybody.

19:  Q. (By Mr. Pence)  We're having a bit of a communication

20:     problem.  I'm not asking for that.  My question was

21:     that you understood -- that the City of Seattle

22:     understood that the strategy was to reduce the jail

23:     population?

24:             MS. COWART:  Objection.  Argumentative.

25:     Confusing.  Scope.  You can answer.

0064

01:     A. According to this memo, yes, that is what the Director

02:        John Diaz was trying to accomplish to have less people

03:        in the jail because they had reduced space.

04:     Q. (By Mr. Pence)  And the way that the King County Jail

05:        elected to accomplish that was by restricting the

06:        offenses that were eligible for booking.  Did the City

07:        understand that?

08:             MS. COWART:  Objection.  Scope.  You can

09:        answer.

10:     A. Yes.

11:     Q. (By Mr. Pence)  And the City understood that the

12:        strategy rendered most misdemeanor offenses not

13:        eligible for booking.  We'll get into the exception in

14:        a second, but you understood the general approach was

15:        to make most misdemeanors ineligible?

16:             MS. COWART:  Objection.  Confusing.  Compound.

17:        You can answer.

18:     A. We never understood it as a hard line.  It was always

19:        the totality of the circumstances surrounding the

20:        arrest.

21:     Q. (By Mr. Pence)  We're going to get into the exception

22:        in a just second, Captain Aagard.  I'm not trying to

23:        ask you a trick question.  I want to -- I understand

24:        that the City understood that the strategy to reduce

25:        the jail population in response to this deadly threat

0065

01:        was to make most misdemeanor offenses ineligible for

02:        booking.  Did the City understand that or not?

03:                MS. COWART:  Objection.  Argumentative.

04:        Confusing.  Scope.  You can answer.

05:     A. If you take out ineligible, I would say yes.  But

06:        because you're saying "ineligible," then that is not

07:        what we understood because there was always the

08:        case-by-case exception.

09:     Q. (By Mr. Pence)  So right here where it says "Jails will

10:        not accept people brought in for misdemeanor charges

11:        except for the following charges that present a serious

12:        public safety concern."  You found that -- you

13:        understood that to not be a hard line, that was a

14:        guideline?

15:     A. There is more to the memo.  Just looking at that --

16:     Q. There is.

17:     A. -- is confusing because another memo says "case-by-case

18:        basis."

19:     Q. Well, there's another part on the next page, but I'm

20:        asking about this right now, where it says "Jails will

21:        not accept people brought in for misdemeanor charges

22:        except for the following charges that present a serious

23:        public safety concern."  Your understanding was that

24:        was not a hard line?

25:                MS. COWART:  Objection.  Mischaracterizes

0066

01:     testimony.  You can answer.

02:     A. Yes, it was not a hard line because there's always

03:        exceptions.

04:     Q. (By Mr. Pence)  Did the Seattle Police Department have

05:        any understanding of what was going on with the jail

06:        population under their booking restrictions?

07:     A. Going on in what respect?

08:     Q. Well, measuring the population of the jail.  There's a

09:        couple different ways to do that.  One would be average

10:        daily population.  Did Seattle Police Department

11:        maintain an awareness of what was going on with the

12:        average daily population of the jail?

13:                    MS. COWART:  Objection.  Scope.  You can

14:        answer.

15:     A. I wasn't aware of any numbers that we got daily from

16:        the jail, no.

17:     Q. (By Mr. Pence)  So was the jail's population, did that

18:        have anything to do with Seattle Police Department's

19:        decision making about arresting and booking people?

20:     A. According to this memo, we -- we followed this memo

21:        with the added exception for screening, case-by-case

22:        basis, we did follow it.

23:     Q. Okay.  I'm asking you about how you would know about

24:        the jail population.  Did the Seattle Police Department

25:        track and consider measurements of the jail population

0067

01:          when making booking restriction decisions -- sorry,

02:          booking decisions?

03:     A. That was part of our screening process when I would

04:          screen with the jail on the -- the night of, that was

05:          taken into consideration by the jail.

06:     Q. Was it taken in consideration by the Seattle Police

07:          Department?

08:     A. When I screened they would inform me of certain things

09:          and not allow bookings based on their numbers or their

10:          staffing.

11:     Q. What would they inform you about?

12:     A. Sorry, what?

13:     Q. You said they informed you of certain things.  What are

14:          those certain things?

15:     A. Staffing, how many people were on duty to take care of

16:          inmates that were there.

17:     Q. Anything else?

18:     A. No.

19:     Q. Did the Seattle Police Department keep officers

20:          apprised of the average daily population of the King

21:          County Jail on any given day?

22:     A. No.

23:     Q. Why not?

24:     A. It wasn't something that was messaged out to officers.

25:          I'm not -- I can't speak to conversations that other

0068

01:          people may have had with the jail, but it was never

02:          messaged out if they did.

03:     Q. Was the Seattle Police Department's decision making

04:          with respect to arrests and bookings during the period

05:          of time covered in Topic 1, did that consider as a

06:          factor the City's desire to not spread Covid-19?

07:     A. Can you rephrase that?  That was a little confusing.

08:     Q. Yeah.  Did the City of Seattle consider Covid-19 as a

09:          factor when making decisions addressed under Topic 1?

10:     A. Yes.

11:     Q. Tell me about that.

12:                    MS. COWART:  Objection.  Vague.  You can

13:          answer.

14:     A. Officers were concerned about getting Covid as well.

15:          We had protocols in place, we wore masks, we wore

16:          coverings when needed.  If there was an arrest that

17:          didn't meet the protocols and didn't meet any

18:          exceptions on that case-by-case basis, then they would

19:          release them.

20:     Q. (By Mr. Pence)  Anything -- any concerns that SPD had

21:          about Covid-19 as addressed under Topic 1 beyond

22:          officer safety?

23:     A. Safety for the arrestees as well.  We didn't want to

24:          put them in the same holding cell.  Sometimes we

25:          provided them with masks.

0069

01:    Q. Does the City recognize that with respect to its

02:       decision making about arresting people for non-violent

03:       offenses under the case-by-case basis or anything else,

04:       does the City recognize the risk posed by jail churn,

05:       what that term means?

06:    A. I don't know what jail churn is.

07:    Q. So jail churn is instead of a person being booked into

08:       the jail for a long period of time and thereby

09:       increasing the jail population over a long period of

10:       time, being booked in and then being released within a

11:       few hours.  That's a jail churn.  So you're going in

12:       and out quickly.

13:    A. Administratively booking?

14:    Q. Well, I'm not -- administrative -- so a person who gets

15:       booked into the jail, so arrives at the jail is put in

16:       jail clothes, photographed, fingerprinted, held for a

17:       number of hours and then released.  Is that what you

18:       mean when you say "administrative booking"?

19:    A. It sounds similar.  I've never heard jail churn before,

20:       but administratively booked means about that.

21:    Q. Okay.  So does the City recognize that having someone

22:       exposed to the jail and also to put them -- bring their

23:       own viruses, whatever those may be, into the jail on a

24:       brief stay creates a risk to officers, to the public,

25:       to detainees, and so forth?

0070

01:                 MS. COWART:  Objection.  Scope.  You can

02:        answer.

03:     Q. (By Mr. Pence)  And I'll just say as it pertains to the

04:        City decision making with respect to booking and

05:        arrests under Topic 1?

06:                 MS. COWART:  Objection.  Confusing.

07:        Objection.  Scope.  You can answer.

08:     A. There were a lot of concerns and that is one of them.

09:        Large crowds is another concern.  Any people gathering

10:        in a large crowd is a concern.

11:     Q. (By Mr. Pence)  People gathering in a large crowd by

12:        itself is a concern?

13:                 MS. COWART:  Objection.  Scope.  You can

14:        answer.

15:     A. Any get-togethers during that time or large crowds

16:        were -- or family functions with several people, they

17:        were all discouraged.

18:     Q. (By Mr. Pence)  Does that concern get worse if it

19:        involves officers arresting someone, how the contact

20:        there with City employees and then taking to them to

21:        the jail where they have more contact with County

22:        employees and detainees with respect to decision making

23:        under Topic 1?

24:                 MS. COWART:  Objection.  Scope.  Confusing.

25:        You can answer.

0071

01:     A. Any of that is a concern.  That is why we had to weigh

02:        that with any ongoing threat to the community.  So that

03:        was what we weighed.

04:     Q. (By Mr. Pence)  I'm going to show you Exhibit 2 again,

05:        the booking restrictions.  Did the Seattle Police

06:        Department honor these restrictions?

07:     A. As far as I know, we honored those restrictions unless

08:        there was an ongoing threat to the community that

09:        surrounded any non-violent felony.

10:     Q. Did the Seattle Police Department know that Covid-19

11:        was circulating within the King County Jail on or

12:        before January 1st, 2021, and that factor, how that

13:        might apply to SPD decision making?

14:             MS. COWART:  Objection.  Scope.  You can

15:        answer.

16:     A. The decision making was up to the jail.  We never

17:        booked anyone unless they said it was okay to book.

18:        The ultimate decision was always with the jail.  We

19:        could never override the jail.  They're the ultimate

20:        authority on it that.  Not us.

21:             MR. PENCE:  Object as nonresponsive.

22:     Q. (By Mr. Pence)  My question is:  Did the Seattle Police

23:        Department know that Covid-19 was circulating within

24:        the King County Jail on January 1st, 2021?

25:             MS. COWART:  Objection.  Scope.  You can

**Pl's Obj: Personal knowledge, FRE 602.**

0072

01:     answer.

02:     A. I don't think we would have known on that specific date

03:         how many people were positive for Covid in the jail.  I

04:         know it was a concern worldwide.  I don't know

05:         specifically on that date how many arrestees in the

06:         County jail had Covid.

07:     Q. (By Mr. Pence)  Was the Seattle Police Department aware

08:         that at any point prior to January 1st, 2021 -- well,

09:         let's just do through December, December 2020, was the

10:         Seattle Police Department aware that there was Covid-19

11:         circulating in the King County Jail?

12:             MS. COWART:  Objection.  Scope.  You can

13:         answer.

14:     A. I think we were aware that there was Covid in the

15:         prisons, in the jails, kind of like the -- any place

16:         where there was a lot of people, but I didn't have the

17:         exact numbers.

18:     Q. (By Mr. Pence)  How did the Seattle Police Department

19:         monitor its compliance with the booking restrictions

20:         prior to January 1st, 2021?

21:             MS. COWART:  Objection.  Confusing.  Outside

22:         the scope.  You can answer.

23:     A. We monitored how many people were booked in large crowd

24:         functions.  But other data broken down more than that,

25:         I'm not sure.

0073

01:     Q. (By Mr. Pence)  Do you know how many people were booked

02:        in large crowd events during 2020?

03:              MS. COWART:  Objection.  Asked and answered.

04:        Outside the scope.  You can answer.

05:     A. You asked me that before and I said I didn't have a

06:        total number.

07:     Q. (By Mr. Pence)  So if all you're tracking is the number

08:        of people booked during large crowd events, how do you

09:        assess SPD's conformity with the restrictions?

10:              MS. COWART:  Objection.  Scope.  Confusing.

11:        You can answer.

12:     A. That is confusing.  I'm sure that there's some way to

13:        track how many bookings SPD made into the King County

14:        Jail because we do have a contract with them.  I'm sure

15:        there's a way to get that data, but I do not have that

16:        data.

17:     Q. (By Mr. Pence)  Is it fair to say that Seattle Police

18:        Department's directions to its officers regarding

19:        decisions to arrest and book during 2020 protests did

20:        not depend upon a regular assessment of the jail's

21:        population or SPD's overall compliance with the

22:        restrictions?

23:     A. It was a case-by-case basis.  We took into account

24:        safety of the community.  That was our paramount.

25:     Q. (By Mr. Pence)  Was -- did Seattle Police Department

0074

01:        become aware of prior to January 1st, 2021, any

02:        concerns that SPD decision making about booking and

03:        arrests was turning upon detainee participation in

04:        protests?

05:     A. Can you repeat that or rephrase that?

06:     Q. Yeah.  Did Seattle Police Department become aware of

07:        any allegations or concerns that officers were making

08:        arrests and booking decisions for improper reasons,

09:        particularly that non-violent protesters were

10:        protesting?

11:     A. I wasn't aware of any of that.

12:     Q. (By Mr. Pence)  Okay.  Was the Seattle Police

13:        Department aware of any of that?

14:     A. Not that I'm aware of.

15:     Q. And again, you're testifying as a 30 (b)(6) witness on

16:        the issue of decisions, so -- how were the -- were

17:        Seattle Police Department decisions with respect to

18:        arrests and bookings addressed at Jail Administrative

19:        Group meetings, JAG meetings?

20:                MS. COWART:  Objection.  Scope.

21:     A. I'm not aware of that.

22:     Q. (By Mr. Pence)  So you're not aware of SPD officers or

23:        command staff attending JAG meetings at any point prior

24:        to January 1st, 2021?

25:                MS. COWART:  Objection.  Scope.

0075

01:     A. That wasn't part of my duty at the time.  I was not

02:        involved in that.

03:     Q. (By Mr. Pence)  Ms. Aagard, I'm not asking in your

04:        personal capacity.  I'm asking you as the witness

05:        designated to respond to questions about decision

06:        making in 2020.

07:            MS. COWART:  It's Captain Aagard.

08:     Q. (By Mr. Pence)  So, Captain Aagard, you're the designee

09:        to testify about SPD's decision making.  I'm asking if

10:        SPD's decision making was addressed at any JAG meetings

11:        in 2020 prior to my clients' arrests?

12:     A. I don't know.  I was not there.  I can only testify

13:        truthfully to things I'm aware of, so I cannot answer

14:        that because I -- I am being honest.

15:            MS. COWART:  And I'll renew my objection as to

16:        scope in terms of what was discussed at JAG meetings or

17:        not discussed.

18:     Q. (By Mr. Pence)  Did you make any effort to determine

19:        what was discussed at JAG meetings regarding SPD's

20:        decision making about Topic 1?

21:            MS. COWART:  Objection.  Scope.

22:     A. No.

23:     Q. (By Mr. Pence) Did SPD treat the restrictions as

24:        binding on SPD's decision making with respect to Topic

25:        1?

0076

01:     A. No.

02:     Q. Did it treat it as voluntarily?

03:     A. No.

04:     Q. Did it comply with them?

05:     A. Did it what?

06:     Q. Did SPD comply with the restrictions?

07:     A. Yes.

08:     Q. Are there any known instances in which the Seattle

09:         Police Department did not comply with the booking

10:         restrictions up through January 1st, 2021?

11:     A. Not that I know of.

12:     Q. Did plaintiffs' bookings comply with the booking

13:         restrictions?

14:             MS. COWART:  Objection.  Scope.  Calls for

15:         speculation.  Personal knowledge.  You can answer.

16:             MR. PENCE:  It's a totally specious objection.

17:         1 (b) says the connection, if any, between this topic

18:         and arrests and bookings of plaintiffs at issue.

19:     A. I didn't read the arrest report.

20:     Q. (By Mr. Pence)  Okay.  Would you like to read the

21:         arrest report in order to answer that question?

22:             MS. COWART:  Objection.  Scope.  Because she's

23:         already testified that there's not a connection, that

24:         they weren't arrested at a large protest.

25:     Q. All right.  Do you see Exhibit 13 on your screen?

0077

01:     A. Yeah.

02:                   MS. COWART:  It's a little small.

03:     A. Yeah.

04:     Q. (By Mr. Pence)  The three-page exhibit previously

05:        marked --

06:     A. Do you have the booking sheet?  That would be a lot

07:        easier and quicker to see what the jail read.

08:     Q. Your counsel hasn't provided that to us.  We're

09:        referring to SPD decision making in any event.  This is

10:        plaintiffs' Exhibit 13.  Would you please take your

11:        time and read this document -- this --

12:     A. I can't scroll down.  Is this the start of it right

13:        here?

14:                   MS. COWART:  So we can only see a chunk.

15:                   MR. PENCE:  There's the top.

16:     Q. (By Mr. Pence)  The narrative is the part that I'm

17:        interested in you reading.

18:     A. The -- I need to move these over a little more.  Okay.

19:     Q. I'm going to scroll down to the second page.  It's got

20:        the language of the ordinance.  So it goes on to Number

21:        2 up here.  Just a couple more paragraphs.  Go ahead.

22:     A. Okay.  Any more?

23:     Q. No.  That's -- that's essentially the statement.  So --

24:     A. Ask me your question again.

25:     Q. Yeah.  Did plaintiffs' bookings into jail under these

```
   0078
```

01:          facts comply with the booking restrictions as far as

02:          the City of Seattle is concerned?

03:     A. Yes.

04:     Q. How?

05:               MS. COWART:  Objection.  Scope.  You can

06:          answer.

07:     A. Well, several reasons.  Just from looking at this and

08:          not the footage, they were doing what fits the -- fits

09:          the SMC for property damage.  They were repeat

10:          offenders.  They had other previous times been arrested

11:          for obstructing and failure to disperse.  Those are the

12:          first two.

13:               And then if you look at the totality of the

14:          circumstances and what the east precinct has been

15:          dealing with up there, crowds have been trying to burn

16:          the precinct down, hindering the operations of the

17:          precinct, harassing the officers.

18:               It says here that it was live streamed, meaning

19:          that by live streaming this incident, situations like

20:          that can escalate quickly.  Others join in, the crowd

21:          gets bigger, so there is a danger to an ongoing

22:          incident here where officers can be in fear of being

23:          assaulted, more damage to the precinct.

24:               There's apartment buildings right there, right

25:          above and beside the precinct that would be in danger

**Pl's Obj.:
Personal
knowledge, FRE
602.**

0079

01:          if anything happened to the precinct.  People having

02:          dinner, if the crowds got bigger.  So there's an

03:          ongoing danger to the community and the officers and

04:          the operations of the precinct.

05:     Q. So writing peaceful protests created an ongoing danger

06:          to the community and the precinct?

07:               MS. COWART:  Objection.  Scope.  You can

08:          answer.

09:     A. Yes, for the facts that I just stated.

10:     Q. (By Mr. Pence)  How did SPD implement the booking

11:          restrictions?

12:               MS. COWART:  Objection.  Outside the scope.

13:          You can answer.

14:     A. So they were booking restrictions by the jail, not by

15:          SPD.

16:     Q. (By Mr. Pence)  Right.  And you said you honored them;

17:          you complied with them.  How did you comply with them?

18:     A. We --

19:               MS. COWART:  Objection.  Outside the scope.

20:          You can answer.

21:     A. If it was a non-violent misdemeanor and there was no

22:          extenuating circumstances, we could screen it with the

23:          jail and they would say yes or no.

24:     Q. (By Mr. Pence)  So my question is specifically about

25:          how staff were -- so officers and supervisors are the

0080

01:        ones who were making this decision to present people to

02:        the jail, correct?  Outside of -- outside of large

03:        crowd events, correct?

04:    A. Correct.

05:    Q. So how are those individuals, those officers and

06:        supervisors, made aware of the booking restrictions?

07:                MS. COWART:  Objection.  Scope.  You can

08:        answer.

09:    A. There were e-mails, memos passed down to patrol that

10:        were given to the officers and the sergeants and

11:        discussed.

12:    Q. (By Mr. Pence)  Have you reviewed those in preparation

13:        for this deposition?

14:    A. Yes.  I've seen some of them, maybe not all of them.

15:                MR. PENCE:  I haven't received those.  I would

16:        make a formal request --

17:                (Request for Information Made.)

18:                MS. COWART:  No worries.  Later.

19:                MR. PENCE:  -- for defendants to provide the

20:        e-mails and memos that were used to communicate the

21:        booking restrictions to its officers and supervisors.

22:    Q. (By Mr. Pence)  Were officers and supervisors given a

23:        copy of Exhibit -- I've forgotten already -- I guess

24:        this is 13.  Yeah.  I'm sorry, not 13.  Excuse me.

25:        Strike that.

```
       0081
```

01:              Were officers given a copy of the Diaz memo, the

02:        booking restrictions memo, Exhibit 2?

03:                   MS. COWART:  Objection.  Scope.  You can

04:        answer.

05:    A. I'm unsure if they were given a copy of that particular

06:        memo.

07:    Q. (By Mr. Pence)  Were officers and sergeants given any

08:        sort of instruction regarding the purpose of the

09:        restrictions?

10:                   MS. COWART:  Objection.  Scope.  You can

11:        answer.

12:    A. The booking restrictions were communicated and I was

13:        aware of it.  I'm assuming other people knew why as

14:        well.

15:    Q. (By Mr. Pence)  So but specifically the purpose being a

16:        health measure to prevent the spread of Covid-19, was

17:        that communicated to officers and sergeants to your

18:        knowledge?

19:    A. Yes.

**Pl's Obj.: Personal knowledge, FRE 602.**

20:    Q. And were officers given any instruction regarding how

21:        to make booking referral decisions given the

22:        restrictions?

23:                   MS. COWART:  Objection.  Scope.  You can

24:        answer.

25:    A. They were given the list that non -- that still

0082

01:         qualified for booking that were non-violent

02:         misdemeanors and told that outside of those, it would

03:         be a case-by-case basis, which you would have to screen

04:         with the jail.

05:    Q. (By Mr. Pence)  And what were they told about the

06:         case-by-case basis criteria that they would need to --

07:         what were they told they needed to tell the jail in

08:         order to get a booking that didn't qualify under the

09:         restrictions?

10:    A. It would have been a case-by-case basis and there would

11:         have to be extenuating circumstances, an ongoing threat

12:         to the public, the community, repeat offenders,

13:         totality of the circumstances surrounding the arrest.

14:    Q. Were officers instructed to change their practices with

15:         respect to arrests or booking in any way in response to

16:         the restrictions?

17:                   MS. COWART:  Objection.  Scope.  You can

18:         answer.

19:    A. If they screened an arrest with the jail and the jail

20:         declined to take them, then they would investigate and

21:         release the subject, if the jail would refuse to take

22:         them.

23:    Q. (By Mr. Pence)  Okay.  I guess I'm saying before the

24:         decision was made to present them to the jail for

25:         booking before the refusal would happen, if any, were

0083

01:        officers under instructions from SPD to make -- to

02:        change their decision making at all about arrests or

03:        bookings given the restrictions?

04:                MS. COWART:  Objection.  Confusing.  Compound.

05:        So you can answer.

06:    A. I can give you an example.  If an officer had an arrest

07:        for a shoplifter, misdemeanor shoplifter, during this

08:        time with the restrictions and there was no extenuating

09:        circumstances with that shoplifter, no warrants, no

10:        ongoing threat to the community, then they would

11:        investigate and release that subject.  They wouldn't

12:        screen those with the jail.

13:    Q. (By Mr. Pence)  Was there an instruction to SPD

14:        officers to simply do less policing during 2020 leading

15:        up to January 1st, 2021?

16:                MS. COWART:  Objection.  Scope.  Vague.  You

17:        can answer.

18:    A. No.

19:    Q. (By Mr. Pence)  So were officers arresting people at

20:        the same rate during that period of time than they were

21:        prior like in the year before, for example?

22:                MS. COWART:  Objection.  Scope.  You can

23:        answer.

24:    A. I would have to look at data to know that for sure.

25:    Q. (By Mr. Pence)  I'm trying to understand how it is that

0084

01:        the jail population dropped substantially during this

02:        period of time and how SPD participated in that drop.

03:        So I guess my question is:  To your knowledge with

04:        respect to SPD decision making for booking and arrests,

05:        how did SPD accomplish the reduction in the number of

06:        people it's referring to the jail, or did it?  Was SPD

07:        referring the exact same number of people approximately

08:        as it was in years before?

09:                MS. COWART:  Objection.  Scope.  Compound.

10:        Confusing.  You can answer.

11:    A. I think one of the factors that reduced the King County

12:        Jail population was the DOC warrants.  They were

13:        deferred to SCORE jail.  We could no longer book DOC

14:        warrants into the King County Jail.  We had to take

15:        them to the SCORE jail.  That would have been a

16:        substantial amount of arrestees.

17:    Q. (By Mr. Pence)  Anything else like that that would

18:        structurally change the number of people SPD was

19:        bringing into the jail?

20:                MS. COWART:  Objection.  Scope.  You can

21:        answer.

22:    A. Like the example I used before, a shoplift, they were

23:        I&R'd, if there was no other extenuating circumstances

24:        or ongoing threat to the community.

25:    Q. (By Mr. Pence)  So if I were to present to you the

0085

01:         claim that there were approximately 500 people arrested

02:         and booked into jail by SPD during large crowd events

03:         in 2020, the vast majority of whom were arrested for

04:         offenses that are not eligible for booking based off

05:         the offense into the King County Jail, is it your

06:         testimony that in all of those circumstances, there are

07:         extenuating circumstances related to ongoing threat to

08:         the community or to public safety or to significant

09:         property damage that justifies those bookings?

10:                 MS. COWART:  Objection.  Confusing.  Compound.

11:         Scope.  You can answer.

12:    A. When I was doing the prisoner processing, they were

13:         all -- they all met the criteria for ongoing threat to

14:         the community, repeat offenders, with totality of

15:         circumstances.  I can't testify to all of them without

16:         looking at each individual booking sheet.

17:    Q. (By Mr. Pence)  And that's your testimony as the City's

18:         30 (b)(6) designee on this topic, correct?

19:    A. Yes.

20:    Q. All right.  I'm going to go back to Exhibit 2, I

21:         believe, the booking restrictions.  Do you see that on

22:         your screen?

23:    A. Yes.

24:    Q. All right.  I'm going to go down to the section below,

25:         which is what you have been alluding to.  "Please note

0086

01:        we have provided an avenue that would allow our shift

02:        captains the authority to work with your agency on

03:        specific recommendations regarding an individual

04:        booking."  Do you see that language?

05:     A. Yes.

06:     Q. Is this the case-by-case avenue you were referring to

07:        before about how someone who was not arrested for an

08:        eligible offense might be booked?

09:     A. That's one of them.  Another memo states case by case,

10:        but that has the same flavor as the other one, but it

11:        was a different memo.

12:     Q. So what is the City's understanding what this language

13:        means?

14:                 MS. COWART:  Objection.  Scope.  Personal

15:        knowledge.  You can answer.

16:     Q. (By Mr. Pence)  As it pertains to City decision making

17:        in Topic 1, what is the City's understanding of what

18:        that language means?

19:     A. The paragraph where it says "Please note that we have

20:        provided an avenue to allow our shift captains..."

21:     Q. Yes.

22:     A. I dealt with the jail.  I would call over to screen the

23:        arrests.  I don't know if it was always shift captains

24:        or what that definition of a shift captain is over

25:        there.  Sometimes it was delegated to the -- another

0087

01:        individual that was acting as a shift captain and they

02:        would screen the arrest with us.  That's what it means

03:        to me is that I would screen it with their version of a

04:        shift captain when we made arrests.

05:    Q. Yeah.  It sounds like you're talking about the

06:        logistics of how this worked, and I appreciate that.

07:        We're going to get to that, but is it true that this

08:        avenue that Director Diaz is referring to is

09:        essentially a way for the City to book someone who has

10:        not committed a qualifying offense?

11:    A. A qualifying offense, that is a case-by-case basis.  We

12:        don't try to screen calls that we know do not fit the

13:        protocols.

14:    Q. I'm not trying to be tricky here.  This right up here

15:        says "Jails will not accept people brought in for

16:        misdemeanor charges except for the following."  When I

17:        say qualifying offense, I'm referring to this list of

18:        offenses that says -- that exclusively will not accept

19:        people.

20:           So that's what I mean when I say, if they're not on

21:        this list, you don't qualify.  So down here it says

22:        This is a way you can do a booking that for an offense

23:        that's not listed.  That's what I'm asking about.

24:           Is that your understanding that this language here

25:        essentially allows the City to do a booking outside of

0088

01: this list?  And I know the list changed a little bit.

02: There were gun offenses and other misdemeanors added on

03: a few weeks after this.  So this is not a complete

04: list, but there is a list.

05: You can either qualify for booking because

06: easy-peasy, you were arrested for an offense on the

07: list.  And if not, there's this alternative avenue.

08: That's my question.  Does the City understand this is

09: essentially a way for you to book someone for an

10: offense that's not on the list?

11: A. If we can say they're an immediate risk to the public

12: safety, then the jail can either accept that or deny

13: it.  It was always up to the jail, though, not SPD.

14: Q. All right.

15: MS. COWART:  Is this a good time for another

16: quick break?

17: MR. PENCE:  I would like to keep going for a

18: few more minutes if we can, and then I think we would

19: be happy to take a break.  Yeah.  Is that okay?

20: MS. COWART:  The only issue is I need to

21: get -- I need to plug in my laptop.

22: MR. PENCE:  You need to plug in your laptop?

23: MS. COWARD:  How long -- how much longer do

24: you want to go before we have a break?  Because I have

25: to --

0089

01:                    MR. PENCE:  I'm going to be done by 4:00

02:        today.

03:                    MS. COWART:  Okay.  Can we take a five-minute

04:        break just so I can plug in my laptop?  But if you want

05:        to ask a few more questions, that's totally fine.  But

06:        if my laptop dies, then I'll be gone.  Then we'll have

07:        to break.

08:                    MR. PENCE:  Definitely we can take a break in

09:        a couple minutes.

10:                    MS. COWART:  Okay.

11:    Q. (By Mr. Pence)  So if I understood your testimony

12:        regarding Exhibit 2 about the avenue, the way that

13:        would work would be the booking sergeant would call

14:        somebody over -- the sergeant -- the officer would

15:        refer the matter to the sergeant and the sergeant would

16:        call over to the jail or the person in your capacity

17:        would call over to the jail and make representations

18:        regarding public safety to the jail, who would then

19:        either accept those or not and allow for an exception

20:        to the booking restrictions; is that right?

21:    A. If there was an immediate risk to public safety, yes.

22:    Q. If SPD represented that to the jail?

23:    A. If we articulated the facts of the case.

24:    Q. Are there any magic words SPD would have to say to

25:        articulate a public safety concern?

0090

01:     A. No.

02:     Q. Are you aware of any times in which Seattle Police     **Pl's Obj.:Personal knowledge, FRE 602.**

03:        Department said, This person represents a public safety

04:        concern, we need them booked, and the jail said no?

05:     A. We would always articulate the facts in the case

06:        surrounding the arrest.  We wouldn't just say "public

07:        safety concern."  We would have to articulate the facts

08:        in each case.

09:     Q. Right.  Are you aware of any times in which SPD made

10:        those claims and the King County Jail said no, that's

11:        not sufficient to constitute a public safety exception

12:        to the restrictions?

13:     A. There were some times when they articulated they were

14:        so short with staffing, it wasn't that -- it wasn't

15:        just the facts.  They were taking into account also

16:        their staffing.

17:     Q. So when did that occur?

18:     A. I don't -- I can't -- I do not know the exact moment I

19:        had that conversation.

20:     Q. Approximately when did that occur?

21:     A. Somewhere of 2020.

22:     Q. Okay.  Approximately how many occasions did that occur?

23:     A. And you're asking just for the large crowd events,

24:        correct?

25:     Q. Let's start with that, yes.

0091

01:     A. I -- I wouldn't be able to give you a number on the

02:        exact amount.  It was three years ago.

03:     Q. Okay.  So how about an approximate number?

04:     A. I really don't know.

05:     Q. So anywhere between -- so can you couch it for me,

06:        somewhere between 100 times and zero times?  Is there

07:        any range you can give that you would be comfortable

08:        with?

09:     A. It would -- it would have been around 5-ish.  It's a

10:        very broad number.  I just know it -- sometimes their

11:        staffing was so low that it did affect the bookings.

12:     Q. All right.

13:              MR. PENCE:  Let's -- Kerala, did you get the

14:        plug in?  Is that what you were doing there for a

15:        second?

16:              MS. COWART:  I got the plug in. I still would

17:        like a restroom break, but it's not as urgent as having

18:        to plug in, so --

19:              MR. PENCE:  Let's go ahead and take a break.

20:        Five minutes.  3:17, please.  Thank you.

21:              THE VIDEOGRAPHER:  Okay.  Off the record at

22:        3:12 p.m.

23:              (Recess taken.)

24:              THE VIDEOGRAPHER:  Back on the record at 3:20

25:        p.m.

0092

01:              MR. PENCE:  A little longer than five minutes.

02:         Hopefully we'll get through with this before 4:00.

03:    Q. (By Mr. Pence)  So the term "protestor exception" has

04:       been kicking around this case.  Sometimes it's referred

05:       to in deposition testimony.  It's been referred to in

06:       the pleadings.  What does that term mean to the City

07:       with respect to the Topic 1?

08:    A. There's no protestor exception for bookings into the

09:       King County jail.

10:    Q. We have discovery responses and deposition testimony

11:       indicating that on occasion during 2020 Seattle Police

12:       Department would reach out to the jail in advance of

13:       large protest events to accommodate booking protestors

14:       for offenses that did not qualify under the

15:       restrictions.  Is that a protester exception?

16:    A. No.

17:    Q. What is that?

18:              MS. COWART:  Objection.  Vague.  Vague.

19:         Scope.  You can answer.

20:    A. So when we make arrests at large crowd demonstrations,

21:       we are -- our objective is to facilitate people's right

22:       to express their First Amendment right, freedom of

23:       speech.  We don't -- we try to deter from making any

24:       arrests.  The only arrests we make are targeted

25:       arrests.

**Pl's Ojb:
Relevance,
confusion, waste of
time FRE 401-403.**

```
     0093
```

01:              So when we make a targeted arrest, it's for

02:         something that is either significant property damage or

03:         is endangering the public or the people -- the

04:         protesters themselves or bystanders.  So when we make

05:         an arrest, it's targeted.  So almost all of those fit

06:         the booking protocols.

07:    Q. My question was about the practice of SPD reaching out

08:         to the jail in advance of large protest events.  Is

09:         that true that that occurred?

10:    A. Is that what?

11:    Q. Did that occur?

12:    A. Yes.

13:    Q. So you're not doing that in response to any specific

14:         event or specific property damage or endangering the

15:         public or anyone because you're doing it before it's

16:         happened.  So my question is whether or not -- what do

17:         you call the practice of reaching out to the jail in

18:         advance of a protest in order to get authority to book?

19:    A. I did -- I was the one that reached out to the jail a

20:         lot of the time.  And the reason I did that was more of

21:         a courtesy to the jail to let them know we have this

22:         big event and we're letting you know that we may have

23:         several people that we're going to bring in to book.

24:         So it was more of a courtesy to let them know and to be

25:         prepared.

0094

01:     Q. And what did the King County Jail say to you in

02:        response when you reached out in advance of these

03:        protests?

04:     A. When I was talking to them it was mainly letting them

05:        know, so they would say thank you for letting us know.

06:        And I have had conversations when I've called over

07:        there to the King County Jail.  And one night I was

08:        talking to one of the booking commanders there and he

09:        told me specifically that if any of the arrests do not

10:        fit the non-violent or the violent misdemeanor, so it's

11:        a non-violent misdemeanor, if you have any of those and

12:        they're an ongoing threat to the community, we will

13:        still take those.  So he told me that that would fit

14:        the case-by-case screening basis.

15:     Q. So prior to any particular arrest or any factors

16:        arising, you would get preauthorization from the King

17:        County Jail about -- for booking of protesters who met

18:        that exception?

19:     A. Preauthorization to know that they had staffing and

20:        letting them know that there's going to be bookings and

21:        that we may be screening on a case-by-case basis for

22:        potential non-violent misdemeanors that were an ongoing

23:        threat to the community.

24:     Q. Where would officers have gotten the impression that

25:        there was a protester exception to the booking

D's Obj: 403 (mischaracterizes earlier testimony),
602, Outside Scope of 30(b)(6)

```
     0095
01:          restrictions?
02:                    MS. COWART:  Objection.  Scope.  You can
03:          answer.
04:      A. I think those in patrol that weren't working a lot of
05:          the large crowd demonstrations that were not hearing
06:          the roll call and reading the IAPs may have in their
07:          world and their daily workup, like at each precinct
08:          when they're working second or third watch, they may
09:          casually think that.  But it was never what -- that was
10:          never discussed or determined by anyone outside that
11:          there was a protester exception.
12:      Q. How would SPD have intervened in order to correct that
13:          misunderstanding that officers and patrol may have
14:          developed, like --
15:      A. We didn't --
16:      Q. -- was there a training or instruction or oversight
17:          that would have corrected officers misunderstanding
18:          about the existence of a protest or booking exception?
19:                    MS. COWART:  Objection.  Scope.  You can
20:          answer.
21:      A. There was the memo that was given out that said it was
22:          a case-by-case basis.  So maybe they would have gotten
23:          it confused by that, but there was not -- the thought
24:          wasn't there that people were confused or that people
25:          on patrol were -- thought that there was a protestor
```

0096

01:     exception.  I had never heard that until I read

02:     Sergeant Kennard's testimony.

03: Q. (By Mr. Pence)  I'm going to share with you previously

04:     marked Exhibit 21.  This is an October 8th e-mail

05:     string between Caedmon Cahill and public defenders and

06:     some folks from the King County -- yeah, I guess these

07:     are King County public defenders and other folks in the

08:     Seattle city government.

09:         This includes a response from Mr. David Montes to

10:     Ms. Cahill responding in line to some questions that

11:     Ms. Cahill posed, including a concern I guess by Ms.

12:     Cahill, who you had previously identified as an Office

13:     of Civil Rights employee, that SPD filings/practices

14:     that appear to try and evade the booking restrictions.

15:         Mr. Montes responds with information -- his

16:     perspective on it, including the sentence "In protest

17:     cases especially, they have gotten the jail to book

18:     people on misdemeanors."

19:         And this goes on.  So this is October 8th, 2020.

20:     To your knowledge, as the City's 30 (b)(6) witness

21:     regarding SPD decision making, did this ever come to

22:     your attention?  Did you ever become aware of a concern

23:     by the public defenders and other folks who actually

24:     within the City -- the City's Office of Civil Rights

25:     were concerned that SPD was circumventing the booking

0097

01:       restrictions in order to book people?

02:                 MS. COWART:  Objection.  Confusing as to you.

03:   A. No, I wasn't aware of that.

04:   Q. (By Mr. Pence)  And you specifically as the City's 30

05:       (b)(6) witness, are you aware of -- the City -- the

06:       Seattle Police Department ever becoming aware of that

07:       concern?

08:   A. Only recently when I was reading over the material that

09:       I received from my attorney.

10:   Q. So the material you've reviewed in preparing for this

11:       has let you know that SPD did have reason to know that

12:       there was a concern about this prior to January 1st,

13:       2021?

14:                 MS. COWART:  Objection.  Assumes facts not in

15:       evidence.

16:                 MR. PENCE:  It's a question.

17:   A. The memo I read was from the jail, not from SPD.

18:   Q. (By Mr. Pence)  The memo you read about concerns that

19:       SPD was circumventing the booking restrictions was from

20:       the county jail?

21:   A. The one that I just read, it appeared it was from the

22:       -- someone from the county jail, not SPD.

23:   Q. The one I just showed you?

24:   A. Yeah.

25:   Q. No, it's not from the county jail.  Okay.  I'm not

0098

01:       referring to Exhibit 21.  Are you -- this -- as the

02:       City's 30 (b)(6) designee, are you aware of any basis

03:       that the City -- that SPD was aware of about a concern

04:       that officers were circumventing the booking

05:       restrictions to book protesters prior to January 1st,

06:       2021?

07:   A. Not specifically within SPD.  I read some news articles

08:       that stated that, yes.

09:   Q. When were the news articles published?

10:   A. I would have to refer to it.

11:   Q. What did SPD do, if anything, to change or investigate

12:       this concern?

13:   A. We didn't change anything because we were already

14:       screening them on a case-by-case basis and we did not

15:       have a protester exception.

16:   Q. Okay.  When did SPD first become aware that the King

17:       County Jail had took the position that SPD was

18:       circumventing the booking restrictions?

19:             MS. COWART:  Objection.  Mischaracterizes

20:       testimony.  Assumes facts not in evidence.  Scope.  You

21:       can answer.

22:   A. That doesn't make sense to me because we can't

23:       circumvent it.  We screened it and it was up to the

24:       jail to accept it or not accept it.

25:   Q. (By Mr. Pence)  Did SPD ever become aware of John Diaz,

0099

01:          the director of DAJD, having a complaint regarding the

02:          people who SPD was bringing to the jail to book?

03:     A. I wasn't aware of that.

04:     Q. And you -- that's your testimony as a 30 (b)(6)

05:          designee, correct?

06:     A. Yes.

07:     Q. Is SPD aware of anything that DAJD Director John Diaz

08:          did to alert, advise, or influence SPD's decision

09:          making regarding booking during 2020?

10:               MS. COWART:  Objection.  Scope and confusing

11:          with respect to timing.

12:     Q. (By Mr. Pence)  You can answer.

13:     A. Can you repeat that one more time, please?

14:     Q. Yeah.  What, if anything, is SPD aware of John Diaz

15:          doing to complain about alert, advise, or influence

16:          SPD's decision making about booking protesters during

17:          large crowd events in 2020?

18:     A. I wasn't aware of any complaints from John Diaz about

19:          the bookings that they accepted.

20:     Q. And that's your testimony as the CR 30 (b)(6) witness,

21:          correct?

22:     A. Correct.

23:     Q. What is SPD's understanding about the Office of Civil

24:          Rights concern about protester booking in 2020?

25:               MS. COWART:  Objection.  Confusing with

```
     0100
```

01:        respect to time and outside scope.  You can answer.

02:     A. I wasn't aware of any at the time until I read the --

03:        the articles.

04:     Q. (By Mr. Pence)  How would SPD make itself aware of a

05:        concern about this particular topic, the decision

06:        making regarding booking folks in 2020?

07:                MS. COWART:  Objection.  Confusing.  You can

08:        answer.

09:     A. Yeah, that's confusing.

10:     Q. (By Mr. Pence)  You're acknowledging that there was a

11:        concern, but you weren't aware of it.  You're

12:        testifying about decision making, and I'm wondering

13:        what is the way that SPD should have become aware of

14:        that concern with respect to that topic?

15:                MS. COWART:  Objection.  Confusing.  Scope.

16:        You can answer.

17:     A. From the public or from the news media or from the

18:        jail?

19:     Q. (By Mr. Pence)  Any or all.  If someone has a concern

20:        that SPD is circumventing the restrictions in order to

21:        book protesters, how would SPD become aware of that?

22:        If that's being discussed among Office of Civil Rights,

23:        there's complaints from the director of the jail,

24:        there's newspaper articles coming out about it.

25:                How should you as the City have become aware of

0101

01:     those concerns?

02:          MS. COWART:  Objection.  Compound.  Confusing.

03:     Scope.  You can answer.

04:  A. That would go through our Office of Professional

05:     Accountability and they would investigate it.

06:  Q. (By Mr. Pence)  Was the Seattle Police Department aware

07:     during 2020 about community concerns that Seattle

08:     Police Department was making arrests and booking

09:     decisions in retaliation for free speech?

10:          MS. COWART:  Objection.  Scope.  Vague.  You

11:     can answer.

12:  A. I wasn't aware of that.

13:  Q. (By Mr. Pence)  And you're testifying as a 30 (b)(6)

14:     witness?

15:  A. Yes.

16:  Q. So let's talk briefly about the factors that were

17:     authorized for officers and sergeants to rely on and to

18:     represent to the King County Jail in order to make

19:     booking recommendations that don't qualify under that

20:     list of offenses.

21:          As I understand your testimony, those factors are

22:     significant property damage and endangering the public

23:     of an ongoing threat; is that correct?

24:          MS. COWART:  Objection.  Confusing as to

25:     qualify.

```
        0102
```

01:     A. No, because significant property damage would be a

02:        felony and that would be bookable.

03:     Q. (By Mr. Pence)  Okay.  So the only reason that someone

04:        should be being booked is endangering the public or the

05:        community through -- or officers to an ongoing threat?

06:     A. There were many reasons case by case of why they would

07:        be booked, several reasons on a case-by-case basis, if

08:        it didn't meet the booking criteria that was specified.

09:     Q. Well, your previous testimony on this topic has been

10:        repeated that the primary considerations were

11:        significant property damage and endangering the public

12:        of an ongoing threat or officers or other folks.

13:           So I guess I'm wondering if someone doesn't pose a

14:        threat to -- an ongoing threat to the public, someone

15:        isn't carrying a weapon, isn't making assaultive

16:        statements, isn't -- hasn't done that in the past, I'm

17:        trying to understand why they would be booked.

18:           So we have heard a little bit of testimony in this

19:        case about the concern about imposing consequences on

20:        people, that I guess if someone is chalking -- so for

21:        example, we're talking about sidewalk chalk, right?

22:        Can we agree that sidewalk chalk doesn't present a

23:        threat to the public?

24:     A. Well, just to be clear, I thought it said in the report

25:        charcoal.  Was it charcoal or chalk?

0103

01:     Q. One person wrote in charcoal, one person -- three

02:       people or two people wrote -- I don't know exactly.

03:       Honestly it's both charcoal or chalk, but is there a

04:       big difference to you in your mind between charcoal and

05:       chalk with respect to danger in the community?

06:              MS. COWART:  Objection.  Scope.  You can

07:       answer.

08:     A. I would have to look at the totality of the

09:       circumstances in that case.

10:     Q. (By Mr. Pence)  Yeah.  Well, you've read the report, so

11:       that's what I'm asking you about, the totality of the

12:       circumstances in that case.  People writing in

13:       charcoal, let's talk about that first.  Does someone

14:       writing the words "peaceful protest" in charcoal

15:       present a danger to officers?

16:              MS. COWART:  Objection.  Scope.  Speculation.

17:       Asked and answered.  You can answer.

18:              MR. PENCE:  You can have a standing objection

19:       to all of those bases.  The topic is whether -- like

20:       how those things apply to the rest of the plaintiffs.

21:       Your objection is noted for the record.

22:     A. So I would have to --

23:     Q. (By Mr. Pence)  How does somebody writing in charcoal

24:       create a danger to an officer?

25:              MS. COWART:  Same objections.

0104

01:     A. So in looking at the totality of the circumstances,

02:        they were repeat offenders, they were live streaming

03:        it, and hindering the operations of the east precinct.

04:        So the east precinct was a flash point.  They had many

05:        things happen there, they had people firing fireworks

06:        into their building, they were hindering the access and

07:        egress of the precinct.

08:            And the officers were in fear for their lives many

09:        times when they were trying to burn the precinct down

10:        and lock them inside, so --

11:     Q. (By Mr. Pence)  Is there anything about charcoal that

12:        gave officers concern for their lives?

13:     A. Charcoal gave them the PC for the arrest.  It was

14:        property damage.

15:     Q. Okay.  So did -- was the factors -- we're dealing with

16:        the decision making -- SPD's decision making for

17:        arrests and booking.  Was -- was fear for their

18:        lives -- was fear for their lives a factor in the

19:        decision to arrest or book for my clients?

20:                MS. COWART:  Objection.  Calls for

21:        speculation.  Lack of personal knowledge.  Outside the

22:        scope.  You can answer.

23:     A. It is looking at the totality of the circumstances.  So

24:        when they made the decision to book, there was an

25:        ongoing threat to the community and to the officers.

Pl's Obj:
Personal
knowledge FRE
602.

0105

01:     On that night they couldn't operate their precinct and

02:     come and go in their operations.

03:          It hindered the operation of that police department

04:     for that night.  And they were live streaming it,

05:     meaning many other protesters -- many other people can

06:     come down there, join it, block the roadways.  It can

07:     escalate very fast in these kind of conditions.

08:  Q. (By Mr. Pence)  Okay.  So I'm not trying to trick you

09:     or force you into a corner.  I'm asking you about each

10:     of the pieces of the answer you've given me.  You've

11:     said repeat offenders; we'll talk about that.  You've

12:     said live streaming; we'll talk about that.  You've

13:     said east precinct operations being hindered; we'll

14:     talk about that.

15:          I'm trying to get a simple answer from you on

16:     whether or not a person writing in chalk or writing in

17:     charcoal made the officers fear for their lives; yes or

18:     no?

19:          MS. COWART:  Objection.  Argumentative.

20:     Harassing.

21:  Q. (By Mr. Pence)  Go ahead and answer the question.

22:  A. It's not a yes or no question.  It's totality of the

23:     circumstances.

24:  Q. Okay.  And what I'm asking is the totality of the

25:     circumstances, is that factor of writing in chalk, does

0106

01:      that raise a concern about -- like the officer safety,

02:      does that make the officers fear for their lives?

03:   A. It can.

04:   Q. Do you have an opinion about whether that occurred in

05:      this case?

06:            MS. COWART:  Objection.  Outside the scope.

07:      Asked and answered.  Calls for speculation.  You can

08:      answer.

09:   A. I think there was an ongoing feeling that they were a

10:      threat to the safety of the officers in the surrounding

11:      community, yes.

12:   Q. (By Mr. Pence)  All right.  And they're repeat

13:      offenders, so what does that mean?  What -- what do you

14:      have to do to qualify as a repeat offender in order to

15:      get an exception to the book restriction?

16:            MS. COWART:  Objection.  Mischaracterizes

17:      testimony.  Outside scope.  You can answer.

18:   A. That is part of the totality of the circumstances

19:      showing that they have been arrested prior on charges

20:      of obstructing or property damage surrounding

21:      disturbances.

22:   Q. (By Mr. Pence)  So does it matter what you're arrested

23:      for?

24:            MS. COWART:  Objection.  Vague.  Confusing.

25:   A. I would say it would matter in obstructing or a failure

Aagard, Lori 30(b)(6) - Volume 1 - 01/29/2024

0107

01:          to disperse or anything that creates a -- a threat to

02:          community safety would be different than like an

03:          isolated shoplifting incident ten years ago.  Anything

04:          that would show an ongoing threat to the officers or

05:          the community.

06:     Q. (By Mr. Pence)  So Mr. Tucson was arrested first; he

07:          was writing "peaceful protest" in charcoal.  No one was

08:          live streaming when Mr. Tucson was writing.  He -- they

09:          started live streaming as soon as the officers ran out

10:          to take him into custody.  So does live streaming

11:          really justify the decision to book or to arrest Mr.

12:          Tucson?

13:     A. No --

14:               MS. COWART:  Objection.  Scope.

15:     A. No.  It's still the totality of the circumstances.  We

16:          look at everything surrounding that charcoal writing.

17:          It's the totality of circumstances.

18:     Q. (By Mr. Pence)  So did the totality of circumstances

19:          include like with respect to this concern about

20:          hindering the operations, that there are two different

21:          vehicle ports that could be accessed through that

22:          parking lot area, that there's another on the other the

23:          side of the building, and that officers would have had

24:          no problem entering or exiting the building from there?

25:               MS. COWART:  Objection.  Scope.  Assumes facts

D's Obj: 403 (confusion/ mischaracterizes testimony); 602, Outside Scope of 30(b)(6)

0108

01:     not in evidence.  You can answer.

02:     A. In the past and that night, there is a concern that

03:        people gathering in a crowd and disrupting the area

04:        could hinder the operation of the east precinct by not

05:        allowing officers to get in and out of the building, or

06:        the Seattle Fire Department, when they have to come and

07:        treat people, arrestees in the holding cells.  It

08:        creates a danger for them as well because they can't

09:        get medical aid.

10:     Q. So is it the concern that it could hinder and that's

11:        what justifies the -- that's a factor in favor of

12:        arrest and booking?

13:                MS. COWART:  Objection.  Scope.  You can

14:        answer.

15:     A. Yes, that is one piece of it.

16:     Q. (By Mr. Pence)  With respect to the live stream, would

17:        -- so live streaming, does the Seattle Police

18:        Department recognize that live streaming of police

19:        activity is a First Amendment protected activity?

20:     A. Absolutely.

21:                MS. COWART:  Objection.  Scope.

22:     Q. (By Mr. Pence)  But you're saying that that's a factor

23:        that also justifies arresting and booking people if the

24:        event is being live streamed.  Can you help me

25:        understand that?

0109

01:  A. Not specifically doing live stream, but the threat that

02:     a crowd may grow and become more volatile and have

03:     escalation, people joining in.  Many factors, not just

04:     that they're live streaming, no.

05:  Q. When officers did attempt to use the sally port off of

06:     Pine into the precinct, the crowd got out of the way.

07:     So how does that factor -- how did that factor affect

08:     SPD decision making on one -- January 1st, 2021?

09:           MS. COWART:  Objection.  Scope.  Personal

10:     knowledge.  Calls for speculation.

11:  A. If an officer is driving through a crowd, that creates

12:     a danger to that officer.  We don't like to pull our

13:     patrol cars through crowds because in the past they

14:     have damaged them, they've jumped on them, they've

15:     broken out the windows.  It's a danger for that officer

16:     to have to drive through a crowd.

17:  Q. And none of those things occurred on this occasion; is

18:     that right?

19:  A. I do not know.

20:  Q. Was there a concern about the fact that my clients were

21:     -- would -- if they were just released would go back

22:     and continue chalking or writing in charcoal on the

23:     wall; is that part of the reason why they were booked?

24:           MS. COWART:  Objection.  Scope.  Personal

25:     knowledge.  You can answer.

0110

01:        A. I am not sure what they screened with the jail.

02:        Q. (By Mr. Pence)  So you haven't reviewed any deposition

03:           transcripts in this case in which officers had said

04:           that part of reason why they booked was because they

05:           were concerned that there needed to be consequences for

06:           writing in chalk and charcoal?

D's Obj: 403 (mischaracterizes underlying testimony and offers incomplete designation of witness' testimony), Outside Scope of 30(b)(6)

07:               MS. COWART:  Objection.  Scope.  You can

08:           answer.

09:        A. I would have to review that particular deposition.

10:        Q. (By Mr. Pence)  Is it the City of Seattle's position

11:           there should be consequences for someone writing in

12:           charcoal or chalk on public property?

13:               MS. COWART:  Objection.  Scope.  You can

14:           answer.

15:        A. Taking in all of the other factors, it's not something

16:           that we would want to continue because it can escalate.

17:        Q. (By Mr. Pence)  What do you mean by that?

18:        A. When crimes happen and they start out at a lower level,

Pls Obj.: FRE 602, 701-703.

19:           crowd mentality is different than the normal -- the

20:           normal day-to-day workings of, say, arresting a

21:           shoplifter.  When people get together in a crowd, they

22:           feel anonymous and things can escalate to where they're

23:           throwing fireworks or bottles or escalating to

24:           significant property damage or assaults.  It can

25:           escalate quickly.

0111

01:     Q. (By Mr. Pence)  Does that logic apply to civil

02:         disobedience in which protesters are intentionally

03:         making violations of the law that are intended to

04:         deliver a political message that this escalatory

05:         concern you have applies even in that circumstance?

06:             MS. COWART:  Objection.  Scope.  Compound.

07:         Confusing.  You can answer.

08:     A. Yeah, that's a little confusing.  We allow -- our goal

09:         and objective is to allow freedom of speech.  And we

10:         target -- we make targeted arrests within those crowds

11:         on subjects that are not protesting peacefully; they

12:         may be hurting the other protesters.  We try to remove

13:         those from the people that are protesting peacefully so

14:         we can facilitate free speech.

15:     Q. How can you distinguish between someone who is -- like

16:         I guess this is maybe a better question:  So does the

17:         Seattle Police Department recognize any sort of

18:         conflict of interest between the Seattle Police

19:         Department itself and protesters who are protesting

20:         against the police department in terms of making this

21:         judgment about whether someone is escalating or whether

22:         someone is a threat?

23:             MS. COWART:  Objection.  Confusing and outside

24:         the scope.  You can answer.

25:     A. Yeah, I don't understand that question.

Aagard, Lori 30(b)(6)  - Volume 1 - 01/29/2024

0112

01:      Q. (By Mr. Pence)  Does the City see any problem with SPD

02:          having discretion over whether to teach -- to impose

03:          consequences on protesters who are protesting SPD?

04:      A. We would treat it the same.

05:      Q. As I understand it, Seattle Police Department claims to

06:          have a policy of not arresting or booking for people

07:          writing in chalk on the sidewalk.

08:              So my question is:  Does -- do the factors that you

09:          talk about with respect to escalation or threat to the

10:          community apply to people writing in sidewalk chalk on

11:          the sidewalk?

12:              MS. COWART:  Objection.  Scope.  Confusing.

13:          You can answer.

14:      A. It would depend on the circumstance.  If they're a

15:          daycare and they're out in front of their daycare and

16:          they're, you know, five to ten years old and they're

17:          writing on the sidewalk with chalk, that's totally

18:          fine.  If they're within a group and they're writing on

19:          the sidewalk, we would watch them more carefully.

**D's Obj:** 403 (question confusing; testimony unclear), Outside Scope of 30(b)(6)

**Pl's Resp: Testimony goes to City's purported reason for arrest, relevant and not confusing under 401-403**

20:      Q. (By Mr. Pence)  What do you mean by that?  You watch --

21:          what do you mean by that, watch them more carefully?

22:              MS. COWART:  Objection.  Scope.  You can

23:          answer.

24:      A. When there's large crowd events, we monitor them to

25:          ensure the safety of the community.

**Pl's Obj: Relevance, 401-403.**

0113

```
01:        Q. (By Mr. Pence)  So I guess that gets me back to my
02:           question about Derek Tucson's arrest.  What about Derek
03:           Tucson writing "peaceful protest" on the temporary wall
04:           built across the sidewalk in front of the east precinct
05:           invoked a concern about public safety?
06:                   MS. COWART:  Objection.  Assumes facts not in
07:           evidence.  Scope.  Personal knowledge.  You can answer.
08:        A. Again, it's a totality of the circumstance, it's the
09:           hindering of the operations of the east precinct, it's
10:           the fear from prior acts that officers would be in
11:           danger, that it would escalate.
12:        Q. (By Mr. Pence)  So if there were a large group of
13:           preschoolers outside of the east precinct writing in
14:           chalk on the sidewalk, would you pay attention to them?
15:                   MS. COWART:  Objection.  Scope.  You can
16:           answer.
17:        A. No, I would probably call CPS because I don't think
18:           kids should be allowed alone out in front of the
19:           precinct writing in chalk on the sidewalk.
20:        Q. (By Mr. Pence)  Would you have concern about an
21:           escalation of violence or of property destruction or
22:           large crowd factors?
23:        A. For little kids?
24:        Q. Yeah.
25:        A. No.
```

0114

01:     Q. You -- so what is it about my clients that made them

02:        different than a group of little kids?

03:              MS. COWART:  Objection.  Calls for

04:        speculation.  Lack of personal knowledge.  Outside the

05:        scope.  You can answer.

06:     A. I don't know the totality of the circumstances of the

07:        case you're referring to.  I only read the -- the

08:        report.  I don't know what the totality of the

09:        circumstances were, but I know that it was hindering

10:        the operation of the east precinct.

11:     Q. How do you know that?

12:              MS. COWART:  Objection.  Scope.  You can

13:        answer.

14:     A. The clerk is the one, I believe, that called, so he was

15:        concerned.  He was concerned for his safety.  He's out

16:        in the front of the building with the doors.  He was

17:        concerned enough to call it in.  So he feared for his

18:        safety.

19:              Past practices of groups out in front of the

20:        precinct over that past year escalated tremendously

21:        into almost burning the precinct down, hinders the

22:        egress and the getting in and out of the precinct.  So

23:        taking in the totality of the circumstances, I don't

24:        know what the subjects were saying.  I don't know if

25:        they were yelling.  I don't know if they were harassing

0115

01:         the officers that were trying to come in and out.

02:             I don't know the -- all of the facts in that case.

03:         But the officers were in fear for their safety or they

04:         wouldn't have called it in.

05:    Q. I'm going to show you Exhibit 55.  This is a video.

06:        PL000581 Bates.

07:                 (Exhibit 55 marked for identification.)

08:                 (Video playing.)

09:    Q. It's a 19-second video.  Do you see that?

10:    A. Yeah.

11:    Q. Could you hear it?

12:    A. I didn't hear what she said.

13:    Q. Did you hear anything?  Did you hear anything?

14:    A. I heard her say something.

15:    Q. I'll turn it up and see if you can hear it this time.

16:                         (Video playing.)

17:    Q. Did you hear it that time?

18:    A. Something with chalk.

19:    Q. Yeah.  I hear her saying "just borrowed your chalk."

20:    A. I don't know whose chalk that is.

21:                         (Video playing.)

22:    A. "I just borrowed your chalk."  Yeah, I heard that.

23:    Q. And she appears to have written I heart police in front

24:        of the west precinct.  I'll represent to you that the

25:        chalk belongs to Daniel Clark, a person who was

Aagard, Lori 30(b)(6) - Volume 1 - 01/29/2024

0116

01:     arrested by SPD for writing in caulk at the east

02:     precinct in December.  This occurred in I think July

03:     2020, something like that.

04:         So I'm wondering, what it is about -- if there's

05:     anything about writing in chalk itself that the City

06:     would indicate puts officers in danger or makes them

07:     afraid for their lives?

08:             MS. COWART:  Objection.  Scope.  You can

09:     answer.

10:     A. It's not just the writing in chalk.  It's the actions

11:     and the verbals and the location that goes along with

12:     that writing in chalk.  The west precinct was never

13:     under siege or in lockdown like the east precinct was.

14:     Q. (By Mr. Pence)  So does that mean that video -- so this

15:     is -- I don't think this one has been used before -- I

16:     think I'm going to call this one 56.

17:             (Exhibit 56 marked for identification.)

18:     Q. And this is Bates PL000165.

19:         This is a video in March of 2021 at the west

20:     precinct with Lieutenant Brooks threatening enforcement

21:     action against people writing in chalk on the plaza

22:     here.  Any concerns -- I mean, and he's threatening to

23:     arrest them for it in the same spot that the other

24:     officer wrote I love cops.  Just wondering if you

25:     could -- I'll play it for you and you can listen to the

```
0117
```

01:          whole thing if you want.

02:               But my question is going to be about what sort of

03:          threats or concerns about escalation that chalk raises

04:          for the City.  Would you like me to play it?

05:     A. Yeah.

06:                         (Video playing.)

07:     Q. So I don't hear Lieutenant Brooks saying anything about

08:          we're concerned that you're going to escalate or that

09:          more people are going to show up or you're going to

10:          somehow become assaultive.  What would be the reason

11:          for SPD to be threatening enforcement action against

12:          peaceful protesters writing peaceful comments about

13:          SPD's past behavior in that location?

14:               MS. COWART:  Objection.  Outside the scope.

15:          Calls for speculation.  Lack of personal knowledge.

16:          You can answer.

17:     A. I mean, I would have to see the whole -- or know of

18:          what happened earlier, what happened the night before,

19:          what was happening that day; where this crowd came

20:          from, what the crowd did prior to using chalk, what

21:          they were saying.

22:               They're not going to express their fear of

23:          escalation to -- to the subjects.  That's not something

24:          that we do because that would escalate it more.  They

25:          were obviously concerned that something more may

0118

01:     happen.  They did warn them.  They didn't arrest them

02:     right there for it.  They warned them, so I don't know

03:     what had happened prior.

04:  Q. Does SPD have any concern about officers escalating?

05:          MS. COWART:  Objection.  Outside the scope.

06:     Vague.  You can answer.

07:  A. Our whole department is about deescalation.  That's

08:     what the whole Force Review Board is about,

09:     deescalation.  And we are trained hours and hours and

10:     hours on how to deescalate.  So we get a lot of

11:     training on that, so no, we wouldn't want officers to

12:     escalate situations.

13:  Q. (By Mr. Pence)  Is it the City's position that the

14:     arrest of the Derek Tucson on January 1st was a

15:     deescalation?

16:          MS. COWART:  Objection.  Outside the scope.

17:     You can answer.

18:  A. No.  Arrests are not classified as deescalation in

19:     themselves.

20:  Q. (By Mr. Pence)  So when making the decision to arrest

21:     and book on January 1st, 2021, what efforts of

22:     deescalation did the City undertake?

23:          MS. COWART:  Object to lack of personal

24:     knowledge.  Calls for speculation.  Outside the scope.

25:  A. I think to -- when you have a disturbance or a crowd

0119

01:     and you release them from the precinct right back out

02:     into that demonstration or that crowd, that in itself

03:     can escalate the crowd.

04:        So I wouldn't say arresting is deescalation, but

05:     releasing them right back out into the same situation

06:     that they were just taken from could escalate the crowd

07:     and promote the same behavior again that they were

08:     arrested for.

09:        So by booking them, it takes them out of that area

10:     and -- in that way, it deescalates it.

11:            MS. COWART:  Braden, what is your timing

12:     looking like?

13:            MR. PENCE:  I'm good.  I -- that was a great

14:     answer to end on.  I don't have any questions.

15:        Kerala, do you have any follow-up?

16:            MS. COWART:  No, I don't have any follow-up.

17:            MR. PENCE:  Okay.  Let's go off the --

18:     whatever you have to do to wrap this up on the record,

19:     and then let's go off.

20:            THE VIDEOGRAPHER:  I'm sorry, take us off the

21:     record?

22:            MR. PENCE:  Yes.

23:            THE VIDEOGRAPHER:  Okay.  This concludes the

24:     video-recorded deposition of Captain Aagard.  Off the

25:     record at 4:07 p.m.

```
    0120
01:     MR. PENCE:  I'm going to order.

02:     THE REPORTER:  Would you like a copy?

03:     MS. COWART:  Yes, we would.

04:     (Signature reserved.)

05:     (Deposition adjourned at 4:08 p.m.)

06:

07:

08:

09:

10:

11:

12:

13:

14:

15:

16:

17:

18:

19:

20:

21:

22:

23:

24:

25:
```

0121

01:                      C E R T I F I C A T E

02:        STATE OF WASHINGTON )
                              )
03:        COUNTY OF SNOHOMISH )

04:

05:             I, the undersigned Washington Certified Court
           Reporter, pursuant to RCW 5.28.010 authorized to administer
06:        oaths and affirmations in and for the State of Washington
           do hereby certify:

07:

                That the foregoing 30 (b)(6) DEPOSITION OF CITY OF
08:        SEATTLE DESIGNEE LORI AAGARD was taken before me and
           completed on January 29, 2024, and thereafter was
09:        transcribed under my direction; that the deposition is a
           full, true and complete transcript of the testimony of said
10:        witness, including all questions, answers, objections,
           motions and exceptions;

11:

                That the witness, before examination, was by me
12:        duly sworn to testify the truth, the whole truth, and
           nothing but the truth, and that the witness reserved the
13:        right of signature;

14:             That I am not a relative, employee, attorney or
           counsel of any party to this action or relative or employee
15:        of any such attorney or counsel and that I am not
           financially interested in the said action or the outcome
16:        thereof;

17:             That I am herewith securely sealing the said
           deposition and promptly delivering the same to Attorney
18:        BRADEN PENCE.

19:             IN WITNESS WHEREOF, I have hereunto set my hand
           this 5th day of February 2024.

20:

21:

22:

23:                        Kim Scheuerman, CCR
                           WA CCR. No. 2517
24:                        Washington State Certified Court Reporter
                           Residing at Edmonds, Washington.

25:

```
     0122
```

01:                      E R R A T A   S H E E T

02:        CASE:  TUCSON vs CITY OF SEATTLE

           CASE NO.:  2:23-cv-00017-MJP

03:        NAME OF WITNESS:  LORI AAGARD

           DATE TAKEN:  01/29/2024

04:

05:        Please make all changes or corrections on this sheet.

           If there are none, please write "NONE" across this sheet.

06:        Please sign and date this sheet and the declaration.

           Please do not mark the transcript.  Thank you.

07:

08:        PAGE #    LINE #   CHANGE/CORRECTION & REASON

09:        _____   _____   _____

10:        _____   _____   _____

11:        _____   _____   _____

12:        _____   _____   _____

13:        _____   _____   _____

14:        _____   _____   _____

15:        _____   _____   _____

16:        _____   _____   _____

17:        _____   _____   _____

18:        _____   _____   _____

19:        _____   _____   _____

20:        _____   _____   _____

21:        _____   _____   _____

22:            EXECUTED this _____ day of _____,

23:        20_____, at _____ (City), _____ (State).

24:                          _____

25:                               LORI AAGARD

0123

01:     CASE:  TUCSON vs CITY OF SEATTLE

        CASE NO.:  2:23-cv-00017-MJP

02:     NAME OF WITNESS:  LORI AAGARD

        DATE TAKEN:  01/29/2024

03:

04:          I, LORI AAGARD, do hereby declare under

05:       penalty of perjury that I have read the foregoing

06:       transcript of my deposition; that I have made such

07:       changes/corrections as noted herein, in ink, initialled

08:       by me or attached hereto; that my testimony contained

09:       herein, as corrected, is true and correct.

10:          EXECUTED this _____ day of _____,

11:       20_____, at _____ (City), _____ (State).

12:                    _____

13:                    LORI AAGARD

14:

15:

16:

17:

18:

19:

20:

21:

22:

23:

24:

25: